# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COLE, RAYWID & BRAVERMAN, LLP ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 07-CV-2242-JR |
| v. ) | |
| ) | |
| ROBERT J. GEORGE, *et al.*, ) | |
| ) | |
| Defendants ) | |
| ) | |

## PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS, AND CROSS-MOTION FOR JURISDICTIONAL DISCOVERY IN THE ALTERNATIVE

Plaintiff Cole, Raywid & Braverman, LLP ("CRB") finds itself in the unfortunate position of having to seek this Court's aid in recovering a confessed debt owed by a former client, Custom Communications International, Inc. ("CCI"), and by Robert George, CCI's only principal, sole shareholder and personal guarantor of the debt.

For more than four years, Mr. George, through repeated empty promises, obfuscations, misrepresentations and evasions, has avoided paying this uncontested debt to CRB for legal services rendered to CCI in 2002 and 2003, and he now seeks to evade the debt yet again through misleading assertions that this Court lacks jurisdiction over his long-running communications business. Relying on corporate dissolutions, formations, restructurings and successions that were not revealed to Plaintiff when they occurred, and through which Mr. George has continued to carry on the same business that he ran through CCI when it originally incurred (and Mr. George guaranteed) the original debt, Defendants seek to evade not only their debt to CRB but the Court's jurisdiction over them.

As we explain below, Defendants are firmly within the Court's jurisdictional reach. Alternatively, at the very least, CRB is entitled to discovery so that it may have an opportunity to untangle Mr. George's web of corporate façades, demonstrate the relationship of the Defendants to one another and to the debt at issue, and thereby show that the Court has jurisdiction over the parties to this case.

## I.    INTRODUCTORY STATEMENT

Insofar as CRB is aware, Mr. George's evasions began when, starting in 2003, in an effort to lull CRB into refraining from enforcing either the debt or a promissory note validly executed by CCI and personally guaranteed by Mr. George for that debt, he made repeated promises to pay.  Meanwhile, without informing CRB, Mr. George quietly filed for dissolution of CCI in November 2003, but continued thereafter for *four years* to make the same assurances of payment under the pretense that CCI had not been dissolved.  Given his secrecy in filing for dissolution, it is not surprising that he failed to reveal to CRB – and likewise has failed to disclose to the Court in his self-serving affidavit in these proceedings – that *less than one week* after filing for dissolution of CCI, he reincorporated his communications business under the name Strategic Communications, Inc.  Two years later, while still making assurances of payment and while still failing to disclose any of his corporate maneuverings to CRB, he again reincorporated his communications enterprise:  in May 2005, he dissolved Strategic Communications, Inc., only to reincorporate it as StratComm, Inc. ("StratComm") two months later.[1]  As of 2007, he has now formally reclaimed the name Strategic Communications (because, he alleges, "the name became available") and has reincorporated his old Boston Publishing

---

[1] He now states he "preferred" the "Strategic Communications" name, which he alleges, for reasons he opts not to identify, was "unavailable" when he incorporated StratComm.  In any

enterprise by forming Strategic Communications, Inc. ("Strategic Communications '07") and Boston Publishing Company, Inc. ("Boston Publishing").  He operates these entities as a single enterprise, with a single commingled set of books, apparently held by StratComm.[2]

Mr. George waited until March 2007, conveniently four months after the expiration of the statutory winding-down period for CCI (and apparently thinking his chicanery had successfully insulated his business from its debt to CRB), to finally reveal to CRB that he had dissolved CCI in 2003.  Only then, and, moreover, only after conducting its own investigation of Mr. George's businesses, did CRB discover (or have reason to believe) that he had fraudulently resurrected CCI under the guises of his interim and current "StratComm" businesses.  It appears that these evasive acts were all substantially undertaken to shield his singular communications enterprise from its and his creditors, including CRB.

Because the Amended Complaint and the evidence proffered to the Court demonstrate that the currently-operating defendant entities are no more than revived versions of CCI, the StratComm Entities' motion to dismiss should be denied.  CCI's motion likewise should be denied pursuant to Fed. R. Civ. P. 12(b)(6).  At the very least – and CRB hereby moves in the alternative for this relief – jurisdictional discovery should be granted to allow CRB the opportunity to unravel Mr. George's entangled corporate enterprises in order to demonstrate the Court's jurisdiction over the Defendants from whom relief is sought in this lawsuit.

---

event, if that truly were the only reason for his action, he could have simply changed the corporate name rather than reincorporate.

[2] For purposes of this opposition and cross-motion, and unless otherwise noted, the currently operating entities shall be referred to, collectively, as the "StratComm Entities."

## II.  <u>STANDARD OF REVIEW</u>

When a court reviews a motion to dismiss for failure to state a claim upon which relief can be granted, "the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Leatherman v. Tarrant County Narcotics & Intelligence Coordination Unit*, 507 U.S. 163, 164 (1993); *Phillips v. Bureau of Prisons*, 591 F.2d 966, 968 (D.C. Cir. 1979).  Therefore, the factual allegations must be presumed true, and the plaintiff must be given every favorable inference that may be drawn from the allegations of fact.  *Scheuer*, 416 U.S. at 236; *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000).  Moreover, all that the Federal Rules of Civil Procedure require of a complaint is that it contain "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. __, 127 S. Ct. 1955, 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)); *accord Erickson v. Pardus*, 551 U.S. __, 127 S. Ct. 2197, 2200 (2007) (per curiam). "A Rule 12(b)(6) motion tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  Thus, the complaint's allegations need only "be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 127 S. Ct. at 1965 (citations omitted).

Motions to dismiss for lack of personal jurisdiction filed pursuant to Fed. R. Civ. P. 12(b)(2), such as the motion that the StratComm Entities have filed, are assessed differently. Plaintiffs, of course, have the initial burden of establishing that the court has personal jurisdiction over the Defendants. *Jacobsen v. Oliver*, 201 F.Supp.2d 93, 104 (D.D.C. 2002).  But this burden is "only a minimal one" and "all factual disputes concerning jurisdiction must be

resolved in favor of plaintiffs." *Id.* at 104 (quotations omitted). Thus, absent jurisdictional discovery, "plaintiffs need only make a prima facie showing of personal jurisdiction in order to defeat defendants' motion." *Id.*; *Second Amendment Found. v. U.S. Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001); *Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 90 F.Supp.2d 15, 20 (D.D.C. 2000); *Material Supply Int'l, Inc. v. Sunmatch Indus. Co.,* 62 F.Supp.2d 13, 19 (D.D.C. 1999). In assessing such motions, the court "may receive and weigh affidavits and any other relevant matter to assist it in determining the jurisdictional facts." *United States v. Philip Morris, Inc.*, 116 F.Supp.2d 116, 120 n.4 (D.D.C. 2000). However, in weighing this evidence, the court nonetheless must continue to resolve all factual discrepancies in the nonmovant's favor, *Crane v. New York Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990), and the motion should be granted "only if 'it appears beyond doubt that the [nonmovant] can prove no set of facts in support of his claim which would entitle him to relief.'" *Material Supply*, 62 F.Supp.2d at 19 (quoting *In re Swine Flu Immunization Products Liability Litigation*, 880 F.2d 1439, 1442 (D.C. Cir. 1989); *Novak-Canzeri v. Al Saud*, 864 F. Supp. 203, 206 (D.D.C. 1994) ("[T]he Court must accept Plaintiff's claims as true in ruling on a Rule 12(b)(2) motion, unless they are directly contradicted by an affidavit.").

### III. STATEMENT OF FACTS

As alleged in the Amended Complaint, and as shown by the evidence submitted to the Court, the facts are as follows:

### A. CCI AND ROBERT GEORGE OWE AN UNCONTESTED DEBT TO CRB

In 2001, CCI, a "full-service communications provider" providing newsletter, book, magazine, Internet, and other publishing services to companies in "financial services, healthcare, utility, high-tech and other industries," Bowen Aff. Ex. 22, entered a contract with The National

Society of the Daughters of the American Revolution ("NSDAR"), under which CCI was responsible for, *inter alia*, the layout, design, artwork, graphics, writing, editing, printing, quality control and production of *American Spirit*, a NSDAR newsletter and magazine for its membership. Am. Compl. ¶ 16. In early July 2002, after publication of six bimonthly issues of *American Spirit*, NSDAR terminated the CCI contract and filed a complaint against CCI in this Court. *Id*. ¶ 17. CCI retained CRB to represent it in the lawsuit and executed a fee agreement. *Id*. ¶ 18 & Ex. A. The agreement set the rates for CRB's fees and included a provision by which CCI consented, should it fail to pay its bills on time, to commencement of an action in the District of Columbia to collect those fees, and to pay for any fees and costs incurred in bringing such an action.[3] CRB performed legal services for CCI, including defending the NSDAR suit, bringing a counterclaim in that action, and ultimately helping CCI settle the dispute with and receive a cash payment from NSDAR. Am. Compl. ¶ 24.

By year-end 2002, CCI had incurred $193,000 in fees owed to CRB, of which CCI paid $127,000 out of the proceeds of the NSDAR settlement. As to the remaining $66,000, Mr. George executed a promissory note both on behalf of CCI as its President and CEO, and in his personal capacity as guarantor on the promissory note.[4] Payment was due under the Note within

---

[3] *Id*. Ex. A. The agreement provided, *inter alia*, that payment of bills rendered by CRB on a monthly basis for the fees and expenses CCI incurred "shall be due within thirty (30) days of receipt," and that "a service charge of 1 percent per month may be added to all balances outstanding for more than 45 days from the date of billing." *Id*. ¶ IV. CCI agreed that if it did "not promptly pay any amounts due under [the Fee] Agreement, and should it become necessary for CRB to … commence an action in court to collect such sums, … such suit may be brought in any of the courts of the District of Columbia," and CCI would "pay all costs and attorneys fees incurred incident to such collection efforts." *Id.* ¶ V.

[4] Am. Compl. ¶ 25 & Ex. B (the "Promissory Note" or "Note") at 1. Under the Note, CCI "promise[d] to pay CRB the balance of all billed and unbilled legal fees and expenses owing to CRB by CCI (approximately $66,000) in two equal payments, the first of which shall be made within thirty (30) days from the date of th[e] Promissory Note, and the second of which (which shall also include any trailing out-of-pocket expenses and additional legal fees incurred in

sixty days of execution.  *Id.* Ex. B ¶ 3.  In addition to Mr. George's personal guarantee, the Note recites that "CCI and Mr. George agree that in the event either of them should fail to perform the obligations" of the Promissory Note, that "they waive any requirement of presentment and notice, agree to a confession of judgment in the amount of any unpaid legal fees and expenses then owing to CRB together with interest on such amounts," and that CRB may bring suit in the District of Columbia … to enforce th[e] Promissory Notice," in which case "CCI and Mr. George, jointly and severally, shall reimburse CRB for any legal fees and expenses incurred in collecting."  *Id.* Ex. B ¶¶ 4–5.

CRB requested that Mr. George sign the promissory note for several reasons.  Although CRB properly could have insisted that it be paid in full from the proceeds from the DAR settlement before making any disbursements,[5] in an effort to cooperate with Mr. George, who wished to use the funds to pay off other debts first, CRB acceded to his request to accept only partial payment.  Am. Compl. ¶ 62; Braverman Aff. ¶ 3.  However, having learned during the course of representing CCI that its financial position was compromised, observing that Mr. George was requesting that funds to which CRB was entitled be diverted to pay off other debts he apparently could not otherwise pay, and because CCI had made no payments to CRB to that point, CRB agreed to accept partial payment and perform further legal services for CCI necessary to satisfy its obligations under the settlement agreement only on the condition of receiving assurance regarding payment for both past and future services.  Braverman Aff. ¶ 3; George Aff. ¶ 8.  Accordingly, CRB requested the personal guarantee, which Mr. George pro-

---

connection with the completion of settlement and dismissal of the [NSDAR] case) within sixty (60) days of th[e] Promissory Note."  *Id.* Ex. B ¶ 3.

    [5] *See* D.C. R. of Prof. Conduct 1.15 & cmt. 4 (stating that attorneys may pay their undisputed fees from settlement funds prior to disbursing them to their clients).  Here, at least at the time in question, CRB's fees were wholly undisputed.  Braverman Aff. ¶ 3.

vided without objection – indeed, he thanked CRB for agreeing to defer payment of its bills, for its good work on his case, and for its willingness to stick with him in his battle with NSDAR. Braverman Aff. ¶ 3; *cf.* George Aff. ¶¶ 13–14; *see also In re Rolfe*, 25 B.R. 89, 93 (D. Mass. 1982).

Pursuant to the original and new agreements, CRB provided additional services in connection with CCI's performance of its obligations under the settlement agreement, and also represented CCI in subsequent injunction proceedings arising out of CCI's alleged breach of the settlement agreement, which representation generated further fees and expenses in the amount of $26,293.81. Am. Compl. ¶ 8. CRB would not have done so but for the personal guarantee that Mr. George willingly and freely signed. Braverman Aff. ¶ 3; Am. Compl. ¶ 62. However, notwithstanding execution of the Promissory Note and the additional legal services rendered to CCI thereafter, neither CCI nor Mr. George made either of the payments called for by the Promissory Note or paid for the additional services rendered. Am. Compl. ¶ 29.

Since 2003, CCI and Mr. George have failed to satisfy this outstanding debt to the firm despite CRB's efforts to collect. *Id.* ¶ 31. CRB has asked for payment repeatedly, and has made multiple attempts to provide means for CCI/George to make payment (including payment in installments), and while Mr. George repeatedly has made assurances that the outstanding balance would be paid, CRB's efforts to collect have been fruitless. *Id.* ¶ 32; Braverman Aff. ¶ 5, 12 (relating multiple assurances from Mr. George of his intent to honor his and his business's debts). Between the unpaid balance outstanding at the time of the Promissory Note, and the fees and expenses for services rendered by CRB thereafter, by early 2003, CCI and Mr. George owed CRB $75,282.70 exclusive of interest. Including interest, CCI and Mr. George currently are

indebted to CRB in an amount of more than $87,400, plus the attorneys' fees that are accruing as CRB pursues this action.  Am. Compl. ¶ 30.

## B.    ROBERT GEORGE'S CONTINUANCE OF HIS CCI COMMUNICATIONS BUSINESS UNDER NEW GUISES

While the foregoing events played out, and without informing CRB, Mr. George quietly filed for dissolution of CCI in November 2003.[6]  Less than one week later, he incorporated a new communications entity, Strategic Communications.  In his affidavit filed with the Court, Mr. George fails to reveal the existence of this corporation, instead alleging that after filing for CCI's dissolution, he worked as a "consultant" for an unspecified period of time and sold the "assets" of CCI (which he alleges consisted solely of a laptop and two printers) to a third party, for whom he worked.  George Aff. ¶¶ 21–22.  Indeed, although Mr. George and his new entities place great emphasis on the purported "gap" between the filing of dissolution papers for CCI in November 2003 and the reemergence of his business under the "StratComm" label in July 2005, Defs.' Br. at 4, 13; George Aff. ¶¶ 20–22, the familiarly-named Strategic Communications (hereinafter "Strategic Communications '03") fills that gap *completely*, having operated from November 2003 to May 2005.[7]

*Strategic Communications 2003–2005*.    Through Strategic Communications '03, George continued to operate his publishing business and to serve existing CCI clients.  For ex-

---

[6] The same date, he filed for dissolution of an affiliated entity, CCI Communications, Inc. Bowen Aff. Ex. 2.  George also is listed in public records as the manager of a Connecticut limited liability company, Custom Communications International, LLC, which registered in Massachusetts as a foreign entity in 2000.  Bowen Aff. Ex. 6.

[7] Bowen Aff. ¶¶ 5–7 & Exs. 3–5.  For the Court's convenience, CRB has prepared a demonstrative chronological chart of Massachusetts entities incorporated and owned by George which counsel have been able to identify through public records searches.  The chart, which depicts the entities based upon their dates of incorporation and, if applicable, dissolution, is attached as Exhibit 1 to the Bowen affidavit filed herewith, and is referred to as the "George Entity Chart."  *See also* Bowen Aff. Exs. 19-21.

ample, the company claimed in 2005 (via StratComm, its newly formed successor), that Strategic Communications "pioneer[ed]" hybrid print/electronic publications and had published eNewsletters and white papers for Fidelity Charitable Services prior to that time.[8]    CCI clients served by Strategic Communications '03 included Fidelity and the Massachusetts Association of REALTORS ("MAR"), for whom CCI launched Bay State REALTOR magazine in 2003 – a publication which Mr. George's entities have published consistently from 2003 to the present.[9] George/Strategic Communications '03 also continued to publish OPEN magazine (a webzine dealing with open-source issues), which was previously published by CCI and since CCI's dissolution has been published on a continuing basis by Strategic Communications.[10]    These

---

[8] Hickman Aff. Ex. A at CRB 0011–0014; *see also* Braverman Aff. Ex. A (discussing CCI services to Fidelity).  Historical web pages referenced in this filing have been accessed via the Internet "Wayback Machine," a web archive operated by a nonprofit entity called the Internet Archive.  *See* Bowen Aff. ¶ 9 & Ex. 7 at CRB 0030–0044 ("Internet Archive is a 501(c)(3) nonprofit … was founded to build an Internet library, with the purpose of offering permanent access for researchers, historians, and scholars to historical collections that exist in digital format").

*See also* Hickman Aff. ¶¶ 1–6.  The affidavit from Paul Hickman of the Internet Archive filed herewith describes the archiving process and attests to the authenticity of the web pages submitted to this Court.  *Id.*  Courts have recognized the validity and accuracy of, and relied upon, copies of web pages archived on the "Wayback Machine" and presented in this affidavit-supported manner.  *See*, *e.g.*, *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534,  553 (D. Md. 2007); *Telewizja Polska Usa, Inc. v. Echostar Satellite Corp.*, No. 02-cv-3293, 2004 WL 2367740, at *6 (N.D. Ill. Oct. 15, 2004) (same); *St. Luke's Cataract & Laser Inst., P.A. v. Sanderson*, No. 8:06-CV-223, 2006 WL 1320242, at *2–3 (M.D. Fla. May 12, 2006) (same).

[9] *See* Bowen Aff. Ex. 8 (MAR website chronicling magazine's issues since 2003 re-launch); Bowen Aff. Ex. 11 at CRB 0071 (StratComm website claiming that "Strategic Communications" launched and has published the magazine); Hickman Aff. Ex. A at CRB 0021–0022 (same claims in 2005); Braverman Aff. Ex. A (George 2003 communication relating the success of the magazine's launch).  Strategic Communications '03 appears to have operated a website, but placed a "robot" on its site blocking web crawlers from imaging and indexing its contents. Bowen Aff. Ex. 7 at CRB 0041–0044, 0048 (explaining effect of robots on Internet archiving).

[10] *See* Hickman Aff. Ex. A at CRB 0007 (2003 website for OPEN magazine listing CCI and George as publishers of the magazine and George as CEO of CCI/Open); *id.* at CRB 0008 (2003 OPEN magazine website touting the services and skills of CCI); *id.* at CRB 0027–0029 (2005 OPEN magazine website informing customers that Strategic Communications, "the publishers of *OPEN* magazine," entered into and terminated a partnership with a third party in May and July

open-source related ventures have been managed by Mr. George and Jack Fegreus, a longtime CCI/Strategic Communications '03/StratComm employee and current officer of the StratComm Entities.[11]

**Boston Publishing.** Similarly, Mr. George has continued to operate Boston Publishing, holding it out as an active entity and soliciting clients on an ongoing basis well after he purportedly sold the company to a third party in the late 1990s. Internet Archive records show, for example, that his Boston Publishing website has been active and regularly updated for years (in substantially the same form as it currently exists).[12] For example, Mr. George changed the entity and contact information for its "custom publishing division" from CCI to StratComm between April and August 2004, when Mr. George now asserts to the Court that he was not

---

2005, respectively); Bowen Aff. Ex. 7 at CRB 0046–0047 (archive memorializing active use and modification of OPEN magazine's website over time); *see also* Hickman Aff. Ex. A at CRB 0023–0026 (OPEN magazine home pages from 2004 and 2005 depicting alternating StratComm and CCI links/icons).

[11] *See* Hickman Aff. Ex. A at CRB 0007, 0008, 0027-0029, *supra*; *see also* Bowen Aff. Ex. 13 (article published by Jack Fegreus in April 2005 as "technology director" of Strategic Communications and linking to StratComm's website, despite the lack of formal corporate existence of either entity); *id.* Ex. 16 (same, published via Strategic Communications prior to either its or StratComm's formal incorporation); *id.* Ex. 11 at CRB 0055–0070 (similar article published in 2004 by Fegreus/Strategic Communications); *id.* Ex. 12 (2006 article published by Jack Fegreus, CTO of Strategic Communications and "OpenBench Labs, A Division of Strategic Communications"); *id.* Ex. 14 ("About Us" webpage listing StratComm e-mail address for Fegreus and linking to StratComm website); *id.* Ex. 15 (Open Magazine 2006 media kit listing George and Fegreus as contacts); *id.* Ex. 18 (LinkedIn.com profile for Fegreus listing his employment with Strategic Communications as ongoing since 2001); *id.* Ex. 11 at CRB 0073 (current StratComm website listing Open Bench Labs as a "division of Strategic Communications"); *id.* Exs. 4, 5 (annual reports signed by Mr. George in March 2004 and December 2004). (Note that StratComm's/Strategic Communication's current website touts the 2004 article (*id.* Ex. 11 at CRB 0055–0070) as an example of its work, despite its purported non-existence during 2004. *Id.* Ex. 11 at CRB 0054).

[12] Bowen Aff. Ex. 7 at CRB 0045 (Internet Archive page showing ongoing web presence).

active in the publishing industry.[13]   Sometime prior to April 2004 (and, again, prior to StratComm's purported organization in mid-2005), George also updated the general contact information on Boston Publishing's website, directing visitors to contact StratComm and providing the e-mail address RGeorge@StratComm-Inc.com.  Hickman Aff. Ex. A at CRB 0003.

*The Current StratComm Entities*.  George formally re-incorporated CCI/Strategic Communications as "StratComm" in July 2005.  George Entity Chart; Am. Compl. Ex. G.  Through this entity, along with the recently reincorporated Strategic Communications '07 and Boston Publishing (both incorporated on April 10, 2007), George operates the current iteration of his communications business out of a single office in Newton, Massachusetts.  Am. Compl. ¶¶ 3, 5-8; George Aff. ¶¶ 2, 27.  Though none of these entities have any apparent formal ownership or parent- or subsidiary-type relationships with each other (as they are each wholly owned by George as the sole shareholder and director, Am. Compl. Exs. D, G, H), they share a single commingled set of books, are operated without regard to corporate formalities,[14] and they hold themselves out as providing comprehensive communications services to a wide range of

---

[13] Hickman Aff. Ex. A at CRB 0001 (April 2004 Boston Publishing website listing CCI as the "custom publishing division" and linking to its website); *id.* at CRB 0002 (August 2004 Boston Publishing website listing the not-yet-incorporated StratComm as its "custom publishing division"); *compare* George Aff. ¶ 38.

[14] For example, Boston Publishing's website identifies StratComm as a "custom publishing division" of Boston Publishing.  Am. Compl. Ex. E.  In contrast, Mr. George avers to the Court that Boston Publishing is a "publishing imprint" of StratComm.  George Aff. ¶ 1.  In addition, Strategic Communications was operating under that name, via StratComm or in its own right, well before its incorporation, at least as early as 2005.  Hickman Aff. Ex. A at CRB 0021–0022 (December 2005 website identifying Strategic Communications as the re-launcher of Bay State REALTOR); Bowen Aff. Ex. 13 (article published by Jack Fegreus in April 2005 as "technology director" of Strategic Communications and linking to StratComm's website, despite the lack of formal corporate existence of either entity); *id.* Ex. 12 (2006 Fegreus article published via Strategic Communications and linking to StratComm's website).

clients.[15]   Such services include the design, production, and publication of, *inter alia*, magazines and newsletters for businesses, organizations, and other parties.[16]  Though Mr. George attests otherwise, the companies do not purport to operate in or serve clients within a single sector, but rather purport to serve clients across a broad range of disparate sectors.[17]

The StratComm Entities not only perform the same services CCI performed, they specifically hold themselves out to the public as the ongoing continuation of Mr. George's many prior businesses.  Since as early as 2005 (StratComm's year of incorporation), for example, they have repeatedly claimed to have provided services, received awards, and accomplished feats that pre-date any of their formal incorporations.[18]  Such claims include the re-launching of Bay State

---

[15] George Aff. ¶; 1 Bowen Aff. Ex 11 at CRB 0049 (home webpage for StratComm claiming the corporation is "a leading custom publishing and communications firm with over 30 years of experience helping Fortune 500 companies and other large, complex organizations" and claiming that "[o]ur company has won nearly every major editorial and design award"); *id.* at CRB 0074–0075 (detailing ongoing clients); *see also* Braverman Aff. Ex. A (listing many of the same clients as CCI clients in 2003).

[16] Am. Compl. ¶¶ 34, 39; Bowen Aff. Ex. 11 at CRB 0076 (StratComm website).

[17] Am. Compl. ¶ 35 & Exs. C (Boston Publishing touting services in general consumer and business markets), E, (touting Boston Publishing as a "full service publisher" for "major corporations"), & F (StratComm website listing clients across a range of sectors); Bowen Aff. Ex. 11 at CRB 0076 (StratComm "what we do" website boasting of a range of clientele and services); *id.* at CRB 0074–0075 (StratComm website listing current clients).

[18] *See* Bowen Aff. Ex. 11 at CRB 0052 (StratComm Entity website claiming that "Strategic Communications" published a 1986 centennial celebration book for General Motors); Hickman Aff. Ex. A at CRB 0011–0012 (2005 website stating that Strategic Communications "pioneered the concept of creating integrated print and electronic publications"); *id.* at CRB 0013–0014 (2005 website claiming that Strategic Communications had published an eNewsletter and white papers for Fidelity Charitable Services).  Further, Mr. George avers in his affidavit that the StratComm Entities now service former CCI client Goldman Sachs (a financial services client, rather than an IT-based client), whose contract "was terminated" following September 11, 2001, and which has been re-acquired by the Entities "after six years."  George Aff. ¶ 31.  In contrast, Mr. George has previously represented in marketing pitches that CCI reacquired Goldman Sachs' business in 2003, rather than 2007.  Braverman Aff. ¶ 10 (recollecting that George had claimed in marketing pitches that CCI had lost clients formerly located in and around the World Trade Center, but that two clients, Goldman Sachs and Deloitte & Touche, had brought their business back to CCI on an ongoing basis); *see also* Bowen Aff. Ex. 11 at CRB 0074–0075.

REALTOR, a publication for the Massachusetts Association of REALTORS which *CCI* re-launched in 2003, and which George/StratComm publishes to this day. *Compare* Hickman Aff. Ex. A at CRB 0021-0022 (2005 Strategic Communications website claiming to have re-launched Bay State REALTOR in 2003, when, in fact, CCI did so) *with* Braverman Aff. Ex. A (George 2003 communication stating that CCI had done so). Rather than highlight the experience of Mr. George (the sole shareholder and director of each entity), the companies attribute the professional accomplishments of prior George entities to the companies themselves.[19] They also specifically hold themselves out to the public as a continuation of the CCI enterprise. Am. Compl. Ex. E (Boston Publishing website inviting visitors to "visit other CCI websites," including the home page for Defendants StratComm and Strategic Communications '07). Indeed, the StratComm Entities have even paid to have their website appear as a "sponsored link" when web searchers type the query "custom communications" into Google's search engine.[20]

---

Similarly, the StratComm Entities have claimed since at least 2005 to have previously produced numerous web-based publications for IBM, including a publication entitled Linux Line – for which OpenBench Labs likewise takes credit. Hickman Aff. Ex. A at CRB 0015–0016 (2005 Strategic Communications website); Bowen Aff. Ex. 11 at CRB 0072 (Strategic Communications current website); *id.* Ex. 17 (OpenBench current website); *see also* Braverman Aff. Ex. A (discussing CCI Linux Line work).

[19] *See, e.g.*, Am. Compl. Ex. F (StratComm/Strategic Communications '07 website claiming that "[w]e have been creating content for major corporations and associations for more than 30 years"); *id.* Ex. C (Boston Publishing website boasting that "over the years Boston Publishing Company has offered a range of publications and services to both the general consumer and to business markets" and claiming to have published a 1980s book series entitled *The Vietnam Experience* in collaboration with Time-Life Books (*see also* Am. Compl. ¶ 36)); *id.* Ex. I (StratComm/Strategic Communications '07 website claiming that these companies – rather than Boston Publishing – published the 1980s-era *Vietnam Experience* book series, and stating that the series was "created and written *entirely by Strategic Communications*") (emphasis added); Hickman Aff. Ex. A at CRB 0021–0022 (same regarding Bay State REALTOR).

[20] Bowen Aff. Exs. 9, 10 (Google search showing results and "about" page explaining how Google's "sponsored links" work).

Each and all of Mr. George's entities have, by way of fraudulent transfer, *de facto* merger, and as part of an effort by Mr. George to avoid his and CCI's liabilities, in fact incurred those liabilities as successors-in-interest to CCI and as alter ego entities of both Mr. George and CCI. Am. Compl. ¶¶ 38, 43. This is so because, *inter alia*, they held themselves out as, carried on the business of, and have acquired (via fraudulent corporate transactions) the assets, good will, brand, long-term clients and operations of Mr. George's long-running communications enterprise formerly embodied in CCI. *Id.* All of the above-mentioned corporate formations and re-formations were executed by Mr. George with the intent of carrying on his CCI communications, while at the same time avoiding his and its debt to CRB. *Id.* ¶¶ 45, 47.

During CRB's long efforts to collect the debt, Defendant George made numerous statements that he and CCI could not pay these debts due to his/CCI's financial condition. Mr. George willfully concealed from CRB, in an attempt to hinder and obstruct its ability to collect, the fact that he had formed additional companies through which he was conducting the same business and receiving revenues. *Id.* ¶¶ 45, 47; Braverman Aff. ¶¶ 6–8. As a result of CCI's and Mr. George's continued failure to make good on the promises to pay and because the amount outstanding is excessive and has been outstanding for so long, after attempting for nearly four years to work out payment options and accommodations with CCI and Mr. George, CRB has finally been forced to file this suit to recover legal fees and costs owed by CCI, Mr. George and CCI's successors. Am. Compl. ¶ 48.

## IV. ARGUMENT

Defendants have filed two motions. The StratComm Entities moves to dismiss for lack of personal jurisdiction, contending they are neither successors-in-interest to CCI nor alter ego entities of CCI or Mr. George. For its part, CCI has filed a motion alleging that it has dissolved

and therefore may not be subject to suit.[21]   Both motions, addressed in turn below, should be denied.  In any event, CRB is entitled to discovery prior to dismissal of any claims in this action.

A.   **THE ALLEGATIONS IN THE COMPLAINT, ASSESSED IN LIGHT OF THE EVIDENCE BEFORE THE COURT, SATISFY CRB'S PRIMA FACIE  BURDEN AND ESTABLISH PERSONAL JURISDICTION**

Whether specific personal jurisdiction has been asserted properly against a defendant depends on two inquiries:  first, the district court looks to the long-arm statute of the forum in which it sits to determine if jurisdiction is allowed under state law; and second, the court determines whether asserting jurisdiction would comport with the minimum requirements of due process.  *Johnson-Tanner v. First Cash Fin. Servs., Inc.,* 239 F.Supp.2d 34, 37 (D.D.C. 2003).  Here, the two inquiries are folded into one, as the District of Columbia's long-arm statute allows for jurisdiction to the fullest extent permissible under the Due Process Clause.[22]   As noted above, the inquiry allows for weighing of evidence for jurisdictional purposes, but all factual ambiguities must be resolved in favor of the plaintiff.  *Crane*, 894 F.2d at 456; *Material Supply*,

---

[21] Defendant George has filed an answer to the Amended Complaint.

[22] *Id.*; *see also* D.C. Code § 13-423; *Crane v. New York Zoological Soc'y*, 894 F.2d at 455; *Mouzavires v. Baxter*, 434 A.2d 988, 990-91 (D.C. 1981).  The District of Columbia provides the governing rules of law for purposes of Defendants' motion.  A district court applies the choice-of-law rules of the forum in which it sits.  *Rafferty v. NYNEX Corp.*, 60 F.3d 844, 849–50 (D.C. Cir. 1995).  The District employs a governmental interests approach, which balances the competing interests of the jurisdictions in question to determine which jurisdiction's policy would be most advanced by having its laws applied to the facts of the case.  *Herbert v. District of Columbia*, 808 A.2d 776, 778–79 (D.C. 2002).  Here, as Defendants appear to recognize, this test, which assesses the place of the injury, the domiciles of the parties, the place where the injury-causing conduct occurred, and where the relationship between the parties is centered, favors applying District of Columbia law, given the District's superior *lex loci* concerns vis-à-vis those of Massachusetts.  *See id.*; *see also Dominion Caisson Corp. v. Clark*, 614 A.2d 529, 531 (D.C. 1992); *Myers v. Gaither*, 232 A.2d 577, 583 (D.C. 1967) ("The general conflict-of-laws rule, followed by a vast majority of the States, is to apply the law of the place of injury to the substantive rights of the parties."); *Luc v. Krause Werk GMBH & Co.*, 289 F.Supp.2d 1282, 1288–89 (D. Kan. 2003) (applying substantive law of forum state to assess alter-ego  jurisdiction over foreign parent corporation).

62 F.Supp.2d at 19 ("[T]he motion should be granted "only if 'it appears beyond doubt that the [nonmovant] can prove no set of facts in support of his claim which would entitle him to relief"); *Al Saud*, 864 F. Supp. at 206 ("[T]he Court must accept Plaintiff's claims as true in ruling on a Rule 12(b)(2) motion, unless they are directly contradicted by an affidavit.").

Here, there is no dispute that jurisdiction is (or would be) properly asserted over Defendants George and CCI for purposes of due process. The only question is whether the facts establishing jurisdiction over them can be imputed to other defendants. Because that question must be answered in the affirmative, the motion to dismiss under Rule 12(b)(6) must be denied.

### 1.     The StratComm Entities are Successors-In-Interest to CCI (By Way Of Strategic Communications '03)

Defendants do not directly dispute that personal jurisdiction can be imputed to a corporate successor. Defs.' Br. at 12. Nor could they, in light of this Court's prior recognition (and a vast body of persuasive authority holding) that doing so is perfectly appropriate.[23] Instead, they contend (without citing any authority) that they should be immune from suit. They are wrong.

---

[23] *See McDaniel v. Armstrong World Indus.*, 603 F. Supp. 1337 (D.D.C. 1985); *Material Supply, Int'l, Inc. v. Sunmatch Indus. Co.,* 62 F.Supp.2d at 23–25 (applying D.C. law regarding successor liability in assessing a motion to dismiss for lack of personal jurisdiction); *see also Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 206 F.Supp.2d 958, 960 (N.D. Ind. 2002), *aff'd*, 338 F.3d 773 (7th Cir. 2003); *Select Creations, Inc. v. Paliafito America, Inc.*, 852 F. Supp. 740, 765–66 (E.D. Wisc. 1994); *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 630 (11th Cir. 1996); *In re Celotex Corp.*, 124 F.3d 619, 628 (4th Cir. 1997); *Duris v. Erato Shipping, Inc.*, 684 F.2d 352, 356 (6th Cir. 1982) ("Any other ruling would allow corporations to immunize themselves by formalistically changing their titles."), *aff'd sub nom. Pallas Shipping Agency Ltd v. Duris*, 461 U.S. 529 (1983); *City of Richmond v. Madison Mgmt. Group, Inc.*, 918 F.2d 438, 454 (4th Cir. 1990) ("The great weight of persuasive authority permits imputation of a predecessor's actions [for purposes of personal jurisdiction] upon its successor *whenever* forum law would hold the successor liable for its predecessor's actions.") (emphasis in original); *Idaho v. M.A. Hanna Co.*, 819 F. Supp. 1464, 1477 (D. Idaho 1993) (finding personal jurisdiction proper through imputation to successor despite "two statutory mergers and a name change" and collecting cases); *Neagos v. Valmet-Appleton, Inc.*, 791 F. Supp. 682, 689 (E.D. Mich. 1992).

In the District of Columbia, courts hold successors liable for their predecessors' acts, liabilities and debts in any of the following circumstances: (1) where there is an express or implied agreement to assume the liabilities; (2) where the transaction amounts to a consolidation or merger; (3) where the successor entity is a mere continuation or reincarnation of the predecessor entity; or (4) where the transaction was fraudulent, not made in good faith, or made without sufficient consideration. *Material Supply*, 62 F.Supp.2d at 23 (citing *Bingham v. Goldberg, Marchesano, Kohlman, Inc.*, 637 A.2d 81, 89–90 (D.C. 1994)). The presence of any one of these scenarios suffices to establish jurisdiction. *Madison Mgmt. Group*, 918 F.2d at 454. At least three (if not all four) are present here.

### a.    Mere Continuation and/or *De Facto* Merger

The Amended Complaint and evidence now before the Court abundantly demonstrate that the StratComm Entities are "mere continuation[s] or reincarnation[s]" of George's predecessor entities.[24] Factors courts consider in making this determination include whether the entities "have common officers and stockholders," whether they "are in the same line of business," and "whether sufficient consideration was paid for the predecessor's assets." *Material Supply*, 62 F.Supp.2d at 23   (citations omitted). Courts also have considered whether the predecessor ceases to exist after the transaction, *id.* (citing *Minnesota Mining & Mfg. v. Eco Chem, Inc.*, 757 F.2d 1256, 1262 (Fed. Cir. 1985), though liability will attach even where an entity continues to formally exist but effectively ceases operations, *id.* at 23–24 (citing *Colonial*

---

[24] The mere continuation and *de facto* merger doctrines are often assessed identically, and this Court has assessed them in tandem via a single inquiry. *See Material Supply*, 62 F.Supp.2d at 23–24; *see also Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 464–65 (3d Cir. 2006) (noting that the tests are "generally treated identically," and that the former "focuses on whether the new corporation is merely a restructured version of the old," while the latter inquires whether a given transaction or set of transactions "factually amounts to a consolidation or merger"). Accordingly, because a "mere continuation" is present here, so, too, is there a *de facto* merger.

*Ice Cream Co. v. Southland Ice Utils. Corp.*, 53 F.2d 932, 933–34 (D.C. Cir. 1931) (creditor could collect from the purchaser of another company's assets, as the "sale" was no more than continuation of seller's business)). Traditionally, continuity of ownership has been held to be a key (if not *the* key) factor in determining whether a "mere continuation" is present. *Bingham*, 637 A.2d at 91.

Here, this first and crucial factor is beyond contention: Robert George is undisputed to have been the sole director and shareholder of each entity named in the suit, and has served as President and/or CEO of each entity. Moreover, Jack Fegreus, current Chief Technology Officer of one or more of the StratComm Entities, also served as an officer of Strategic Communications '03 between 2003 and 2005, and worked for CCI prior to that.[25] It also is beyond dispute that Mr. George's prior enterprises, such as CCI and Strategic Communications '03, no longer function as operational entities.[26] The StratComm Entities likewise satisfy the line-of-business factor. Their client lists and touted business operations are practically identical to CCI's,[27] as are

---

[25] *See* Braverman Aff. ¶ 9; Hickman Aff. Ex. A at CRB 0007 (2003 website for OPEN magazine listing CCI and George as publishers of the magazine and George as CEO of CCI/Open); *id.* at CRB 0008 (2003 OPEN magazine website touting the services and skills of CCI); Bowen Aff. Ex. 13 (article published by Jack Fegreus in April 2005 as "technology director" of Strategic Communications and linking to StratComm's website, despite the lack of formal corporate existence of either entity); *id.* Ex. 16 (same, published via Strategic Communications prior to either its or StratComm's formal incorporation); *id.* Ex. 11 at CRB 0055–0070 (similar article published in 2004 by Fegreus/Strategic Communications); *id.* Ex. 12 (2006 article published by Jack Fegreus, CTO of Strategic Communications and "OpenBench Labs, A Division of Strategic Communications"); *id.* Ex. 14 ("About Us" webpage listing StratComm e-mail address for Fegreus and linking to StratComm website); *id.* Ex. 15 (Open Magazine 2006 media kit listing George and Fegreus as contacts); *id.* Ex. 18 (LinkedIn.com profile for Fegreus listing his employment with Strategic Communications as ongoing since 2001).

[26] Am. Compl. ¶ 33; George Aff. ¶ 17; Bowen Aff. Ex. 3.

[27] Am. Compl. ¶¶ 13–15, 34–39, 45 & Exs. C, D, F; *compare* Braverman Aff. Ex. A *with* Bowen Aff. Ex. 11 at CRB 0074–0075; *see also*, *e.g.*, Braverman Aff. ¶ 11; Bowen Aff. Ex. 11 at CRB 0076 ("what we do" page); Hickman Aff. Ex. A at CRB 0008 (OPEN magazine webpage regarding CCI's services);

their stated fields of expertise and experience.[28]  Indeed, not only do they engage in the same *line* of business as their predecessors, but they also expressly hold themselves out as the *actual* entities that engaged in those very business pursuits undertaken by CCI (and by its previous successor, Strategic Communications '03).[29]

Further evidence confirms that Defendants are a mere continuation of CCI.  For example, Mr. George's casual, interchangeable treatment of his corporations shows that, at least for purposes of public perception, his various entities were seen and marketed as participants (most frequently in the form of "divisions" of each other) in a shared corporate identity.[30]  Moreover,

---

[28] Defendants' contention that they operate in a different "sector" (IT) from CCI (financial services) is neither of consequence, nor supported by the facts in any event.  The StratComm Entities make no effort in presenting themselves to the public to identify themselves as IT-service businesses. *See*, *e.g.*, Bowen Aff. Ex. 11 at CRB 0076.  Indeed, their client list (including their list of long-term, ongoing publication clients) plainly contradicts the IT-sector contention. *Id.* at CRB 0074–0075.  Nor is it accurate to characterize CCI as having operated primarily in the financial services "sector."  *See*, *e.g.*, Braverman Aff. ¶ 9 & Ex. A (listing clientele across a range of industries).  In point of fact, the publication at issue in CCI's litigation with NSDAR, out of which the debt at issue in this case arose, was a general membership magazine.  Am. Compl. ¶ 17 (services for NSDAR).

[29] *Compare*, *e.g.*, Hickman Aff. Ex. A at CRB 0021–0022 (2005 Strategic Communications website claiming to have re-launched Bay State REALTOR in 2003, when, in fact, CCI did so) *with* Braverman Aff. Ex. A (George 2003 communication stating that CCI had done so); s*ee also* Am. Compl. ¶¶ 35, 41 & Exs. D, F, I; Hickman Aff. Ex. A at CRB 0011–0012 (2005 claim that "Strategic Communications" pioneered hybrid web/print publications); Bowen Aff. Ex. 12 (same in 2008); *id.* Ex. 11 at CRB 0050–0051 (claiming 1986 General Motors centennial); *compare* Bowen Aff. Ex. 11 at CRB 0053 (taking credit for CCI's work for the Copyright Clearance Center) *and* Hickman Aff. Ex. A at CRB 0013–0014 (in 2005, taking credit for CCI's work for Fidelity) *with* Braverman Aff. Ex. A.

[30] *See* Am. Compl. ¶¶ 37, 39, 40–42 & Exs. E, F; Braverman Aff. ¶¶ 7–8 (interchangeability of CCI and Boston Publishing); nn.27, 29, *supra*; Hickman Aff. Ex. A at CRB 0001 (April 2004 Boston Publishing website listing CCI as its "custom publishing division" and linking to its website); *id.* at CRB 0002 (August 2004 Boston Publishing website listing the not-yet-incorporated StratComm as its "custom publishing division"); *id.* at CRB 0023–0026 (interchanged CCI/StratComm logos); *id.* at CRB 0027–0029 (OPEN magazine site announcing that Strategic Communications, its publisher, had entered into and terminated an agreement with a third party in 2005); *id.* at CRB 0003 (George alteration of Boston Publishing website to provide StratComm contact information); *id.* at CRB 0007 (OPEN website listing CCI as

standing alone, the *ad seriatim* timing of Mr. George's repeated corporate formations (the technicalities of which George rarely honored for d/b/a and marketing purposes) is further evidence of a single, continuing business. *See* George Entity Chart.[31]

As to the consideration paid by the StratComm Entities for these myriad benefits and assets, the Amended Complaint specifically alleges, and Defendants fail to contest, that *no* consideration was given for them.[32] Any discussion of how, from whom and for how much the StratComm Entities have obtained their names, assets, clients, business operations, *et cetera*, let alone the rights to appropriate prior George entity accomplishments, publications and enterprises, is glaringly missing from the self-serving evidence Defendants have proffered. For

---

publishing entity); *id.* at CRB 0008 (OPEN website promoting CCI); Bowen Aff. Ex. 12 (2006 article published by Jack Fegreus, CTO of Strategic Communications and "OpenBench Labs, A Division of Strategic Communications"); *id.* Ex. 11 at CRB 0073 (same); *compare id.* Ex. 17 (Linux Line) *with* Braverman Aff. Ex. A (same).

[31] Defendants blithely contend that the only allegations in the complaint supporting successor liability are made on information and belief. Defs.' Br. at 12–13. Even setting aside the abundant evidence now submitted in support of this opposition and cross-motion, this is not true. The Amended Complaint provides ample evidence demonstrating, at the very least for purposes of this motion, that the StratComm Entities are, in fact, successors-in-interest to CCI. *See* Am. Compl. ¶¶ 35, 37, 41, 42 & Exs. D, E, G, H, I. Defendants also contend that "the Amended Complaint … argues that any publishing company that George involves himself with is automatically a successor in interest of either George or CCI." Defs.' Br. at 11. This assertion is a straw man. For the voluminous reasons set forth in the Amended Complaint and herein, CRB has ample reason to believe that the specific George operating entities named in the Amended Complaint are liable for CCI's/George's debt to CRB.

[32] Am. Compl. ¶ 46. In Defendant George's Answer, he declines to answer many questions on the basis that they are not directed at him and do not require an answer from him. He is wrong on this point. CRB is entitled to direct answers either admitting denying or stating a lack of information from Mr. George regarding these questions, especially considering the alter ego allegations of the Amended Complaint, and his evasive non-answers should be deemed admissions, at least for purposes of the present motions. Fed. R. Civ. P. 8(b)(6) ("[a]n allegation … is admitted if a responsive pleading is required and the allegation is not denied"); *Burlington Northern R.R. Co. v. Huddleston*, 94 F.3d 1413, 1415 (10th Cir. 1996) ("By failing to submit an answer or other pleading denying the factual allegations of Plaintiff's complaint, Defendant admitted those allegations, thus placing no further burden upon Plaintiff to prove its case

purposes of these motions, the evidence shows the StratComm Entities obtained their business operations *gratis*, courtesy of George, their sole promoter and shareholder, via a series of sham transactions designed to evade George's personal and corporate creditors. Am. Compl. ¶¶ 45–47. At the very least, the question of consideration is a disputed question of fact. *Crane*, 894 F.2d at 456.

In sum, Defendants are continuing the business of CCI and have inhereited and reaped the benefits of its business reputation, good will, accomplishments, clients, copyrights, trade names and other business assets.[33] Collectively, and by any account, they are in both public image and fact a mere continuation (via the interim vehicle of Strategic Communications '03) of Mr. George's CCI communications enterprise.[34]

---

factually."). In any event, it is beyond contention that CRB's allegation of lack of consideration stands undisputed.

[33] *See supra* nn.18–19, 29 and accompanying discussion. *See also generally Airflow Houston, Inc. v. Theriot*, 849 S.W.2d 928, 930–33 (Tex. App. 1993) (upholding verdict for creditor and against successor entity where sole shareholder ceased operating insolvent corporations and re-started a new company that took various intangibles of the old companies, including "good will, and possibly the client list"). Mr. George's statement that CCI's assets upon dissolution consisted only of a laptop and two printers ignores the myriad other assets, including intangible assets, that could have been – and were – transferred to its successors. *See id.* at 930; *Dugan v. Dugan*, 457 A.2d 1, 4–5 (N.J. 1983) (observing that "good will includes a whole host of intangibles" and is "generally regarded as the summation of all the special advantages, not otherwise identifiable, related to a going concern" and that it includes items such as a company's good name, staff, and reputation); 38 Am. Jur. 2d Goodwill §§ 50, 10 (2007) (good will is property that can be bought or sold and transfers with business when business is transferred); *see also, e.g.*, Braverman Aff. Ex. A; Bowen Aff. Ex. 11 at CRB 0074–0075; nn.18–19, *supra* (evidence showing retention of clients, good will and other intangibles from CCI and Strategic Communications '03).

[34] Even if the Court credits Mr. George's disputed assertion of a purported "gap" between dissolution of CCI and formation of StratComm (which the Court should not do, given the factual dispute on this point), the evidence still would suffice to impose successor liability on the StratComm entities. In this case, where entities controlled by a single shareholder operate the continued business of a former entity by re-claiming old clients, taking credit for the accomplishments of the prior entity, and holding themselves out as a longstanding, ongoing business operation dating back to well before their dates of incorporation, the above factors still

### b.    Assumption of Liabilities by Implied or Express Agreement

As to the implied/express agreeement scenario, the Amended Complaint adequately alleges – and the evidence adequately demonstrates – that the entities entered into implied agreements by wholly absorbing the prior George enterprises (*e.g.*, CCI and Strategic Communications '03) in every fashion but for their names (at least in the case of CCI). Am. Compl. ¶¶ 45–46; *see also IV.A.1.a, supra*. By virtue of the fact that the businesses are essentially identical to their predecessors, no other inference is plausible but that the successors took on Mr. George's prior businesses *in toto*. Indeed, absent fraud, disregard of corporate formalities, or bad faith, there exists no other plausible explanation of these acts of absorbtion. In any event, to the extent the express-or-implied-agreement scenario is not shown conclusively to be present, it is only because CRB presently lacks information necessary to determine what arrangements were made between the StratComm Entities and their predecessors. CRB suspects Mr. George did not respect corporate formalities in this regard, but at this early stage cannot amass evidence of any such agreements, to the extent they were memorialized at all. As discussed fully below, any deficiencies in the present Amended Complaint should not lead to dismissal, but rather to jurisdictional discovery. IV.C, *infra*.

---

support successor liability, even if there is a purported corporate "gap." *Kemper v. Saline Lectronics*, 366 F.Supp.2d 550, 554 (N.D. Ohio 2005) (interim transactions do not preclude successor liability) (citing *Dixstar v. Gentec Equip.*, No. 3:02CV-45-H, 2004 U.S. Dist. LEXIS 7201, at *17 (W.D. Ky. Feb. 13, 2004) (reported cases "appear to assume that an intermediate sale does not preclude successor liability")). This is particularly true on a motion to dismiss where it is entirely unclear how and for what consideration (if any) the entity obtained the prior clients, copyrights, good will and other assets of its predecessor. *See* n.32, *supra*. Moreover, given that a corporation's assets return to its shareholders upon dissolution, it must be presumed the StratComm entities obtained these myriad assets and benefits from Mr. George as trustee of CCI's former assets, in exchange for 100% of their stock at incorporation.

c.    **Fraud, Lack of Good Faith, and Inadequate Consideration**

Finally, even if the StratComm Entities have not yet been shown to be mere continuations of CCI's business, there is ample evidence to justify imputing CCI's liabilities to them pursuant to the scenario where successor liability should be imposed, *i.e.*, where a transaction or transactions are fraudulent, not made in good faith, or made without sufficient consideration. *See Material Supply*, 62 F.Supp.2d at 23. While any one of these scenarios will justify successor liability, all three are present here.

First, the timing of Mr. George's repeated incorporations and reincorporations creates a strong inference of evasive intent: Strategic Communications '03 was incorporated and began its functionally identical operations *one* week after George allegedly dissolved CCI.[35] Likewise, Mr. George incorporated StratComm two months after filing for dissolution of Strategic Communications '03 (though he continued to use the preferred "Strategic Communications" name well after the filing – and long before he incorporated Strategic Communications '07 in 2007, when it (he claims) became "available").[36] But perhaps more importantly, Mr. George neglected to disclose his corporate transactions and continuing business enterprises to CRB, all the while making illusory assurances of payment, and only notifying CRB he had dissolved CCI *four months* after the end of its three-year winding down period.[37] These actions are classic

---

[35] George Entity Chart; Bowen Aff. Ex. 3.

[36] George Entity Chart; Am. Compl. Ex. G; Bowen Aff. ¶ 5 & Ex. 3; George Aff. ¶¶ 1, 23, 26. *See also* nn.25, 30.

[37] Braverman Aff. ¶¶ 6, 11. The court may, as always, assess questions of credibility when assessing evidence submitted by the parties. *See Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo*, 264 F.3d 32, 38 (2d Cir. 2001) (discussing district court's ability "to make the necessary credibility judgments" in assessing personal jurisdiction); *see also T.L. ex rel. Ingram v. United States*, 443 F.3d 956, 961 (8th Cir. 2006) (courts are empowered to "make credibility determinations and to weigh conflicting evidence in resolving" factual questions presented in

indicators of bad faith and fraud. *Mickle v. Christie's, Inc.*, 207 F.Supp.2d 237, 252 (S.D.N.Y. 2002) (describing the "hallmarks of bad faith, such as imperfect performance, improper motive, self-dealing, duplicity, fabrication, artifice, unlawfulness, transparent pretext, or deliberate frustration of an agreement"); *Consumers United Ins. Co. v. Smith*, 644 A.2d 1328, 1358 (D.C. 1994) ("badges of fraud" refers to "any fact tending to throw suspicion upon the questioned transaction," to "circumstantial evidence of intent," and to factors such as "lack of consideration for the conveyance, a close relationship between the transferor and transferee, pendency or threat of litigation, financial difficulties of the transferor, and retention of the possession, control, or benefit of the property by the transferor") (internal citations and quotations omitted).

Separate from Mr. George's concealment of his continuing enterprises, essentially *all* of the factors supporting the inference of fraud and bad faith are present here:

- Mr. George/CCI have failed to perform their contractual obligations;

- Mr. George has acted with a motive to conceal his ongoing businesses;

- He has engaged in self-dealing;

- His representations are duplicitous;

- He has fabricated a false state of affairs by omission and artifice;

- He has deliberately frustrated multiple agreements with CRB;

- He has conveyed the enterprise assets of CCI without any apparent consideration to a chain of re-incorporated entities;

- All the entities in suit are dominated by Mr. George;

- The threat of litigation was apparent and ongoing since CCI/George initially failed to pay CCI's bills in 2002;

motions to dismiss).   Defendants – especially Mr. George – have taken multiple actions that call into question their/his credibility.

- CCI was in undisputed financial difficulty; and

- Mr. George, by his entities, has retained possession, control, and the benefit of all CCI's enterprise benefits and assets in an unbroken span of time since he filed for CCI's dissolution in 2003.

Moreover, he has operated all of these businesses without regard to corporate formalities, consistently using them and promoting them interchangeably to benefit his business interests, and  has in so doing, if his current claims of recent incorporation and "gaps" between his efforts in publishing are now to be believed, misrepresented them to the public.[38]   Only when it is convenient for Mr. George's debt-evading purposes does he now call on the fiction to protect himself from his debts.  His continual misrepresentations and half-truths, including those made to this Court in his self-serving affidavit, further demonstrate fraudulent intent and bad faith. [39]

Because Defendants function as mere continuations and reincarnations of CCI, because Mr. George's various dissolutions and incorporations have been made in bad faith, fraudulently, and without any apparent consideration (let alone sufficient consideration), and because Defendants have at least impliedly assumed CCI's liabilities by assuming its good will, customers, and other intangible assets, Defendants are successors-in-interest to CCI and the Court's jurisdiction over CCI should be imputed to them.[40]   Even if all these scenarios are not

---

[38] *See* nn.13, 14, 18, 19, 29, 30 (collecting evidence of interchangeable corporate identities and dishonored corporate formalities).  Far more likely, he has misrepresented his enterprises to CRB, and now to the Court.

[39] Am. Compl. ¶¶ 45, 47; Braverman Aff. ¶¶ 5–12.  The sub-scenario warranting attachment of successor liability – lack of sufficient consideration – is plainly established, at least for purposes of Defendants' motion.  *See* n.33, *supra,* and accompanying text; *Al Saud*, 864 F. Supp. at 206 ("[T]he Court must accept Plaintiff's claims as true in ruling on a Rule 12(b)(2) motion, unless they are directly contradicted by an affidavit.").

[40] *See Bingham*, 637 A.2d at 89–90; *see also Airflow Houston*, 849 S.W.2d at 930–33; *Per-Co, Ltd. v. Great Lakes Factors, Inc.*, 509 F.Supp.2d 642, 647–55 (N.D. Ohio 2007) (imposing successor liability where defendants incorporated a successor entity which operated

conclusively established, the Court need only be satisfied for purposes of this motion that CRB has met its minimal *prima facie* showing of a question of fact as to whether just *one* of these scenarios are present. *Material Supply*, 62 F.Supp.2d at 19. CRB has without question met this burden, and the motion to dismiss accordingly should be denied.

### 2.    Defendants are Alter Egos of CCI and Robert George

Even if the StratComm Entities are not successors-in-interest to CCI, jurisdiction is still proper over them because they are alter egos of Mr. George and CCI. The Amended Complaint and evidence submitted to the court make clear that Mr. George has repeatedly disregarded and abused the corporate form to suit his purposes, all while at the same time using that form to evade his debts. His actions constitute a texbook case for judicial disregard of the corporate form that Mr. George persists in abusing.

In determining whether to pierce the corporate veil, D.C. law weighs whether there is a "unity of ownership and interest" between the entity and its alleged alter ego and whether the claimant has alleged a "use of the corporate form to perpetrate fraud or wrong." *Bingham,* 637 A.2d at 93 (quoting *Vuitch v. Furr*, 482 A.2d 811, 815 (D.C. 1984)). It is not necessary, particularly for purposes of a motion to dismiss, to show actual fraud; rather, "considerations of justice and equity" primarily inform the analysis. *Id.* Some courts have even observed that this can be the case even where those who created the corporate shield did not do so to avoid an obligation (which is all but impossible for Mr. George to argue here).[41]

---

same basic business, shared identical shareholders and directors, and was incorporated in part to evade predecessor's debts).

[41] *See Massachusetts Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors, Inc.*, 343 F.3d 18, 22 (1st Cir. 2003) (citing *NLRB v. Hospital San Rafael*, 42 F.3d 45, 51 (1st Cir. 1994)). *See also Simon v. Circle Assocs., Inc.*, 753 A.2d 1006, 1011 n.8 (D.C. 2000) (citing *Bingham*); *Eichelberger v. Arlington Bldg., Inc.*, 280 F. 997, 999 (D.C. Cir. 1922) (courts "go behind the fiction" of the corporate entity "where its recognition would result in promoting illegality, fraud,

"Although no single factor controls, courts generally inquire, *inter alia*, whether corporate formalities have been observed; whether there has been commingling of corporate and shareholder funds, staff and property; whether a single shareholder dominates the corporation; [and] whether a corporation is adequately capitalized."[42]  On this point, the First Circuit has observed that the alter ego doctrine "is not a formalistic mechanism for reflexively regarding distinct jural entities as legally interchangeable whenever the entities' relationship is marked by a sufficient number of the doctrine's characteristic criteria," but that it "is a tool to be employed when the corporate shield, if respected, would inequitably prevent a party from receiving what is otherwise due and owing from the person or persons who have created the shield." *Massachusetts Carpenters Cent. Collection Agency v. A.A. Bldg. Erectors, Inc.*, 343 F.3d 18, 21–22 (1st Cir. 2003).  Though "a range of factors" such as those listed above may be considered, one factor is "especially" important, specifically, "whether the corporate form has been used to effectuate a fraud," *Meshel v. Ohev Shalom Talmud Torah*, 869 A.2d 343, 355 (D.C. 2005); *Lawlor*, 758 A.2d at 975, or, put differently, whether it was used to "perpetrate fraud or wrong." *Bingham*, 637 A.2d at 93; *see also Quinn v. Butz*, 510 F.2d 743, 758–59 (D.C. Cir. 1975) (courts

---

or injustice" and do not allow the corporate form to "be employed to further wrong"); *Capital Tel. Co. v. FCC*, 498 F.2d 734, 738 (D.C. Cir. 1974) ("courts have consistently recognized that a corporate entity may be disregarded in the interests of public convenience, fairness and equity," and will disregard corporate forms "when the notion of legal entity is used to defeat" those interests); *Shapiro, Lifschitz & Schram, P.C. v. Hazard*, 90 F.Supp.2d 15, 26 (D.D.C. 2000) (applying *Labadie* test and noting that a "finding of unfairness does not require fraud, or willfully wrongful conduct") (citing *Labadie Coal Co. v. Black*, 672 F.2d 92, 100 (D.C. Cir. 1982)).

[42] *Lawlor v. District of Columbia*, 758 A.2d 964, 975 (D.C. 2000).  *Estate of Lisle v. C.I.R.*, 341 F.3d 364, 375 (5th Cir. 2003) (noting the courts' use of "non-exhaustive list[s] of factors" and cautioning that "the question is ultimately determined by examining the totality of the circumstances"), *mandate recalled & modified*, 431 F.3d 439 (5th Cir. 2005); *American Bell Inc. v. Fed'n of Tel. Workers*, 736 F.2d 879, 886–87 (3d Cir. 1984) (observing that factors courts consider are "not the exclusive approach").

have "disregarded the corporate fiction where its recognition would pervert the truth" and that "the ultimate principle is one permitting its use to avoid injustice").

As demonstrated with regard to successor liability, the "especially" important consideration of whether Mr. George has used his corporate formations to effectuate a fraud and wrong is beyond reasonable dispute, especially for purposes of the present motion.[43]   Other factors often considered likewise confirm the StratComm Entities' alter ego status.  That Mr. George dominates all the entities as sole shareholder, sole director and apparent CEO, is clear.[44] Mr. George also admits that despite the lack of any formal ownership/subsidiary interest among the StratComm Entities, he manages them all as one, with a single set of books, a shared office and, presumably, shared employees.  George Aff. ¶ 1.  Moreover, the image these entities have consistently presented to the public is one that does not at all match up with the formal corporate status of any of the entities.  *See* nn. 13–14, 17–19, 29–30.  The casual, interchangeable approach Mr. George has taken in marketing his communications business raises grave doubts about the legitimacy of the corporate forms he now attempts to use as a shield from his business creditors. *Id*.  Given his interchangeable treatment of his business entities in serving his interests, he cannot claim injustice if the Court, in the interests of equity, treats them likewise.

Defendants contend they cannot be alter egos of CCI because it is dissolved.  Defs.' Br. at 8.  Setting aside the myriad questions of fact this asertion raises, *see* IV.B, *infra*, this is incorrect as a matter of law.  *See*, *e.g.*, *Sea-Land Servs., Inc. v. Pepper Source*, 993 F.2d 1309, 1311 (7th Cir. 1993) (claims against alter ego corporations of dissolved company and sole

---

[43] IV.A.1, *supra*; *see also Bingham*, 637 A.2d 93; *Material Supply*, 62 F.Supp.2d at 24 (observing that an "indication" that a defendant engaged in a merger to evade creditors "would show much to support the contention" of successor liability).

[44] Am. Compl. Exs. D, G, H; Bowen Aff. Ex. 3.

shareholder); *Flentye v. Kathrein*, 485 F.Supp.2d 903, 912 (N.D. Ill. 2007).  In any event, the

very act of dissolution and (repeated) reincorporation here is one continuous scheme of fraud and

subterfuge which demonstrates that the StratComm Entities are, in fact, alter egos of CCI,

*regardless* of its formal corporate status.[45]

Defendants cast the veil-piercing inquiry as a rigid "two-pronged" test under which "the

Court must analyze" a series of factors, and they appear to imply that all the factors must be

present for jurisdiction to be proper.  Defs.' Br. at 6–11.  In so doing, they commit two errors:

First, the "test" they appear to apply, arising from *Labadie Coal Co. v. Black*, 672 F.2d 92 (D.C.

Cir. 1982), has been expressly repudiated by the D.C. Circuit as inapplicable to cases such as

that at bar that arise under state law implicating no federal interest.  *United States Through Small

Bus. Admin. v. Pena*, 731 F.2d 8, 12–13 (D.C. Cir. 1984); *cf. Johnson-Tanner*, 239 F.Supp.2d at

38–42 (applying *Labadie* test to case arising under federal discrimination statutes).  Here, where

no federal interest is present, the Court looks to state law to assess the *alter ego* status of the

Defendants.  *Pena*, 731 F.2d at 12–13.  (The federal and state tests are, in the end, relatively

similar, but not identical.)  Second, even if the *Labadie* test used by the court in *Johnson-Tanner*

applied,[46] Defendants overlook that the factors listed by the court are only "[a]mong the factors"

---

[45] Additionally, as the dissolution of CCI itself was an act of subterfuge by George to evade CCI's debts, the veil between CCI and Mr. George should likewise be pierced.  Accordingly, CCI's obligations are imputed to Mr. George, and because the StratComm entities are alter egos to *him*, the liabilities are imputed to them as well.

[46] Defendants are similarly misguided in further relying on *Labadie*'s observation that "[t]he essence of the fairness test is simply that an individual businessman cannot hide from the normal consequences of carefree entrepreneuring by doing so through a corporate shell."  Defs.' Br. at 8 (quoting *Labadie*, 672 F.2d at 100).  Though *Labadie* is inapplicable here, CRB could not agree more to its persuasiveness, given that *Labadie*'s distillation of the alter ego test is on all fours with this case.  It cannot be seriously contested that it would be unfair to the *Defendants* where they have benefited from Mr. George's repeated corporate machinations and so-far-successful evasions from "the normal consequences of [his] carefree entrepreneuring."  To the contrary, it *would* be manifestly unfair to allow Defendants to hide behind corporate fictions of Mr.

to consider and that an entity may qualify as an alter ego where only some of the relevant factors apply. *Johnson-Tanner*, 239 F.Supp.2d at 38–39.

Regardless of the test applied, Defendants' protestations ring hollow, particularly considering that the ultimate animating concern of the alter ego doctrine is the protection of third parties, and considering that the decision turns on the question of "who should bear the risk of loss" when the corporate form is being used as a shield. *Vuitch*, 482 A.2d at 815–16. Given this concern, the alter ego doctrine is "a tool to be employed when the corporate shield, if respected, would inequitably prevent a party from receiving what is otherwise due and owing from the person or persons who have created the shield." *A.A. Bldg. Erectors,* 343 F.3d at 21–22. Strangely, Defendants' sole contention relative to the "fairness prong" of their misapplied test is that it would be inequitable to pierce the veil because the companies are "new and distinct" and are "not [George's] alter ego," Defs.' Br. at 11, but this just begs the ultimate question.[47] Setting aside the ample evidence that the StratComm Entities are *not* "new and distinct," "fairness" is by no means so one-sided, nor is it established by merely conclusory denials. To the contrary, the inquiry looks to all the equities, and the equities here clearly favor CRB. Mr. George has engaged in an ongoing continuation of his CCI business since he secretly dissolved it in an

---

George's willful creation to the continued detriment of an innocent and misled creditor. *See Flynn v. Thibodeaux Masonry, Inc.*, 311 F.Supp.2d 30, 43–44 (D.D.C. 2004) (applying federal common law and holding that "an inequitable result would follow" if the court did not pierce the veil where the primary debtor-entity ceased operations in circumstances suggesting a possible attempt to evade liability); *Lawlor*, 758 A.2d at 975–76 (upholding veil-piercing where principal transferred assets from one corporation-debtor to another to pay debts owed by the transferee, and observing that he "cannot now be absolved of the consequences of his conduct by attributing it to corporations wholly under his control").

[47] Mr. George's side assertion that the Promissory Note is invalid for lack of consideration is, of course, contradicted by the allegations in the Amended Complaint and merely raises a dispute question of fact that is, therefore, meaningless for purposes of Defendants' motion to dismiss. Am. Compl. ¶¶ 62 (alleging, *inter alia*, that CRB agreed to continue representing CCI in exchange for George's personal guarantee of his firm's unpaid debts); *see also* Braverman Aff. ¶ 3.

attempt to evade his creditors, and his current commingled and confused corporations enjoy the fruits, good will, clients, and benefits of that business without having yet answered for its liabilities. Meanwhile, all CRB has done to incur its losses is faithfully and ably perform its contractual obligations and attempt to cooperate with a client that, to this day, has not itself paid CRB. At the very least, CRB has established a *prima facie* case justifying the piercing of Defendants' flimsy corporate veils.

## B.    CRB'S PLEADING MEETS ESTABLISHED STANDARDS TO SURVIVE A MOTION UNDER RULE 12(b)(6)

The separate motion to dismiss filed by CCI also must be denied, because (1) questions of fact remain regarding CCI's status that it claims preclude the Amended Complaint, and because (2) in making those claims, CCI relies on matters outside the pleadings, thus requiring that the motion to dismiss be converted into one for summary judgment that cannot be decided until (at the earliest) full discovery has taken place.

First, because questions of fact exist as to whether CCI survives as a legal or equitable corporation under Massachusetts law, dismissal would be premature. CCI offers no cognizable evidence for the proposition that it has been, and remains, dissolved – which in any event is plainly a question of fact – nor does CCI offer any reason to conclude that, if it has been dissolved, this action should be dismissed rather than simply held in abeyance while CCI is revived under Massachusetts law.[48] It is profoundly premature for CCI to attempt to dispose of

---

[48] *See* G.L.c. 156B, § 108 ("[i]f the state secretary finds that the existence of a corporation has terminated in any manner and that such corporation ought to be revived … he may, upon application by an interested party, file in his office a certificate in such form as he may prescribe reviving such corporation"). After revival, a "corporation 'shall stand revived with the same powers, duties and obligations as if it had not been dissolved.'" *Devlin Constr. v. Driftway South Constr. Corp.*, 14 Mass. App. Ct. 954, 955 (1982) (citing G.L.c. 156B, § 108).

the case based on its bare assertion that Massachusetts corporate formalities bar relief, even before CRB and the Court have the opportunity to determine CCI's actual corporate status.[49]

This is not a technical evidentiary issue regarding CCI's improper exhibit, since CCI may continue to exist as an equitable entity even if dissolved. This determination, too, is one of fact that will depend upon information obtained in discovery.[50] Similarly, CCI ignores the question of fact that exists as to whether CCI is a *de facto* corporation. The Southern District of New York recently considered a case in which, "although the Plaintiffs have sought to rely upon [an entity's] status as a 'dissolved' corporation, [they] treated [it] as a valid, qualified corporation at all times." *Briarpatch Ltd., L.P. v. Geisler Roberdeau, Inc.*, No. 99-9623, 2007 WL 1040809, at *17 (S.D.N.Y. Apr. 4, 2007). Under these circumstances, the *Briarpatch* court held that a "corporation which carries on its affairs and exercises corporate powers as before dissolution is a *de facto* corporation ... and, ordinarily, no one but the State may question its corporate existence." [51] All told, CRB's Amended Complaint in this case alleges, *inter alia*, that Mr. George misled CRB

---

[49] The Court enjoys an inherent discretionary power to stay motions and other matters in the interests of efficiency, economy, justice and fairness. This power "is incidental to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936). It is also subject to broad discretion. *Bechtel Corp. v. Local 215, Laborers' Int'l Union*, 544 F.2d 1207, 1214 (3d Cir. 1976); *see also* 7C Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1838 (2d ed. 1987).

[50] For example, courts have made clear that "where one has recognized the corporate existence of an association, he is estopped to assert the contrary with respect to a claim arising out of such dealings." *Cranson v. IBM Corp.*, 234 Md. 477, 488–89 (Md. 1964). This equitable estoppel "is based upon the ground that it would generally be inequitable to permit the corporate existence of an association to be denied by persons who have represented it to be a corporation, or held it out as a corporation." *Id.* Massachusetts courts have long recognized this equitable principle. *See, e.g., Dooley v. Cheshire Glass Co.*, 81 Mass. 494 (Mass. 1860) ("A corporation … which has assumed liabilities and held itself out as a corporation, cannot avail itself of its omission to publish the certificate of its organization … or of its adoption of the name of another corporation or company … to defeat an action against it by a creditor.").

into believing that CCI was a continuing corporation until Massachusetts's three-year wind-up period had run.  At the very least, before the court dismisses its claims, CRB has the right to conduct discovery of CCI in order to determine whether it really was legally dissolved, whether it was ever revived, whether it can now be revived, and whether it qualifies it as a corporation by estoppel or a *de facto* corporation.

Second, and as an entirely separate matter, CCI's motion cannot be granted because, where a party relies on documents that go beyond the pleadings in moving to dismiss, as CCI does for the dispositive question of its claimed dissolution, the court must ignore the evidence or convert the motion into one for summary judgment and allow discovery, and may not dispose of the case on motion to dismiss.  Fed. R. Civ. P. 12(b)(6); *see also Gordon v. Nat'l Youth Work Alliance*, 675 F.2d 356, 360 (D.C. Cir. 1982).  Here, CCI argues CRB's claims against it "are barred by the applicable statute of limitations because the claims were brought more than three years after the dissolution of CCI."  CCI Br. at 2.  In support of this assertion, CCI does not cite a statute of *limitations*, but a statute that requires a winding-up period for dissolved corporations.  *Id.* at 3 (citing G.L.c. 155 § 51).  Significantly, CCI does not even manage to offer cognizable support for the factual assertion that it no longer exists and, given Defendants' history of abuse of the corporate form, bare assertions are simply not enough.

More importantly with respect to the fact that its motion to dismiss must be converted into one for summary judgment, the webpage attached to CCI's motion that purports to show its dissolution is an exhibit outside the pleadings, and therefore is inappropriate at the 12(b)(6) stage.  Accordingly, assessing such an exhibit automatically converts the motion into one for summary judgment.  CCI claims that "[e]xhibits may be attached to Motions to Dismiss pursuant

---

[51] *Id.*  Massachusetts has long recognized this equitable doctrine, as well.  *See*, *e.g.*, *Boston*

to 12(b)(6) that were referred to in the Complaint or when a plaintiff has failed to introduce pertinent documents into its Complaint." *Id.* at 2. However, the cases cited by CCI stand only for the former proposition – that documents included or referenced in the complaint may be attached to a motion to dismiss.[52] Here, the webpage attached to CCI's motion is neither included nor referenced in the Amended Complaint. Nor is it integral to CRB's claim (as is, for instance, CCI's/George's Promissory Note). *See, e.g.*, *Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002) ("although [previous cases] make it clear that documents attached to a complaint are part of it for all purposes, and suggest further that concededly authentic documents referred to in a complaint that are central to a claim may also be consulted on a motion under Rule 12(b)(6), the converse is also true:  documents … neither included in the plaintiff's complaint nor central to the claim should not be considered on a motion to dismiss").[53]

Indeed, this Circuit – and the Supreme Court – have made clear that "under Rule 12(b)(6) the court may not consider matters outside the pleadings and accompanying legal memoranda without converting the motion into one for summary judgment and affording all parties 'reasonable opportunity to present all material made pertinent to such a motion by Rule 56.'" *Gordon*, 675 F.2d at 360 (quoting Fed. R. Civ. P. 12(b)); *see also McKinney v. Dole*, 765 F.2d

---

*Box Co. v. Shapiro*, 249 Mass. 373, 378 (1924).

[52] *See Pisciotta v. Shearson Lehman Bros.*, 629 A.2d 520, 525 n.10 (D.C. 1993) ("each exhibit attached to the motion had been referred to in the complaint, so Shearson did not rely on matters outside the complaint to support its motion"); *Feinman v. Schulman Berlin & Davis*, 677 F. Supp. 168, 170 n.3 (S.D.N.Y. 1988) ("plaintiffs refer to an offering memorandum in the complaint at ¶ 15 without identifying it by name").

[53] The StratComm Entities have filed what they claim are copies of CCI's articles of dissolution in support of their separate motion to dismiss. Defs.' Mot. Ex. 5. This exhibit is, of course, not cognizable for purposes of CCI's motion since it suffers from the same flaws as the exhibit thereto. Indeed, these papers were *not* attached to the Amended Complaint, *not* referenced in it, and *not* included in CCI's dismissal papers. And even if they were cognizable evidence, they do not answer the relevant question – whether CCI continues as a legal or equitable entity.

1129, 1134 (D.C. Cir. 1985); *Carter v. Stanton*, 405 U.S. 669, 671 (1972) (where "matters outside the pleadings were presented and not excluded by the court," it is "required … to treat the motion to dismiss as one for summary judgment and to dispose of it as provided in Rule 56") (internal citation omitted).  As a corollary, "[w]hen a district court converts a Rule 12(b)(6) motion to one for summary judgment, it must allow all parties both a 'reasonable opportunity to present all material made pertinent to such a motion by Rule 56' and a chance 'to pursue reasonable discovery.'"  *Taylor v. FDIC*, 132 F.3d 753, 765 (D.C. Cir. 1997) (quotation omitted).  Indeed, "the term 'reasonable opportunity' includes the opportunity "to pursue reasonable discovery."  *First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375, 1380 (D.C. Cir. 1988).

In this case, CCI attempts to rely on the purported truth of the contents of its exhibit on the contested fact of whether it has dissolved, and, if so, whether it can remain dissolved.  It attempts, moreover, to do so before CRB can obtain the discovery necessary to contest this assertion.  This plainly is not the function of a motion to dismiss, and dismissal must be denied, CCI's motion converted into one for summary judgment, and discovery allowed to ensue.

## C.    CRB IS ENTITLED TO JURISDICTIONAL DISCOVERY

Defendants' motions should be denied for all the foregoing reasons, but even if the Court were to find that CRB has not made sufficient allegations and/or marshalled enough evidence to defeat the motions, CRB is entitled to jurisdictional discovery.  It is well-established that a plaintiff "faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum."  *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 676 (D.C. Cir.

1996).  Jurisdictional discovery is routinely granted,[54] particularly where, as here, the movant enjoys a disproportionate control of the information and evidence necessary to decide the question where there has been a minimal showing that the plaintiff may be able to supplement the allegations via discovery.[55]  That is precisely the case here, where Defendants have withheld voluminous information about their operations and interrelations – even concealing the existence of entire businesses in an effort to defeat jurisdiction and liability – and where the evidence already marshalled provides ample basis to suggest that CRB's successor and alter ego claims (and therefore CRB's jurisdictional allegations) are meritorious.

CRB has brought forward considerable evidence that strange things are afoot among Mr. George's various businesses.  His entities are intermingled and their relationships are muddled, they claim feats and periods of existence that are belied by public records, and the evidence strongly suggests Mr. George has engaged in a pattern or scheme of reincorporation and obfuscation to avoid his creditors, all while obtaining the maximum marketing benefit to

---

[54] *See Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 513 (D.C. Cir. 2002) (but for insufficient service of process, court would have remanded suit for jurisdictional discovery, which district court should have afforded plaintiff opportunity to conduct).  Discovery is particularly appropriate where, as here, the jurisdictional questions are enmeshed with the central questions on the merits.  *Gruen Marketing Corp. v. Benrus Watch Co.,* 955 F. Supp. 979, 982 (N.D. Ill. 1997) ("where the jurisdictional issue involves factual disputes requiring discovery or is intertwined with the merits of the case, it is sometimes appropriate to postpone to the time of trial resolution of the jurisdictional issue") (citing *Crawford v. United States*, 796 F.2d 924, 929 (7th Cir. 1986) (same, citing *Augustine v. United States*, 704 F.2d 1074, 1077–78 (9th Cir. 1983)).

[55] *See El-Fadl*, 75 F.3d at 676; *GTE New Media Servs., Inc., v. BellSouth Corp.*, 199 F.3d 1343, 1351–52 (D.C. Cir. 2000) (discovery is generally warranted where a party may be able to "supplement its jurisdictional allegations through discovery") (citing *Crane v. Carr*, 814 F.2d 758, 764 (D.C. Cir. 1987 (reversing and remanding dismissal for lack of jurisdiction to allow for jurisdictional discovery)); *Arista Records, Inc. v. Sakfield Holding Co. S.L.*, 314 F.Supp.2d 27, 29 (D.D.C. 2004) (reciting previous allowance for jurisdictional discovery in reliance upon *El-Fadl*); *see also Gorman*, 293 F.3d at 676; *Exhibit Icons, LLC v. XP Cos., LLC*, No. 07-cv-80824, 2008 U.S. Dist. LEXIS 15971, at *3–5 (S.D. Fla. Mar. 3, 2008) ("jurisdictional discovery is highly favored before resolving" personal jurisdiction).

whichever entities are/were currently operational.[56]   These actions provide much more than a good faith basis to believe that CRB has properly asserted jurisdiction over the StratComm Entities and deserve discovery.  *See Caribbean Broad. Sys., Ltd. v. Cable & Wireless P.L.C.*, 148 F.3d 1080, 1090 (D.C. Cir. 1998) (good faith basis sufficient to warrant discovery).

The Court's approach to such discovery is "quite liberal," and this Court previously has observed that it "finds it hard to imagine a situation where a plaintiff could not 'demonstrate[] that it can supplement its jurisdictional allegations through discovery.'"  *Diamond Chem. Co. v. Atofina Chems., Inc.*, 268 F.Supp.2d 1, 15–16 (D.D.C. 2003) (quoting *GTE*, 199 F.3d at 1351– 52); *see also Material Supply*, 62 F.Supp.2d at 24 (granting jurisdictional discovery regarding alleged successor/alter egos where the entities shared same president and address, evidence suggested corporate transactions were entered to evade creditors, and timing of transactions raised suspicions).  Jurisdictional discovery is manifestly warranted, equitable and necessary. Accordingly, in the alternative to the outright dismissal of Defendants' jurisdictional motion, CRB respectfully requests discovery regarding the StratComm Entities' alter ego and successor-in-interest status.[57]

---

[56] *See GTE*, 199 F.3d at 1351 (remanding for discovery where questions about website ownership remain unanswered, even where *prima facie* burden had not been met, because it was "not implausible" that discovery would assist the plaintiff, and Court of Appeals could not tell whether jurisdictional discovery would help the plaintiff).   Moreover, George's various misrepresentations and half-truths raise serious questions about the credibility of his representations to CRB and to this Court.

[57] CRB is entitled to discovery regarding CCI regardless of whether discovery is granted as to the other defendants.  *See* IV.B, *supra*.  CRB has been unable to uncover evidence of the operations of CCI LLC, but given the abundant evidence of George's misuse of corporate forms, misrepresentations, and obfuscations, it, too, should remain in suit pending reasonable discovery.

## V.  CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss should be denied in their entirety.  Should they not be denied, the Court should grant CRB meaningful jurisdictional discovery regarding the StratComm Entities' alter ego and successor-in-interest status.

Dated:  March 12, 2008

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP


_____/s/ Brigham J. Bowen_____
Brigham J. Bowen – D.D.C. Bar No. D00301
Ronald G. London – Bar No. 456284
Davis Wright Tremaine LLP
1919 Pennsylvania Ave., N.W., Suite 200
Washington, D.C.  20006
(202) 973-4200

ATTORNEYS FOR PLAINTIFF

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COLE, RAYWID & BRAVERMAN, LLP ) | |
| ) | |
| Plaintiff, ) | Case No. 07-CV-2242-JR |
| ) | |
| v. ) | |
| ) | |
| ROBERT J. GEORGE, *et al.*, ) | |
| ) | |
| Defendants ) | |

## AFFIDAVIT OF BURT BRAVERMAN

I, Burt Braverman, depose and state under penalty of perjury that the information herein is true and correct.

1.      As a partner of Plaintiff Cole, Raywid & Braverman, LLP ("CRB"), I represented Defendant Custom Communications International, Inc. ("CCI") as counsel in litigation against, and in negotiations with, the National Society for the Daughters of the American Revolution (NSDAR) during the years 2002 and 2003.

2.      I am providing this affidavit in support of Plaintiff's opposition to the motions to dismiss filed by all Defendants except Robert George, and in support of Plaintiff's cross-motion, in the alternative, for jurisdictional discovery.

3.      As set forth in Plaintiff's Amended Complaint, by year-end 2002, CCI had incurred indebtedness to CRB in the amount of nearly $193,000, of which a portion ($127,000) was paid to CRB out of the proceeds of the settlement that CCI reached with NSDAR in late December, 2002. Although my firm properly could have applied the remainder of the settlement proceeds to pay the additional $66,000 owed to it by CCI (as Mr. George and CCI did not contest

that these amounts were rightly due and owing to CRB under the parties' Fee Agreement), *see* D.C. Rules of Professional Conduct 1.15 & cmt. 4, Mr. George requested that CRB release those remaining funds so that CCI could pay other debts. Having learned during the course of the litigation of CCI's alleged financial straits, and because of Mr. George's request that the remaining settlement funds be used to pay other unsatisfied debts of CCI, I recognized that releasing those funds placed my firm at risk of not having its bills for past services paid. In addition, CCI stood in need of substantial further representation by CRB in matters related to performance of CCI's obligations under the NSDAR settlement, which need, if CRB were to continue representing CCI, would place CRB at further risk of providing services for which its client might not have had the ability to pay. Accordingly, and in a good-faith effort to cooperate with my client, who made assurances that CRB would be paid, I requested that CCI and Mr. George respectively execute a promissory note and personal guarantee for the fees owed and future fees to be incurred in exchange and as consideration for the release of funds and for CRB's agreement to continue representing CCI. Mr. George freely and willingly agreed to do so, without any protest or disagreement, and thanked me for my firm's able representation in the litigation with NSDAR and its flexibility and cooperation in dealing with CCI.

4.    After execution of the promissory note, I and my firm represented CCI both in performing a substantial amount of work necessary to CCI's performance of its obligations under the NSDAR settlement agreement, and subsequently in defense of NSDAR's claims that CCI had breached its obligations under the settlement agreement, for which services CCI incurred further fees amounting to $26,293.81.

5.    Throughout 2003 and thereafter, Mr. George made repeated assurances on behalf of himself and CCI that he and CCI would pay their debts to CRB. He also made repeated

assurances that he would, *inter alia*, provide certain financial documentation of his and his business' financial condition, and make specific payments on or before specified dates. Neither he nor CCI made any of the promised payments, and Mr. George frequently and largely failed to deliver on his other promises and assurances.

6.      At no time prior to March 2007 did Mr. George inform me that he had dissolved CCI, or that he was continuing to operate his communications businesses under other guises.

7.      Throughout the period during which CRB represented CCI, as well as during the time when CRB attempted thereafter to collect CCI's/George's debts to it, Mr.George held himself out as proprietor of both CCI and a company called "Boston Publishing."

8.      On or about March 11, 2003, I asked Mr. George to clarify for me the relationship between CCI and Boston Publishing. To my knowledge, he never responded to this query.

9.      Annexed hereto as Exhibit A is a true and correct copy of an e-mail (with attachments) from Mr. George to me and others, including an official with the Small Business Administration, including Jack Fegreus (then-employee of CCI), on May 19, 2003, regarding the status of his CCI business. This communication establishes that many current and ongoing clients of Mr. George's entities have been such clients since before Mr. George allegedly dissolved CCI. It also establishes that achievements currently touted by Mr. George's StratComm entities as company achievements were achieved, in fact, by CCI. Finally, it supports the allegations in the Amended Complaint that Mr. George currently operates, in essence, the same business he operated under the guise of CCI.

10.     Similarly, in late 2003, Mr. George was representing in public-relations and marketing pitches to potential clients and others, some of which I also received, that his CCI business, which he often identified as serving "Fortune 500" clients, had re-captured of some of

these clients which CCI had lost after 9/11 – particularly clients such as Goldman Sachs and Deloitte & Touche, which had substantial operations in and around the World Trade Center.

11.      In January 2005, seven months before Mr. George incorporated StratComm, Inc., the entity through which, according to his representations to the Court, he returned to the publishing industry after a two-year hiatus, Mr. George represented in a communication to me that many of his clients, which he identified as "Fortune 500 clients," had returned.  He did not inform me at this time that he had incorporated and was operating a new entity other than CCI called "Strategic Communications."

12.      By May 2006, Mr. George had made multiple assurances of his good faith and intention to pay CCI's and his debt to CRB, but at about this time, George began affirmatively refusing to communicate with CRB entirely.

Further affiant sayeth not.

_____
Burt Braverman

Washington, D.C.

Subscribed and sworn to before me this _12th_ day of ____March____, 2008.

_____
Notary Public

Gina H. Lee
Notary Public, District of Columbia
My Commission Expires 06-30-2009

*My Commission expires on:* _____

4

**EXHIBIT A
TO
AFFIDAVIT OF BURT BRAVERMAN**

| | |
|---|---|
| **From:** | Robert J. George [RGeorge@CCIcommunications.com] |
| **Sent:** | Monday, May 19, 2003 7:08 PM |
| **To:** | KWoodworth@CCIcommunications.com; JFegreus@CCIcommunications.com; NCohen@CCIcommunications.com; MFarmakis@CCIcommunications.com; CDavis@CCIcommunications.com; CBaker@CCIcommunications.com; RGeorge@CCIcommunications.com; CBarnes@CCIcommunications.com; RGeorge001@attbi.com; David@Sayre.com |
| **Cc:** | Burt Braverman; MLederman@murthalaw.com; martin.orr@sba.gov; JStrandberg@sequenom.com; jss@middlesexfederal.com |
| **Subject:** | Maybe, just maybe... |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Blue |
| **Attachments:** | ER OverviewP1.doc |

Hi all,

As they say:  ?Is that light at the end of the tunnel, or just another train??

As you know, we've been picking up a little new business lately, but after the past few years we've been slow to celebrate anything.

Every time it seems like we?re getting a little puff of wind to fill the sails so we can get underway, another client lays off 1,500 folks and we?re adrift again.

The only wind we have seen was accompanied by a hurricane (and a ton of legal bills).

I thought we saw land once or twice, but it turned out to be a Novell mirage and a DAR pirate ship.

I'm sure glad we?re not on a U.S. Naval vessel, they don't allow drinking on board.  I'm not sure we could have survived this voyage on the good ship CCI without a yo-ho-ho and a bottle (s) of rum.

Well anyway, we have all been pulling pretty hard on our oars, and now we seem to be getting a little help from the wind.

Here?s a cautious update:

■                Copyright Clearance finally wants to begin work; we have a kick-off meeting this Thursday, the program is underway.  Too early to tell the size and scope of the project but it should be reasonable.

■                Fidelity sent us a note today saying how pleased they are, and they look forward to doing more with us --- great work
        Kristin.

■        Computer Associates also says we?re going to get some more work (thanks to Jack and Nancy).

■        IBM keeps plugging along with Linux Line, maybe someday soon the second IBM pub will start up.

■        Goldman Sachs seems to be happy campers, but I don't think they have anymore budget, so things will probably
        remain at the present level.

■        Meanwhile the MAR folks are very pleased.  Kristin and Margaret have done a wonderful job of upgrading their
        magazine (on a limited budget) and Clint, who thought advertising had died and gone to Hell, is breaking MAR ad
        sales records.

■        OPEN list rental is coming in nicely and it should go up soon now that the list is bigger. AND, soon we'll have OPEN
        advertising  how much remains to be seen but Beth Dudas and her group of reps inspire confidence.

■        The syndicated newsletters are doing okay  slower than we'd like, but they?re moving in the right direction.

■        Real Estate Society seems fine and appears to be moving along smoothly.

■        Interex/HP seems fine, small, but steady.

■        Meanwhile we have a few prospects (Humana, KFC, maybe a few others, but we don't count chickens anymore, at
        least not till they?re dead and laying on the table before us).

■        We also have some help.  Jim Herzig is bringing in a promising utility prospect this Thursday, and Dick Dyer has
        arranged meetings with prospects, and Mary Kaye Dennings is out selling our wares.

■        There are other small opportunities too.  Maybe an online publication for Prudential, a few more white papers, every
        little bit helps, but we?re not counting on any of it.

The best news is that our prospects have officially turned into clients: Fidelity and Copyright Clearance.  Maybe even CA will kick in soon.

We still have a long way to go, and lots of bills to pay, but we are moving in the right direction, which is a good feeling after all we've been through together.

Thanks for all you do.  I hope everyone can make it to the company picnic on June 21.

3/7/2008

Bob    (who?s not a sailor, so I don't know why I talk like one)

# Overview of CCI Capabilities




**CCI Communications focuses on content creation and delivery in all media with special expertise in:**

- **Newsletter and Magazine Development**
- **Digital media**
- **Channels Marketing / Direct Marketing**
- **Technology Analysis and Research**

**Newsletter and Magazine Development:** What distinguishes CCI from its competitors is its ability to go well beyond the traditional corporate publication and take on advanced projects to deliver rich print and electronic publications for clients that need to engage customers/members with content that has maximal impact.

In this arena we have our own magazine *Open*, as well as, monthly magazines and quarterly newsletters for clients including the Massachusetts Association of Realtors, Goldman Sachs, Fidelity Investments, Daughters of the American Revolution, Blue Cross / Blue Shield, Ciga Hotels (Europe), the U.S. Polo Association and others. We work with clients in all aspects of their project from content creation, to design, and circulation development.

A key strength of CCI is its 30 years of direct marketing and database development experience, which when combined with our extensive content capabilities enables us to provide significant assistance to clients who must communicate more effectively with their customers, prospects, vendors, shareholders and others.

CCI is comprised of experienced journalists, talented designers, and savvy direct marketers, all of whom are supported by significant in-house technology. We deliver our client's messages precisely to targeted audiences, using any medium, in any language.



CCI has hundreds of writers under contract thus enabling us to produce content and marketing materials on any subject for virtually any market. CCI has worked with many Fortune 500 companies, all of whom are happy to provide references, in the areas of health care, financial planning and technology.

**Digital Media:** Whether it's email campaigns or web-based e-zines, the hot new arena is without doubt digital. The cost savings over print is often a decisive factor for our clients when they realize they can extend reach and frequency by going digital. But while digital media is an alternative to print, successful delivery of digital content is very different from print; here too is where CCI shines.

Companies trying to take advantage of digital media benefit from an outside partner (CCI) who knows how to put together a successful e-zine. Engaging web readers and building an e-zine community involves an order of magnitude involving more reader research as circulation managers are now learning.

For our own publication, *Open,* this meant analyzing reams of web statistics on a daily basis to learn the secrets of building a solid demographically controlled audience. We used our technology skills to engage readers with survey polls crafted to reveal strategic marketing data about buying intentions, usage trends, and user's degree of familiarity. These polls when used in a custom publication can be a potent vendor or partner-

branding tool. Check out how we work up reader survey polls, for example, into real reader engagement at *Open*:

http://www.open-mag.com/2109796188.htm

And now with the crack down in SPAM under way, having a 100% qualified, opt-in list of 47,000+ IT professionals has become the jewel in the crown for *Open*.

All of our skills came into play as we took on helping IBM with *The Linux Line*, their newsletter to help demystify Linux for IT and corporate executives. When we started with *The Linux Line* team, they had a quarterly text-based news letter that dumped reams of essential undifferentiated text on about 1,000 hapless readers on a very loose quarterly schedule. One year later, *The Linux Line* is a successful monthly web-based publication with an e-mail component that goes out religiously to 26,000 direct subscribers the 15th of every month. This year they've also begun mailing the publication to all 47,000 *Open* subscribers as well.

IBM offered this quote for CCI use:

> *"CCI is unique, providing the highest quality edit and design, supported by extensive in-house technology. They save us money and make us look good. We generally must obtain three quotes but we cannot find two more companies like CCI."*
>
> - Ken Godfrey, Manager, IBM Worldwide Linux Marketing

CCI has also worked with smaller companies in a similar manner. We helped Connected Corp., a PC backup company, to develop a design, content, and electronic transmission program they could live with. From square one, we identified a hierarchy of stories suitable for a magazine format, researched resources relevant to their product line, and developed story packages to help brand them as a knowledge-sharing company with existing and new clients.

**Technology Analysis and Research:** CCI provides independent comprehensive labs, white papers and technical product analysis. Armed with the reader polling capabilities (both web and e-mail), CCI offers effective brand-building by providing case studies which are used in research papers, feature stories customized to serve as collateral handouts, sales tools, brochures, PDF-downloads—whatever format is required. Leading IT companies turn to CCI when they have a "special reports" mission, especially in seeking to draw in partners and resellers.

**Channels Marketing:** CCI's ability to target material for a channels marketing strategy was honed in a number of ways. In the IT field, the *Open* team began concentrating on how to deal with channels-oriented editorial, when they put together *BackOffice* Channels in the Microsoft sphere.

*Fortune Magazine* turned to us to write and design *Fortune's* special report about how Microsoft's partners had leveraged *BackOffice* technology to change the way their business customers do business.

This special expertise to develop and deliver highly informative and highly read case studies is also demonstrated by IBM's consistent use of our case studies. They post them on their most prominent web sites: *Update for Linux*, *The Linux Line*, and more. They turn to our work because we write from the focal point not of IBM executives but from the frontlines of IBM' channel community. Story by story, we detail how using a vendor's hardware, software, and services helps their VARs, system integrators, or third-party developers, gain traction and a healthier user base.

The links below provide a neat example of what we do over and over again for IBM's product groups. Starting off as a story for independent *Open*, IBM was alert enough to see that it pays for them to post good-news partner spotlights, because that is the way they grow their marketplace reach, through strategic partnerships with companies that complement their strengths.

http://www.open-mag.com/3074683279.htm

http://www.pc.ibm.com/ww/eserver/xseries/linux_update/pubs/mar03.pdf

CCI is generally asked to manage every aspect of a program; we serve as an extension of our client's in-house staff, providing them with the depth and expertise that enables them to communicate more effectively and less expensively.

**In Summary:**  We produce web content for Prudential Financial Services, interactive online publications for Connected Corporation, comprehensive labs and white papers for Computer Associates, print periodicals for Goldman Sachs and Deloitte & Touche, direct marketing programs for the U.S. Olympic Committee, sales and marketing materials for Fidelity Investments, customer magazines for Blue Cross/Blue Shield, and more.






U.S. Olympic Commitee

Time-Life

Federation of the Arts

The programs we create are often complex and include versioned, variable data publications that interface with all elements comprising a large corporation's marketing and communications program.

In short, we help our clients to speak with one voice and control their message.

Well. There you have the menu in brief. We're open, agile, revved up to talk further.

Bob

Sample CCI online publications:


CCI overview.pdf


PDF CareAct5759-519.pdf


PDF linuxline_may03.pdf


PDF Final Winter03.pdf



www.archive.org
415.561.6767
415.840-0391 e-fax

Internet Archive
116 Sheridan Avenue
Presidio of San Francisco
San Francisco, CA  94129

# AFFIDAVIT OF PAUL FORREST HICKMAN

1. I am the Office Manager at the Internet Archive, located at the Presidio of San Francisco, California. I make this declaration of my own personal knowledge.

2. The Internet Archive is a website that provides access to a digital library of Internet sites and other cultural artifacts in digital form. Like a paper library, we provide free access to researchers, historians, scholars, and the general public. The Internet Archive is affiliated with and receives support from various institutions, including the Library of Congress.

3. The Internet Archive has created a service known as the Wayback Machine. The Wayback Machine makes it possible to surf more than 85 billion pages stored in the Internet Archive's web archive. Visitors to the Wayback Machine can type in a URL (i.e., a website address), select a date range, and then begin surfing on an archived version of the Web. The links on the archived files, when served by the Wayback Machine, point to other archived files (whether HTML pages or images). If a visitor clicks on a link on an archived page, the Wayback Machine will serve the archived file with the closest available date to the originally requested page.

4. The Internet Archive receives data from third parties who compile the data by using software programs known as crawlers that surf the Web and automatically store copies of website files at certain points in time as they existed at that point in time. This data is donated to the Internet Archive, which preserves and provides access to it.

5. The Internet Archive assigns a URL on its site to the archived files in the format http://web.archive.org/web/[Year in yyyy][Month in mm][Day in dd][Time code in hh:mm:ss]/[Archived URL]. Thus, the Internet Archive URL http://web.archive.org/web/19970126045828/http://www.archive.org/ would be the URL for the record of the Internet Archive home page HTML file (http://www.archive.org/) archived on January 26, 1997 at 4:58 a.m. and 28 seconds (1997/01/26 at 04:58:28). Typically, a printout from a Web browser will show the URL in the footer. The date assigned by the Internet Archive applies to the HTML file but not to image files linked therein. Thus images that appear on the printed page may not have been archived on the same date as the HTML file. Likewise, if a website is designed with "frames," the date assigned by the Internet Archive applies to the frameset as a whole, and not the individual pages within each frame.

6. Attached hereto as Exhibit A are true and accurate copies of printouts of the Internet Archive's records of the HTML files archived from the URLs and the dates specified in the footer of the printout.

7. I declare under penalty of perjury that the foregoing is true and correct.

DATE: 3/7/08

Paul Forrest Hickman

# Exhibit A

# Boston Publishing Company, Inc.



Welcome to Boston Publishing Company (BPC). At this site you will find information about our company and the publishing and other communication services we provide to our clients.

Boston Publishing is a full service publisher. We create newsletters, magazines, books, direct mail and Web site content for our clients. Our staff manages everything from edit, art and design through print, circulation, distribution and database management. We produce content for both print and electronic publications.

Because publishing is our only business we can produce higher quality publications for a lower cost than companies or associations are able to do in-house. With BPC you can outsource your communications to a company that knows publishing and direct marketing and can execute programs based on your objectives.

We work for major corporations around the world. Our staff knows how to harness and enhance the power of your data base. Target marketing and communications is our business.

Keep exploring this site and you will find that BPC has all the tools to develop a program that fits your company's needs. Please call us at: 617-559-0003 for more information. Thank you.

Or, e-mail us at: www@bostonpublishing.com

Thank you for visiting us at Boston Publishing Company.

Newsletters | Magazines | Books | Web Content | Direct Mail
About BPC | Credentials | Contact Us

**BOSTON PUBLISHING COMPANY, INC.**
57 Wells Avenue ° Second floor
Newton, MA 02459
Phone: (617) 559-0003
° Fax: (617) 559-0002
Email: www@bostonpublishing.com



Please visit our custom
publishing division at
www.CustomCommunications.com

Please visit other CCI websites at:
OpenMagazine.net | CustomCommunications.com | VietnamExperience.com

# Boston Publishing Company, Inc.



Welcome to Boston Publishing Company (BPC). At this site you will find information about our company and the publishing and other communication services we provide to our clients.

Boston Publishing is a full service publisher. We create newsletters, magazines, books, direct mail and Web site content for our clients. Our staff manages everything from edit, art and design through print, circulation, distribution and database management. We produce content for both print and electronic publications.

Because publishing is our only business we can produce higher quality publications for a lower cost than companies or associations are able to do in-house. With BPC you can outsource your communications to a company that knows publishing and direct marketing and can execute programs based on your objectives.

We work for major corporations around the world. Our staff knows how to harness and enhance the power of your data base. Target marketing and communications is our business.

Keep exploring this site and you will find that BPC has all the tools to develop a program that fits your company's needs. Please call us at: 617-559-0003 for more information. Thank you.

Or, e-mail us at: www@bostonpublishing.com

Thank you for visiting us at Boston Publishing Company.

Newsletters | Magazines | Books | Web Content | Direct Mail
About BPC | Credentials | Contact Us

**BOSTON PUBLISHING COMPANY, INC.**
57 Wells Avenue ° Second floor
Newton, MA 02459
Phone: (617) 559-0003
° Fax: (617) 559-0002
Email: www@bostonpublishing.com



Please visit our custom
publishing division at
www.stratcomm.info

Please visit other CCI websites at:
OpenMagazine.net | StratComm.info| VietnamExperience.com

To learn how StratComm can help you, contact us today!

Tel: 508-655-9255
Fax: 508-655-8560
Email: RGeorge@StratComm-Inc.com

CRB 0004

Logo

Custom Communications
info@CustomCommunications.com
1-800-872-8122

For more information, or to
receive a copy of our
booklet, click here.

Please visit other CCI websites at:
OpenMagazine.net | BostonPublishing.com | VietnamExperience.com

Editorial Focus | Reader Demographics | Edit Contacts | **Ad Rates** | Sales Contacts | CCl

# Three performance-based ad-price options



<u>Editorial Focus</u> | <u>Reader Demographics</u> | <u>Edit Contacts</u> | <u>Ad Rates</u> | **Sales** | <u>CCI</u>



# Sales Contacts

**Publisher**



**Robert George**
*CEO, Publisher*

**Sales**



**Peggy Scanlon**
*National Sales Director, Custom Publishing*
<u>PScanlon@customcommunications.com</u>
57 Wells Avenue, Second Floor
Newton, MA 02459
Voice: 617-559-0001 X203
Fax: 617-559-0002

**Clint Baker**
*National Advertising Director*
<u>clint.baker@open-mag.com</u>
37 Clement Court Haverhill, MA 01832
Voice: 978-372-3951
Fax: 978-372-3961

**Publishers**





**Custom Communications**
**57 Wells Avenue**
**Newton, MA 02459-3227**
**617.559.0001**
**Fax: 617.559.0002**

<u>www.customcommunications.com</u>

**About Us** | Services | Open Media Kit

## The Value of Custom Publishing

- **Build brand identity, loyalty and credibility.**
- **Deliver controlled messages to targeted audiences.**
- **Explain and illustrate complex products and services.**
- **Drive traffic to your Web site**
- **Create affinity groups.**
- **Utilize as a CRM tool for regular, measurable feedback.**



We published *The Vietnam Experience* series in partnership with Time-Life Books, which was twice nominated for a Pulitzer Prize in history. This volume has been annotated from cover to cover by General William Westmoreland, Commander of all U.S. forces in Vietnam. Our research stands the test of the toughest scrutiny.



*Above and Beyond, the Official History of the Medal of Honor* was our first custom publishing venture. Produced for the Congressional Medal of Honor Society, this copy was signed by every living recipient of the Medal and presented to our staff in appreciation for the work done on the project.

At CCI, custom publishing is our *only* business and we've been at it for more than two decades. With our years of experience and our ability to manage complex programs, CCI has often worked with large companies and associations that are leaders in their fields and industries. With every CCI client, no matter how large or small, we take the time to understand their communications goals and then work with them to map out approaches specific to their needs. This personal interaction culminates in a detailed proposal, covering every aspect of the process.

CCI offers integrated, "media neutral" programs. Our goal is to develop great communications programs that meet and exceed your expectations. When you read about our products and services?newsletters, magazines, websites, direct mail and database management?you're actually reading about the separate components that make up a CCI communications program. Regardless of the components you choose for your program, CCI's objective is to deliver valuable content to your database via precision direct marketing, and we'll use any appropriate communications vehicle to accomplish this.

As an employee-owned company, we offer our clients the very highest level of personalized service. In addition, CCI is backed by two of the nation's leading investment banking firms: Allen & Company and Holding Capital. This unique combination allows us the flexibility to put client service first?acting as a small, focused business?while we enjoy the strength and financial stability provided by having access to substantial financial resources.



[We provide measureable results]

### stratcomm

**ASK OUR CLIENTS**

*Thank you! You have no idea how nice it is for me to never have to think about the work you do for us. It's always on time, always top notch and you keep track of where we are and let me know if there's a problem in plenty of time to fix it. Great job, as always.*

— Ron Evans
Director, Interex, Hewlett Packard

We offer a consultative, collaborative approach to creating effective communications solutions. We first assess your pain points and communications challenges by asking the following questions: What are your communications challenges? What are your goals? Who is your target audience? What is the most effective medium to reach that audience? What is the unique selling proposition for your product or service?

Using targeted communications vehicles, we connect the dots between your product excellence and business value, just as we have on high-profile projects for clients like Fidelity Investments, IBM, Goldman Sachs, Microsoft, Deloitte & Touche, Siemens, Prudential Financial and many others.

We offer a unique blend of high quality content and design services, supported by our significant in-house technology.

We unleash award-winning design principles for richly textured information that communicates via breakouts, illustrations, graphics, resource guides and charts.

We leverage a sophisticated knowledge base of business strategies, industry trends and market research in creating communications tools that provide our clients enhanced status as knowledge providers. Our communications tools provide measurable results and feedback that enable us to constantly tweak your program to make it as effective as possible, while keeping schedules running on time and costs within your budget.

Whether the objective is to launch a customer magazine, an interactive online publication, technical white papers or a direct marketing program, you can count on Strategic Communications to deliver high quality, cost effective, response driven communications solutions.

CRB 0009

Strategic Communications Inc

CRB 0010





Strategic Communications has considerable editorial and design resources supported by significant in-house technology.

Strategic Communications pioneered the concept of creating integrated print and electronic publications that work hand-in-hand, as part of an integrated communications program, to ensure that our clients? messages are delivered precisely and cost effectively to targeted audiences.

Our trained journalists are also technologists, and they understand that even the highest quality content is of little value if it is not delivered to the right target audience. Few companies are able to offer Strategic Communications' unique combination of journalism enhanced by sophisticated technologies.



**A CLOSER LOOK**

Click below to take a closer look at the PEAK Technologies *Performance Online* newsletter designed for high-level customers and C-level executives.

MORE



Percent of Sites with Exclusive Readership

Recently, we surveyed the readership of several of our clients? publications. Some were distributing either an online publication (only) or a print publication (only) to their customers. We learned that on average only 11% of the customers read the online publication, and 56% reported they read the print publication.



When a print and online publication are published in tandem (alternating) the readership numbers for both publications increased dramatically. The print publication directs the reader to the online publication for the interactive material, and the online publication directs the reader to the print publication and to the archives of past issues on the website.

CRB 0011

We also learned from the survey that the print publications are much more effective for branding (real estate on the desk), and the longer and more complex articles are better read on the printed page where they can be illustrated and made more engaging and reader friendly.

Only short articles are read on the computer screen, but the online publications are more interactive and, therefore, are more effective for getting reader feedback and other measurable data.

In summary, many of our clients have reduced the frequency of their print publications to save on printing, paper and postage, but they?ve added an online publication for interactivity and to obtain measurable feedback. When working as part of an integrated communications program each publication lifts the readership rate of the other, thereby making them work harder in order to improve demand.

CRB 0012

     



Fidelity's quarterly eNewsletter *Foundation Solutions* (top) and direct mail campaign to clients and prospects (bottom)

MORE

**Become an Extension of the Client?s In-House Marketing Staff to Create High-Quality Publications that Educate, Inform and Empower Clients and Advisors**

**Client: Fidelity Charitable Services®, a division of Fidelity Investments®**

**About Our Client:** Fidelity Charitable Services® offers giving solutions and planning tools through the *Fidelity* Charitable Gift Fund[SM], Fidelity Pooled Income Fund and Fidelity Private Foundation Services[SM] to meet high-net-worth clients? philanthropic needs.

**The Challenge:**
Fidelity needed a company they could turn to that would act as an extension of their in-house marketing and communications staff on projects running the gamut from research-intensive white papers, eNewsletters, direct marketing projects, advanced PowerPoint presentations, speech writing, by-line articles and more.

**The Project Demands:**

- Fidelity required maximum flexibility in terms of being able to tackle any project on a moment?s notice and turn it around quickly, all while adhering to Fidelity?s high standards and strict style guides.
- Fidelity needed to educate and inform its advisors and clients about its array of products and services and position itself as an industry expert.
- Both editorial and creative elements must be on point to pass through Fidelity?s extensive compliance review.
- A collaborative environment was essential in order for Fidelity?s staff to feel they could rely on the team to get the job done.

**The Strategic Communications Solution:**

- Strategic Communications created a library of white papers on everything ranging from trends in the philanthropic industry to legislative updates and tax-planning developments.
- Managing all projects from concept through delivery, Strategic Communications was able to free Fidelity?s staff from the day-to-day details, while getting their approval every step of the way.
- Strategic Communications created an eNewsletter, *Foundation Solutions*, delivered to advisors on a quarterly basis providing useful and relevant information in the charitable arena.
- The Strategic Communications editorial team has become ?the voice? of many of Fidelity?s top executives by writing their speeches and by-line articles for top industry publications and conferences.

CRB 0014

     







IBM's OpenPower Village
website

MORE

**E-Newsletters that Translate High-Technology Into Business Terms**

**Client: IBM**

**About Our Client:** The IBM name is synonymous with information technology leadership in all things hardware and software.

**The Challenge:**

- Capitalize on a $1 billion investment in the Linux operating system.
- Build a community of C-level executives.
- Leverage a wealth of technical content including product specs, press releases, technology briefings, partner announcements, Web casts and market-research surveys.
- Build awareness of Power Architecture for end users and potential electronics partners looking for a ?System On a Chip.?
- A pressing need to expand a limited database, but any new readers had to be highly targeted to be of value.

**The Project Demands:**

- IBM had a limited budget for the project and required quick turnaround times.
- Strategic Communications needed to refocus all existing Linux material from ?How To? to ?Why To.?

**The Strategic Communications Solution:**

- Strategic Communications created two online newsletters for IBM, *The Linux Line* and *Power Architecture Community*. The first was targeted to engage CIOs as to the merits and paybacks of using Linux.
- Turning from an operating system to the chips themselves, we then helped launch IBM?s second newsletter for the Power Architecture community. The launch was driven by IBM?s strategic decision to model a community around Power Architecture. We designed a newsletter for senior-level IT engineers and developers, of whom many are at early-adopter stages.
- Working with the Strategic Communications team of writers and technologists who understand IBM?s?products, can describe them in business context,?and design on-line newsletters with minimum supervision, IBM was able to double the circulation of *The Linux Line* and to take the *Power Architecture* newsletter from concept to distribution in only three weeks.

CRB 0015

CRB 0016



**Strategic Communications, Inc.**
**One Gateway Center, Suite 651**
**Newton, MA 02458**
**617.969.0700**
**800.872.8122**
info@stratcomminc.com

## Directions
Click here to find your way via mapquest.com
GPS: 300 Washington St., Newton, MA

### From Boston/Logan International Airport
Exit from the airport through the Ted Williams Tunnel, which becomes the Massachusetts Turnpike West (Interstate 90). Take Exit 17 (Newton/Watertown). At the end of the ramp, proceed straight through the intersection (following signs for West Newton) onto Washington Street. One Gateway Center is located on the left, and the entrance to the parking garage is the first left after Applebee?s restaurant.

### From the North
Take Route 93 South to Exit 20 (Massachusetts Turnpike West). Follow the Mass Pike to Exit 17 (Newton/Watertown). At the end of the ramp, proceed straight through the intersection (following signs for West Newton) onto Washington Street. One Gateway Center is located on the left, and the entrance to the parking garage is the first left after Applebee?s restaurant.

### From the South
From Cape Cod or other points south, take Route 3 North to Route 93 North to Exit 20 (Massachusetts Turnpike West/ I-90). Take Exit 17 (Newton/Watertown). At the end of the ramp, proceed straight through the intersection (following signs for West Newton) onto Washington Street. One Gateway Center is located on the left, and the entrance to the parking garage is the first left after Applebee?s restaurant.

### From the West
Take the Massachusetts Turnpike East (I-90) to Exit 17. As you exit, move into the left-hand lane and proceed around the circle, over the bridge to Washington Street (you want to get into the lane third from the left as you go over the bridge; be careful not to re-enter the Mass Pike). One Gateway Center is located on the left, and the entrance to the parking garage is the first left after Applebee?s restaurant.

CRB 0017

CRB 0018



[We are solutions oriented]

stratcomm    WHAT WE DO    |    |    |    |

CLICK HERE TO VIEW OUR PORTFOLIO

**ASK OUR CLIENTS**

Strategic Communications is unique, providing the highest quality edit and design, supported by extensive in-house technology. They make us look good and save us money. We normally require three bids but we cannot find two more companies like StratComm.

- Ken Godfrey, Manager, IBM Worldwide Linux Marketing

High profile companies trust our 30 years of experience and our good judgment. With hundreds of experienced writers and designers at our fingertips, we?re able to produce high-quality content on virtually any subject in any language and deliver it using any medium.

We replace advertising clutter with ?information? that helps your customers to do their jobs better?information that produces measurable results, brands your products and creates demand.

We are solutions oriented: We help technology companies manage their communications in the midst of rapidly changing IT environments; energy companies deal with the changing landscape of deregulated markets; financial services firms during mergers and acquisitions; and health services companies inform their customers in the midst of new advances and breakthroughs.

We have worked in virtually every industry and market, from retail and consumer goods to manufacturing and the hospitality industry.

We enable clients to control their message and speak with one voice. We serve as a collaborative extension of our client?s in-house team providing depth, experience and flexibility. We improve quality while reducing costs.

Our company has won nearly every major editorial and design award, including two Pulitzer Prize nominations. All of our clients are pleased to serve as references.

Very simply, we are about good communications.

Strategic Communications Inc.

CRB 0020

     





The Massachusetts Association of REALTORS® bimonthly Bay State REALTOR® Magazine



### Relaunch a Member Magazine with High-Quality Production Values and Increased Advertising Pages

**Client: Massachusetts Association of REALTORS®**

**About Our Client:** MAR is ?The Voice for Real Estate™? in Massachusetts. For more than 80 years, MAR has been working diligently on behalf of property owners to advocate fair housing and home ownership for all. The association also administers educational training, professional standards services and ethics cases to ensure its members not only understand, but adhere to the state and federal laws and the strict, national REALTOR® Code of Ethics.

**The Challenge:**

- Relaunch *Bay State REALTOR®* magazine, a publication with low production values, to better communicate with members, engage readers and put a fresh face on the association in order to keep members better informed, and to encourage them to utilize the association?s services to a greater degree.
- Assist the association in their efforts to increase membership and membership benefits.
- Increase advertising revenue and boost ad sales from only six pages of ads per issue.
- Redesign an outdated media kit to aggressively target new advertisers.

**The Project Demands:**

- Implementation of the project had to meet with unanimous approval from all of the association?s board members and the executive committee.
- Strategic Communications had one month to roll out the media kit and prepare for the magazine?s relaunch.
- With very few existing advertising contacts, Strategic Communications needed to be proactive in generating support for the magazine.

**The Strategic Communications Solution:**

- By designing a targeted, comprehensive advertising program to support the struggling organization and creating new incentives for advertisers, ad revenues more than doubled in less than six months. The current publication supports just under 20 pages of ads and new business-partner relationships have been created.
- Since relaunching the magazine, membership has grown 25% and the circulation continues to increase.

CRB 0022





A weekly e-zine for Linux and
Open Source computing
in the enterprise

CCI

ADVERTISING

EDITORIAL

CRB 0023





A weekly e-zine for Linux and
Open Source computing
in the enterprise

STRATCOMM

ADVERTISING

EDITORIAL

CRB 0024









A weekly e-zine for Linux and
Open Source computing
in the enterprise

STRATCOMM

ADVERTISING

EDITORIAL

CRB 0026

# eXCHANGE

## SAN STORAGE GOES GRID

August 4th, 2005

Using the notions of grid computing, the Linux-based MPC DATAFrame 420 unifies Fibre Channel and iSCSI SAN technologies, eliminates single points of failure, and creates a single point of management. Via its Java-based Storage Server Console, MPC's DATAFrame comes tantalizingly close to the utopian vision of the perfect SAN device. *Click:* SAN STORAGE GOES GRID

## VIRTUALIZATION GETS REAL

August 4th, 2005

The ultimate goal is for storage is to scale without disruption, be self-managing, and provide users with intuitive access to features. The first steps towards storage nirvana are the adoption of a network storage model and the simplification of management with storage virtualization. Learn how separating the logical representation from the physical implementation provides the means to change network infrastructure at will. *Click:* VIRTUALIZATION GETS REAL

## OPEN CONTINUES TO SERVE INTEREX SUBSCRIBERS

July 20th, 2005

 Strategic Communications, the publishers of *OPEN* magazine, regret that after 31 years, of serving the HP user community, our publishing partner Interex has found it financially necessary to close its doors. All of the Interex publications, newsletters, services and conference (HPWorld 2005) will be terminated immediately.

This decision does not affect *OPEN* magazine. *OPEN* magazine will continue to be published on the web by Strategic Communications and all of the Interex subscribers that had previously received *OPEN* through Interex will continue to receive our publication.

## 64-BIT XEON SCALE-UP

July 14th, 2005

Server consolidation is no longer an either-or choice to scale-up or scale-out. The new IT mandate is to rationalize these alternatives into an solid consolidation plan that can scale-out for Web services and grid computing while scaling-up and providing high RAS capabilities for on-demand, mission-critical applications. OpenBench Labs assesses an HP DL580 G3 server with 4 EM64T Xeon CPUs for CIOs who want it all. *Click:* 64-BIT XEON SCALE-UP

## TAPE REVOLUTION

July 14th, 2005

What does it take to backup data at 125MB per second? A lot of very fast disks and an LTO3 tape drive are necessary but not sufficient. Keeping an LTO-3 tape drive streaming requires a special form of backup software. The secret sauce

for better backups is the ability to interleave multiple streams of data. *Click:* <u>TAPE REVOLUTION</u>

## AMD64 NUMAology

June 3rd, 2005

With the introduction of the Linux 2.6 kernel, multiprocessor systems now come in two flavors: traditional SMP and NUMA. The differences are neither transparent nor trivial. We test an AMD64 quad-processor NUMA system with an IA-32 dual-processor SMP system in the first of a series of 64-bit Linux reviews. *Click:* <u>AMD64 NUMAology</u>

## LINUX FUELS ADVANCED ENERGY SCIENCES

June 3rd, 2005

Unraveling the molecular forces that could one day bring the world a clean source of renewable energy requires significant compute power. Learn how Linux is providing researchers with scalability they need at a cost they can afford. *Click:* <u>LINUX FUELS ADVANCED ENERGY SCIENCES</u>

## OPEN JOINS EDITORIAL FORCES WITH INTEREX

May 9th, 2005

Strategic Communications, the publishers of *OPEN* magazine, and <u>Interex</u>, an independent IT professional association and publishers of the monthly *Interex Magazine* and the weekly e-newsletter *Interex Enterprise* News have formed a joint venture to extend coverage of open source and its influence on IT.

Under this agreement, subscribers to Open will now get the added benefit of a free membership in Interex without obligation. All *Open* subscribers will soon receive weekly electronic Interex Enterprise News editions designed to offer comprehensive coverage of news, technology, and IT customer advocacy issues. US subscribers to Open will also be getting a copy of the solutions-oriented *Interex Magazine* written expressly for senior level IT professionals.

We are still working on the details of this exciting new arrangement. Very shortly, you will be getting an email invitation from Interex, with more details on the new publications.

In the meantime, we at Open along with Ronald W. Evans, Executive Director of Interex, want to welcome both the Open and Interex subscribers to a greater extended family of IT professionals, who are making a difference in the world of technology.

Jack Fegreus <u>jack.fegreus@open-mag.com</u>
Ron Evans <u>evans@interex.org</u>

## SUSE 9.3: REAL VIRTUAL

May 9th, 2005

Linux innovation reaches new heights with the release of SUSE LINUX Professional 9.3. On the desktop, the new distribution features KDE 3.4 which introduces the Kontact framework which integrates KMail for e-main with anti-SPAM and anti-virus wizards; KOrganizer for shared calendar functions; and aKgregator for RSS blog and news feeds. On servers, there is XEN from Cambridge University, a powerful software virtualization tool that may redefine the power of Linux. <u>OpenBench Labs evaluates SUSE LINUX Professional 9.3.</u>

# SCALES GREAT...LESS CODING

May 9th, 2005

3 million .NET developers can't be wrong! But they can be full of beans (the Enterprise Java variety). While flexibility and scalability keeps J2EE favored for large-scale enterprise applications, other productivity issues, such as programming complexity and the need for skilled Java developers, have up until now retarded broader use of J2EE. Now programmers working with Visual Studio .NET can work on J2EE projects and radically change the TCO equation. Open looks at Mainsoft's tools to integrate Visual Studio into Linux and J2EE environments.

## ⫶ Sections

- o Business Analysis
- o News
- o openBench Labs
- o Government and NGOs
- o Technology

## • Links

- o Open Table of Contents
- o Archives
- o Media Kit
- o RSS 2.0 Feed
- o bBlog Dev

## • Archives

- o May 2005 ( 4 )
- o June 2005 ( 2 )
- o July 2005 ( 3 )
- o August 2005 ( 2 )

*Powered by **bBlog***
Based on a design by Michael Heilemann. Ported to bBlog by Raefer Gabriel.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COLE, RAYWID & BRAVERMAN, LLP    )<br>               )<br>    Plaintiff,               )<br>               )<br>    v.                  )<br>               )<br>ROBERT J. GEORGE, *et al.*,     )<br>               )<br>    Defendants         )<br>               ) | Case No. 07-CV-2242-JR |

## AFFIDAVIT OF BRIGHAM J. BOWEN

I, Brigham J. Bowen, depose and state under penalty of perjury that the information herein is true and correct.

1.      I am an associate at Davis Wright Tremaine LLP and represent Plaintiff Cole, Raywid & Braverman, LLP ("CRB") in this action.

2.      I make this affidavit in support of Plaintiff's opposition to the motions to dismiss filed by all Defendants except Robert George, and in support of Plaintiff's cross-motion, in the alternative, for jurisdictional discovery.

3.      Attached hereto as Exhibit 1 is a true and correct copy of a demonstrative chart which accurately lists various vital information of corporate entities formed, dissolved, and otherwise operated by Defendant Robert George in the Commonwealth of Massachusetts, to the extent information regarding such entities is available in public records made available by the Secretary of the Commonwealth.

4.      Attached hereto as Exhibit 2 is a true and correct printout of a website and documents from the Corporations Division of the office of the Massachusetts Secretary of the

Commonwealth documenting the dates of organization and dissolution of CCI Communications, Inc., an entity wholly owned by Robert George, its sole director.

5.    Attached hereto as Exhibit 3 is a true and correct printout of a website from the Corporations Division of the office of the Massachusetts Secretary of the Commonwealth documenting the dates of organization and dissolution of Strategic Communications, Inc., an entity wholly owned by Robert George, its sole director, which was incorporated on November 19, 2003, and dissolved on May 25, 2005.

6.    Attached hereto as Exhibit 4 is a true and correct printout of an annual report filed in June 2004 by Robert George Corporations Division of the office of the Massachusetts Secretary of the Commonwealth on behalf of the aforementioned Strategic Communications George signed this document on March 11, 2004.

7.    Attached hereto as Exhibit 5 is a true and correct printout of an annual report filed in May 2005 by Robert George Corporations Division of the office of the Massachusetts Secretary of the Commonwealth on behalf of the aforementioned Strategic Communications George signed this document on December 31, 2004.

8.    Attached hereto as Exhibit 6 is a true and correct printout of a website from the Corporations Division of the office of the Massachusetts Secretary of the Commonwealth documenting the date of registration of Custom Communications International, LLC, a foreign limited liability company organized under the laws of Connecticut but headquartered at 57 Wells Avenue, Newton, MA (the same location where Defendant CCI was headquartered). The registration lists Defendant George as the resident agent and sole manager of the entity.

9.    Attached hereto as Exhibit 7 is a true and correct printout of a collection of web pages from the Internet Archive (www.archive.org), including an "about" page (CRB 0030–

0040); a FAQs page (CRB 0041–0044); pages depicting the index and revision histories for bostonpublishing.com and open-mag.com (CRB 0045, CRB 0046–0047], respectively); and a page explaining that strategiccommunications.com "has been blocked" from indexing and archiving "by the site owner via [a] robots.txt" file (CRB 0048).

10.    Attached hereto as Exhibit 8 is a true and correct copy of a printout of a Massachusetts Association of REALTORS website listing publication dates for Bay State REALTOR magazine.

11.    Attached hereto as Exhibit 9 is a true and correct copy of a printout of Google search results for the query "custom communications," for which search "Strategic Communications" (www.StratCommInc.com) is listed as the sole "Sponsored Link."

12.    Attached hereto as Exhibit 10 is a true and correct copy of a printout of a Google web page explaining how "sponsored links" on Google work.

13.    Attached hereto as Exhibit 11 is a true and correct copy of a collection of web pages from Strategic Communications' current website (www.stratcomminc.com).  These pages contain printed thereon their individual URLs, with the exception of an article authored by Jack Fegreus on behalf of OpenBench Labs/Strategic Communications (CRB 0055–0070), which is accessible at http://www.stratcomminc.com/pdf/QLogic.pdf.

14.    Attached hereto as Exhibit 12 is a true and correct copy of a 2006 article authored by Jack Fegreus on behalf of OpenBench Labs/Strategic Communications.  This article is currently accessible on the Internet at http://www.davenportgroup.com/client_files/ PDF_Articles//Compellent_Raising_the_SAN_Value_Final.pdf.

15.    Attached hereto as Exhibit 13 is a true and correct copy of an April 2005 article written by Jack Fegreus as technology director at Strategic Communications and published on the

Internet at http://www.infostor.com/Articles/Article_Display.cfm?Section=ARTCL&ARTICLE_ ID=226137&VERSION_NUM=2&p=23.

16.    Attached hereto as Exhibit 14 is a true and correct copy of a printout of an "about" page hosted at the website for OPEN magazine. The website lists Jack Fegreus as contact, with a stratcomminc.com e-mail address, and it links to the home page for Strategic Communications.

17.    Attached hereto as Exhibit 15 is a true and correct copy of a 2006 media kit for OPEN magazine. The guide lists Robert George and Jack Fegreus as sales contacts for the magazine. It is hosted on the Internet at http://www.open-mag.com/MediaKit/Open2006.pdf.

18.    Attached hereto as Exhibit 16 is a true and correct copy of a 2005 article authored by Jack Fegreus on behalf of OpenBench Labs/Strategic Communications. This article is currently accessible on the Internet at http://www.ssc-corp.com/white_paper/NFS_ Performance.pdf,

19.    Attached hereto as Exhibit 17 is a true and correct copy of a printout of an OpenBench Labs web page discussing its services for IBM.

20.    Attached hereto as Exhibit 18 is a true and correct copy of a printout of a LinkedIn.com (a professional business networking site on which users submit professional data regarding themselves and are "linked" to their peers via mutual connections, shared interests, shared educational institutions, and the like) profile for Jack Fegreus.

21.    Attached hereto as Exhibit 19 is a true and correct printout of a website from the Corporations Division of the office of the Massachusetts Secretary of the Commonwealth documenting the dates of organization and dissolution of BPC Group, Inc., which lists Robert J. George as its President and Treasurer.

22.    Attached hereto as Exhibit 20 is a true and correct printout of a website from the Corporations Division of the office of the Massachusetts Secretary of the Commonwealth documenting the dates of organization and dissolution of Boston Publishing Company, Inc., which lists Robert J. George as its President and Treasurer.

23.    Attached hereto as Exhibit 21 is a true and correct printout of a website from the Corporations Division of the office of the Massachusetts Secretary of the Commonwealth documenting the dates of organization and dissolution of BPC Publications, Inc., which lists Robert J. George as its President and sole director.

24.    Attached hereto as Exhibit 22 is a true and correct printout of an archived website (http://web.archive.org/web/20030207171940/ccicommunications.com/body_index.html).    This website is among those authenticated by the Internet Archive, *see* Hickman Aff. Ex. A at CRB 0004–0005, but the printed copy provided by the Archive's affiant does not contain the full content of the web page. *Compare id. with* Bowen Aff. Ex. 22.

Further affiant sayeth not.

_____
Brigham J. Bowen

Washington, D.C.

Subscribed and sworn to before me this _12th_ day of ____march____, 2008.

_Carol R. Kaltenbaugh_
_____
Notary Public

Carol R. Kaltenbaugh
Notary Public, District of Columbia
My Commission Expires 9-30-2010

*My Commission expires on:* _____

5

# EXHIBIT 1
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN

| 1985 | 1989 | 1994 | 1995 | 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**CORPORATIONS OWNED/OPERATED
BY ROBERT GEORGE
IN THE COMMONWEALTH OF
MASSACHUSETTS**

**Corporation Name:** BPC Group, Inc.
**ID Number:** 042858456
**Date of Organization:** 03/05/85
**Date of Dissolution:** 08/31/98
**Principal Office Location:** 314 Dartmouth Street, Boston, MA 02116

**Corporation Name:** Boston Publishing Company, Inc.
**ID Number:** 043069829
**Date of Organization:** 12/04/89
**Date of Dissolution:** 08/31/98
**Principal Office Location:** 306 Dartmouth Street Boston, MA 02116

**Corporation Name:** BCP Publications, Inc.
**ID Number:** 000474567
**Date of Organization:** 08/26/94
**Date of Dissolution:** 08/31/98
**Principal Office Location:** 138 Farm Road, Sherborn, MA 01770

**Corporation Name:** Custom Communications, LLC
**ID Number:** 000547080
**Date of Organization:** 08/21/96
**Principal Office Location:** 85 Wells Avenue, Newton, MA 02159

**Corporation Name:** Custom Communications International,Inc.
**ID Number:** 000749629
**Date of Organization:** 04/13/01
**Date of Dissolution:** 011/13/03
**Principal Office Location:** 57 Wells Avenue, Newton, MA 02459

**Corporation Name:** Strategic Communications, Inc
**ID Number:** 000854419
**Date of Org:** 11/19/03
**Date of Dis:** 05/25/05
**Principal Office Location:** 138 Farm Road, Sherborn, MA 01770

**Corporation Name:** Stratcomm, Inc.
**ID Number:** 000900821
**Date of Organization:** 07/15/05
**Principal Office Location:** One Gateway Center, Ste.651, Newton, MA 02458

**Corporation Name:** CCI Communications Inc.
**ID Number:** 571136964
**Date of Org:** 10/30/02
**Date of Dis:** 11/13/03
**Principal Office Location:** 189 Wells Avenue Newton, MA 02459

**Corp. Name:** Strategic Communications, Inc.
**ID Number:** 000948996
**Date of Org:** 04/10/2007
**Principal Location:** One Gateway Center, Ste.651, Newton, MA 02458

**Corp. Name:** Boston Publishing Company, Inc.
**ID Number:** 000948995
**Date of Org:** 04/10/2007
**Principal Location:** One Gateway Center, Ste.651, Newton, MA 02458

# EXHIBIT 2
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN

The Commonwealth of Massachusetts William Francis Galvin - Public ...    http://corp.sec.state.ma.us/corp/corpsearch/CorpSearchSummary.asp?R...



# The Commonwealth of Massachusetts
## William Francis Galvin

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, MA 02108-1512
Telephone: (617) 727-9640

## *CCI COMMUNICATIONS, INC.* Summary Screen

Help with this form

Request a Certificate

The exact name of the Domestic Profit Corporation: CCI COMMUNICATIONS, INC.

Entity Type: Domestic Profit Corporation

Identification Number: 571136964

Old Federal Employer Identification Number (Old FEIN): 000828288

Date of Organization in Massachusetts: 10/30/2002

Date of Voluntary Dissolution: 11/13/2003

Current Fiscal Month / Day: 12 / 31

The location of its principal office in Massachusetts:
No. and Street:    189 WELLS AVE.
City or Town:    NEWTON    State: MA    Zip: 02459    Country: USA

If the business entity is organized wholly to do business outside Massachusetts, the location of that office:
No. and Street:
City or Town:    State:    Zip:    Country:

Name and address of the Registered Agent:
Name:
No. and Street:
City or Town:    State:    Zip:    Country:

The officers and all of the directors of the corporation:

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code | Expiration<br>of Term |
|---|---|---|---|
| PRESIDENT | ROBERT J. GEORGE | | NONE |
| TREASURER | ROBERT J. GEORGE | | NONE |

| SECRETARY | ROBERT J. GEORGE | 138 FARM RD. SHERBORN, MA 01770 USA | |
|---|---|---|---|
| DIRECTOR | ROBERT J. GEORGE | | NONE |

**business entity stock is publicly traded:** __

**The total number of shares and par value, if any, of each class of stock which the business entity is authorized to issue:**

| Class of Stock | Par Value Per Share Enter **0** if no Par | Total Authorized by Articles of Organization or Amendments | | Total Issued and Outstanding |
|---|---|---|---|---|
| | | *Num of Shares* | *Total Par Value* | *Num of Shares* |
| CNP | $0.00000 | 200,000 | $0.00 | 0 |

| __ Consent | __ Manufacturer | __ Confidential Data | __ Does Not Require Annual Report |
|---|---|---|---|
| __ Partnership | __ Resident Agent | __ For Profit | __ Merger Allowed |

**Select a type of filing from below to view this business entity filings:**

ALL FILINGS
Administrative Dissolution
Annual Report
Application For Revival
Articles of Amendment

View Filings    New Search

### Comments

© 2001 - 2008 Commonwealth of Massachusetts
All Rights Reserved

Help

1/7/2008 12:28 PM



**The Commonwealth of Massachusetts**
William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640

FEE: $125.00

0302 14522

NOTE: PLEASE TYPE OR PRINT CLEARLY! INSTRUCTIONS ON OTHER SIDE.

# MASSACHUSETTS CORPORATION ANNUAL REPORT

Federal Identification No. 571 136 964

1 The *exact* name of the corporation is: CCI Communications Inc.

2. Location of its principal office in Massachusetts: 189 Wells Avenue, 3rd Fl
_____(number and street)_____
Newton _____(city or town)_____ MA _____(state)_____ 02459 _____(zip)_____

NOTE: If corporation is organized wholly to do business outside Massachusetts, state location of that office also:

N/A
_____(number & street)_____ _____(city or town)_____ _____(state)_____ _____(zip)_____

3. Name and address of the Resident Agent, if any: N/A
_____(name)_____
_____(number & street)_____ _____(city or town)_____ _____(zip)_____

4. Date of the end of the last fiscal year was: December _____(month)_____ 31 _____(day)_____ 2003 _____(year)_____

5. Check here if the corporation stock is publicly traded: ☐ .

6. The capital stock of each class as of the end of its last fiscal year was:

| CLASS OF STOCK | PAR VALUE PER SHARE STATE IF NO PAR | TOTAL AUTHORIZED BY ARTICLES OF ORGANIZATION OR AMENDMENTS | | TOTAL ISSUED AND OUTSTANDING |
|---|---|---|---|---|
| | | Number of Shares | Total Par Value | Number of Shares |
| COMMON: | 100 % | R. George | one class | |
| PREFERRED: | | | | |

7. State the names and addresses of the officers specified below and of all the directors of the corporation, and the date on which the term of office of each expires:

| OFFICERS | NAME | ADDRESS Number, Street, City or Town, State, Zip Code | EXPIRATION OF TERM |
|---|---|---|---|
| PRESIDENT | Robert J. George | 138 Farm Rd. Sherborn, MA 01770 | dissolved |
| TREASURER | Robert J. George | 138 Farm Rd Slerborn, MA 01770 | |
| CLERK | Robert J. George | 138 Farm Rd. Slerborn, MA 01770 | 11/13/03 |
| DIRECTORS | Robert J. George | 138 Farm Rd. Slerborn, MA 01770 | |

I, the undersigned Robert J. George , being the CEO — OWNER of the above-named corporation, in compliance with the General Laws, Chapter 156B, hereby certify that the above information is true and correct as of the dates shown. IN WITNESS WHEREOF AND UNDER PENALTIES OF PERJURY, I hereto sign my name on this 6th day of OCT , 20 03 .

Signature: Robert J. George Title: Pres / CEO

Contact Person: Robert J. George Contact Person Telephone #: 508-330-0388

1568NKor 4/5/00



# EXHIBIT 3
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN

The Commonwealth of Massachusetts William Francis Galvin - Public ...    http://corp.sec.state.ma.us/corp/corpsearch/CorpSearchSummary.asp?R...



# The Commonwealth of Massachusetts
## William Francis Galvin

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, MA 02108-1512
Telephone: (617) 727-9640

**STRATEGIC COMMUNICATIONS, INC.** Summary Screen

Help with this form

Request a Certificate

The exact name of the Domestic Profit Corporation: STRATEGIC COMMUNICATIONS, INC.

Entity Type: Domestic Profit Corporation

Identification Number: 000854419

Date of Organization in Massachusetts: 11/19/2003

Date of Voluntary Dissolution: 05/25/2005

Current Fiscal Month / Day: 12 / 31

The location of its principal office in Massachusetts:
No. and Street: 138 FARM RD.
City or Town: SHERBORN    State: MA    Zip: 01770    Country: USA

If the business entity is organized wholly to do business outside Massachusetts, the location of that office:
No. and Street:
City or Town:    State:    Zip:    Country:

Name and address of the Registered Agent:
Name:
No. and Street:
City or Town:    State:    Zip:    Country:

The officers and all of the directors of the corporation:

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code | Expiration<br>of Term |
|---|---|---|---|
| PRESIDENT | ROBERT J. GEORGE | 138 FARM RD.<br>SHERBORN, MA 01770 USA | NONE |
| TREASURER | ROBERT J. GEORGE | 138 FARM RD.<br>SHERBORN, MA 01770 USA | NONE |
| SECRETARY | ROBERT J. GEORGE | 138 FARM RD.<br>SHERBORN, MA 01770 USA | NONE |

| DIRECTOR | ROBERT J. GEORGE | 138 FARM RD.<br>SHERBORN, MA 01770 USA | NONE |
|---|---|---|---|

**business entity stock is publicly traded:** __

**The total number of shares and par value, if any, of each class of stock which the business entity is authorized to issue:**

| Class of Stock | Par Value Per Share<br>Enter **0** if no Par | Total Authorized by Articles<br>of Organization or Amendments<br>*Num of Shares* | *Total Par Value* | Total Issued<br>and Outstanding<br>*Num of Shares* |
|---|---|---|---|---|
| CNP | $0.00000 | 275,000 | $0.00 | 0 |

| __ Consent | __ Manufacturer | __ Confidential Data | __ Does Not Require Annual Report |
|---|---|---|---|
| __ Partnership | __ Resident Agent | __ For Profit | __ Merger Allowed |

**Select a type of filing from below to view this business entity filings:**

ALL FILINGS
Administrative Dissolution
Annual Report
Application For Revival
Articles of Amendment

View Filings    New Search

Comments

© 2001 - 2008 Commonwealth of Massachusetts
All Rights Reserved

Help

1/7/2008 12:42 PM

# EXHIBIT 4
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN

03/12/2004  14:13    7814448454              GOLDBERG & ASSOC CPA              PAGE  05/05

The Commonwealth of Massachusetts                    **FEE: $ 125.00**
William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512
Telephone: (617) 727-9640                            040046943
NOTE: PLEASE TYPE OR PRINT CLEARLY!

# MASSACHUSETTS CORPORATION ANNUAL REPORT

Federal Identification No. 20-0410254    300855419

1. The exact name of the corporation is:    STRATEGIC COMMUNICATIONS, INC.

2. Location of its principal office in Massachusetts: 138 FARM ROAD
                                                      (number and street)

SHERBORN                          MA                        01770
   (city or town)                (state)                    (zip)

NOTE: If corporation is organized wholly to do business outside Massachusetts, state location of that office also:

   (number & street)        (city or town)        (state)              (zip)

3. Name and address of the Resident Agent, if any:
                                                          (name)

   (number & street)        (city or town)                            (zip)

4. Date of the end of the last fiscal year was:    DECEMBER    31    2003
                                                   (month)     (day)  (year)

5. Check here if the corporation stock is publicly traded: ☐ .

6. The capital stock of each class as of the end of its last fiscal year was:

| CLASS OF STOCK | PAR VALUE PER SHARE STATE IF NO PAR | TOTAL AUTHORIZED BY ARTICLES OF ORGANIZATION OR AMENDMENTS | | TOTAL ISSUED AND OUTSTANDING |
|---|---|---|---|---|
| | | Number of Shares | Total Par Value | Number of Shares |
| COMMON: | NO PAR | 275,000 | | 1,000 |
| PREFERRED: | | | | |

7. State the names and addresses of the officers specified below and of all the directors of the corporation, and the date on which the term of office of each expires:

| OFFICERS | NAME | ADDRESS Number, Street, City or Town, State, Zip Code | EXPIRATION OF TERM |
|---|---|---|---|
| PRESIDENT | ROBERT J. GEORGE | 138 FARM ROAD, SHERBORN, MA  01770 | * |
| TREASURER | ROBERT J. GEORGE | 138 FARM ROAD, SHERBORN, MA  01770 | * |
| CLERK | ROBERT J. GEORGE | 138 FARM ROAD, SHERBORN, MA  01770 | * |
| DIRECTORS | ROBERT J. GEORGE | 138 FARM ROAD, SHERBORN, MA  01770 | * |

**\* UNTIL SUCCESSOR IS ELECTED AND DULY QUALIFIED**

I, the undersigned ROBERT J. GEORGE                     , being the PRESIDENT
of the above-named corporation, in compliance with the General Laws, Chapter 156B, hereby certify that the above information is true and correct as of the dates shown. IN WITNESS WHEREOF AND UNDER PENALTIES OF PERJURY, I hereto sign my name on this

✓    March          11 TH    day of    March                    , 20 04

Signature:                            Title: PRESIDENT

Contact Person: ROBERT J. GEORGE              Contact Person Telephone #: (617) 457-4000

357441
10-15-03                                                          188bmear 4/20/00

1118312 807246 STR0254        2003.04000 STRATEGIC COMMUNICATIONS, I STR02541

# EXHIBIT 5
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN

**D F**

# The Commonwealth of Massachusetts
### William Francis Galvin
Secretary of the Commonwealth
One Ashburton Place, Boston, Massachusetts 02108-1512

**Annual Report for Domestic**
**and Foreign Corporations**

(General Laws Chapter 156D Section 16.22; 950 CMR 133.56)

Filing Fee: $125.00
Late Fee: $25.00

050077257

FORM MUST BE TYPED                                                                 FORM MUST BE TYPED

(1) The exact name of the corporation is **STRATEGIC COMMUNICATIONS, INC.**

(2) The corporation is organized under the laws of **MASSACHUSETTS**

(3) The street address of the corporation's registered office in the commonwealth is
**138 FARM ROAD, SHERBORN, MA 01770**
(number, street, city or town, state, zip code)

(4) The name of the registered agent at the registered office is **ROBERT J. GEORGE**

(5) The street address of the corporation's principal office is **138 FARM ROAD**
**SHERBORN            MA            01770**
(number, street, city or town, state, zip code)

(6) Provide the name and business address of the corporation's board of directors and its president, treasurer and secretary, and
il different, its chief executive officer and chief financial officer.

| | NAME | ADDRESS |
|---|---|---|
| President: | ROBERT J. GEORGE | 138 FARM ROAD, SHERBORN, MA 01770 |
| Treasurer: | ROBERT J. GEORGE | 138 FARM ROAD, SHERBORN, MA 01770 |
| Secretary: | ROBERT J. GEORGE | 138 FARM ROAD, SHERBORN, MA 01770 |
| Chief Executive Officer: | ROBERT J. GEORGE | 138 FARM ROAD, SHERBORN, MA 01770 |
| Chief Financial Officer: | ROBERT J. GEORGE | 138 FARM ROAD, SHERBORN, MA 01770 |
| Directors: | ROBERT J. GEORGE | 138 FARM ROAD, SHERBORN, MA 01770 |

(7) Briefly describe the business of the corporation:
**PUBLISHING**

(8-9) The capital stock of each class and series

| CLASS OF STOCK | TOTAL AUTHORIZED BY ARTICLES OF ORGANIZATION OR AMENDMENTS Number of Shares | TOTAL ISSUED AND OUTSTANDING Number of Shares |
|---|---|---|
| COMMON: | 275,000. | 1,000. |
| PREFERRED | | |

(10) Check if the stock of the corporation is publicly traded. ☐

(11) Date of the fiscal year end is **DECEMBER    31    2004**
(month, day, year)

Signed by _____
(signature of authorized individual)

(Please check appropriate box)
☐ Chairman of the Board of Directors    ☐ Incorporator    ☒ Other Officer    ☐ Court Appointed Fiduciary
on this _____ day of **MARCH 15** of **2005**



156d1622 9/23/04

# EXHIBIT 6
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN

The Commonwealth of Massachusetts William Francis Galvin - Public ...    http://corp.sec.state.ma.us/corp/corpsearch/CorpSearchSummary.asp?R...



# The Commonwealth of Massachusetts
# William Francis Galvin

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, MA 02108-1512
Telephone: (617) 727-9640

## CUSTOM COMMUNICATIONS INTERNATIONAL, LLC Summary Screen

[?] Help with this form

Request a Certificate

The exact name of the Foreign Limited Liability Company (LLC): CUSTOM COMMUNICATIONS INTERNATIONAL, LLC

Entity Type: Foreign Limited Liability Company (LLC)

Identification Number: 061462171

Date of Registration in Massachusetts: 04/11/2000

The is organized under the laws of:  State: CT   Country: USA  on:  01/12/1996

The location of its principal office:
No. and Street:    57 WELLS AVE.
City or Town:    NEWTON        State: MA    Zip: 02459-0000    Country: USA

The location of its Massachusetts office, if any:
No. and Street:
City or Town:            State:        Zip:        Country:

The name and address of the Resident Agent:
Name:    ROBERT GEORGE
No. and Street:    57 WELLS AVE.
City or Town:    NEWTON        State: MA    Zip: 02459-0000    Country: USA

The name and business address of each manager:

| Title | Individual Name First, Middle, Last, Suffix | Address (no PO Box) Address, City or Town, State, Zip Code |
|---|---|---|
| MANAGER | ROBERT GEORGE | 57 WELLS AVE. NEWTON, MA 02459-0000 USA |

The name and business address of the person in addition to the manager, who is authorized to execute documents to be filed with the Corporations Division.

| Title | Individual Name First, Middle, Last, Suffix | Address (no PO Box) Address, City or Town, State, Zip Code |
|---|---|---|
| | | |

**The name and business address of the person(s) authorized to execute, acknowledge, deliver and record any recordable instrument purporting to affect an interest in real property**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code |
|---|---|---|
| REAL PROPERTY | ROBERT GEORGE | 57 WELLS AVE.<br>NEWTON, MA 02459-0000 USA |

___ Consent     ___ Manufacturer     ___ Confidential Data     ___ Does Not Require Annual Report

___ Partnership     ___ Resident Agent     ___ For Profit     ___ Merger Allowed

**Select a type of filing from below to view this business entity filings:**

ALL FILINGS
Annual Report
Application For Registration
Certificate of Amendment
Certificate of Cancellation

[ View Filings ]  [ New Search ]

**Comments**

© 2001 - 2008 Commonwealth of Massachusetts
All Rights Reserved

Help

1/7/2008 12:22 PM

# EXHIBIT 7
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN



**Web | Moving Images | Texts | Audio | Software | Education | Patron Info | About IA**

Home     Donate | Forums | FAQs | Contributions | Terms, Privacy, & Copyright | Contact | Jobs | Bios

Search: [                ]  [All Media Types        ]  [GO] Advanced Search          [Upload]   **Anonymous User** (login or join us)

*Universal access to human knowledge*

CRB 0030

**Read More**

Why the Archive is Building an 'Internet Library'

Future Libraries

Storage and Preservation

Related Projects and Research

Researcher Access

Server Statistics

Archive Statistics

Job Opportunities at the Internet Archive

Report Bugs and Request New Features

Usage Logs

---

**Media Coverage [more]**

Brewster Kahle profiled in GOOD magazine

Podcast of Brewster at South By Southwest!

Nasa and Internet Archive Team to Digitize Space Imagery

OSTI Partners with Internet Archive

Brewster Kahle interviewed in Second Life!

Great Article from WebProNews!

Cnet Article- Grant Funds Open-Source Challenge to Google Library

Ap Story Picked up by

---

**About the Internet Archive**

The Internet Archive is a 501(c)(3) non-profit that was founded to build an Internet library, with the purpose of offering permanent access for researchers, historians, and scholars to historical collections that exist in digital format. Founded in 1996 and located in the Presidio of San Francisco, the Archive has been receiving data donations from Alexa Internet and others. In late 1999, the organization started to grow to include more well-rounded collections. Now the Internet Archive includes texts, audio, moving images, and software as well as archived web pages in our collections.



**Why the Archive is Building an 'Internet Library'**

Libraries exist to preserve society's cultural artifacts and to provide access to them. If libraries are to continue to foster education and scholarship in this era of digital technology, it's essential for them to extend those functions into the digital world.

Many early movies were recycled to recover the silver in the film. The Library of Alexandria - an ancient center of learning containing a copy of every book in the world - was eventually burned to the ground. Even now, at the turn of the 21st century, no comprehensive archives of television or radio programs exist.

But without cultural artifacts, civilization has no memory and no mechanism to learn from its successes and failures. And paradoxically, with the explosion of the Internet, we live in what Danny Hillis has referred to as our "digital dark age."

The Internet Archive is working to prevent the Internet - a new medium with major historical significance - and other "born-digital" materials from disappearing into the past. Collaborating with institutions including the Library of Congress and the Smithsonian, we are working to preserve a record for generations to come.

Open and free access to literature and other writings has long been considered essential to education and to the maintenance of an open society. Public and philanthropic enterprises have supported it through the ages.

The Internet Archive is opening its collections to researchers, historians, and scholars. The Archive has no vested interest in the discoveries of the users of its collections, nor is it a grant-making organization.

At present, the size of our Web collection is such that using it requires programming skills. However, we are hopeful about the development of tools and methods that will give the general public easy and

CRB 0031

meaningful access to our collective history. In addition to developing our own collections, we are working to promote the formation of other Internet libraries in the United States and elsewhere.

**Find out**
- How to make a Monetary Donation to the Archive
- About our announcement and discussion lists on Internet libraries and movie archives

as well as our user forums

**Future Libraries - How People Envision Using Internet Libraries**

**From ephemera to artifact:**
Internet libraries can change the content of the Internet from ephemera to enduring artifacts of our political and cultural lives.

> "I believe historians need every possible piece of paper and archived byte of digital data they can muster. The Smithsonian Institution sees the value, and has affiliated with the Archive to preserve the 1996 campaign Web sites, official and unofficial."

> Dan Gillmor, computing editor, *San Jose Mercury News,* 1 September 1996

**Protecting our right to know:**
Most states have pre-Internet sunshine laws that require public access to government documents. Yet while the Internet has generally increased public access to information, states have just begun to amend those laws to reflect today's Internet environment. According to Bill Chamberlin, director of the Marion Brechner Citizen Access Project at the University of Florida's College of Journalism and Communications, such laws are being enacted "piecemeal, one state at a time," and cover information that varies widely in nature - everything from "all public records" to specialized information such as education reports and the licensing status of medical practitioners. In the meantime, while public officials are posting more information on the Internet than their state legislatures require, there's little regulatory control over exactly what is posted, when it's taken off, or how often it's updated. This leaves a gap that online libraries can help to fill.

**Exercising our "right to remember":**
Without paper libraries, it would be hard to exercise our "right to remember" our political history or hold government accountable. With much of the public's business now moving from paper to digital media, Internet libraries are certain to become essential in maintaining that right. Imagine, for instance, how news coverage of an election campaign might suffer if journalists had only limited access to previous statements that candidates had made in the media.

> "The Internet Archive is a service so essential that its founding is bound to be looked back on with the fondness and respect that people now have for the public libraries seeded by Andrew Carnegie a century ago.... Digitized information, especially on the Internet, has such rapid turnover these days that total loss is the norm. Civilization is developing severe amnesia as a result; indeed it may have become too amnesiac already to notice the problem properly. The

CRB 0032

Internet Archive is the beginning of a cure - the beginning of complete, detailed, accessible, searchable memory for society, and not just scholars this time, but everyone."

Stewart Brand, president, The Long Now Foundation

**Establishing Internet centers internationally:** What is a country without a memory of its cultural heritage? Internet libraries are the place to preserve the aspect of a country's heritage that exists on the Internet.

**Tracing the way our language changes:**
During the late 19th century, James Murray, a professor at Oxford University, built the first edition of the *Oxford English Dictionary*
by sending copies of selected books to "men of letters" who volunteered to search them for the first occurrences of words and to trace the migration of their various meanings. Internet libraries could allow linguists to automate much of this extremely labor-intensive process.

**Tracking the Web's evolution:** Historians, sociologists, and journalists could use Internet libraries to hold up a mirror to society. For example, they might ask when different ethnic groups or special interests or certain businesses became a presence on the Internet.

"We don't know where this Internet is going, and once we get there it will be very instructive to look back."

Donald Heath, president of the Internet Society in Reston, Virginia

**Reviving dead links:** A few services - such as UC Berkeley's Digital Library Project, the Online Computer Library Center, and Alexa Internet
are starting to offer access to archived versions of Web pages when those pages have been removed from the Web. This means that if you get a "404 - Page Not Found" error, you'll still be able to find a version of the page.

**Understanding the economy:**
Economists could use Archive data such as link structures - what and how many links a site contains - to investigate how the Web affects commerce.

**Finding out what the Web tells us about ourselves:** Researchers could use data on links and traffic to better understand human behavior and communication.

"Researchers could use the Archive's Web snapshots in combination with usage statistics to compare how people in different countries use the Web over long periods of time.... Political scientists and sociologists could use the data to study how public opinion gets formed. For example, suppose a device for increasing privacy became available: Would it change usage patterns?"

Bernardo Huberman, Xerox Palo Alto Research Center

CRB 0033

"The Internet Archive has created a kind of test tube that allows a broad range of researchers to analyze the Web in ways that have never been possible before. What makes this type of research unique is that it often requires the fusion of traditional tools and techniques with new methods, and it results in the development of new theories, techniques, and metrics."

James Pitkow, Xerox Palo Alto Research Center

**Looking back:**
With a "way-back machine" - a device that displayed the Web as it looked on a given date - historians and others would literally have a window on the past.

How would you use an Internet library?

**Related Projects and Research**

Internet libraries raise many issues in a range of areas, including archiving technology, copyright, privacy and free speech, trademark, trade secrets, import/export issues, stolen property, pornography, the question of who will have access to the libraries, and more.

Below are links to projects, resources, and institutions related to Internet libraries.

Internet Libraries and Librarianship
Archiving Technology
Internet Mapping
Internet Statistics
Copyright
Privacy and Free Speech

**Internet Libraries and Librarianship**

**Alexa Internet** has catalogued Web sites and provides this information in a free service.
www.alexa.com

**The American Library Association** is a major trade association of American libraries.
www.ala.org

**The Australian National Library** collects material including organizational Web sites.
pandora.nla.gov.au/documents.html

**The Council on Library and Information Resources** works to ensure the well-being of the scholarly communication system.
www.clir.org
See its publication **Why Digitize?** at
www.clir.org/pubs/reports/pub80-smith/pub80.html

CRB 0034

**The Digital Library Forum (D-Lib)** publishes an online magazine and other resources for building digital libraries.
www.dlib.org

**Attorney I. Trotter Hardy**
explains copyright law and examines its implications for digital materials in his paper **Internet Archives and Copyright.**
copyright_TH.php

**The Internet Public Library** site has many links to online resources for the general public.
www.ipl.org

**Brewster Kahle**
is a founder of WAIS Inc. and Alexa Internet and chairman of the board of the Internet Archive. See his paper **The Ethics of Digital Librarianship** at
ethics_BK.php

**Michael Lesk**
of the National Science Foundation has written extensively on digital archiving and digital libraries.
www.purl.net/NET/lesk

**The Library of Congress** is the national library of the United States.
www.loc.gov

**The Museum Digital Library** plans to help digitize collections and provide access to them.
www.digitalmuseums.org

**The National Archives and Records Administration** oversees the management of all US federal records. It also archives federal Web sites including the Clinton White House site.
www.nara.gov

**The National Science Foundation Digital Library Program** has funded academic research on digital libraries.
www.nsf.gov/home/crssprgm/dli/start.htm

**National Technical Information Service (NTIS)**, U.S. Department of Commerce, Technology Administration. NTIS is an archive and distributor of scientific, technical, engineering and business related information developed by and for the federal government.
www.ntis.gov

**Network Wizards** has been tracking Internet growth for many years.
www.nw.com

**Project Gutenberg** is making ASCII versions of classic literature openly available.

CRB 0035

3/6/2008 5:35 PM

www.gutenberg.org

**The Radio and Television Archive** has many links to related resources.
www.rtvf.unt.edu/links/histsites.htm

**Revival of the Library of Alexandria** is a project to revive the ancient library in Egypt.
www.bibalex.org

**The Society of American Archivists** is a professional association focused on ensuring the identification, preservation, and use of records of historical value.
www.archivists.org

**The Royal Institute of Technology Library in Sweden** is creating a system of quality-assessed information resources on the Internet for academic use.
www.lib.kth.se/main/eng

**The United States Government Printing Office** produces and distributes information published by the US government.
www.access.gpo.gov

**The University of Virginia** is building a catalog of digital library activities.
http://www.lib.virginia.edu/digital/

**Archiving Technology**

**The Association for Computing Machinery (ACM) computing and public policy page** includes papers and news on pending legislation on issues including universal access, copyright and intellectual property, free speech and the Internet, and privacy.
www.acm.org/serving

**The Carnegie Mellon University Informedia Digital Video Library Project** is studying how multimedia digital libraries can be established and used.
www.informedia.cs.cmu.edu

**The Intermemory Project** aims to develop highly survivable and available storage systems.
www.intermemory.org

**The National Film Preservation Board,** established by the National Film Preservation Act of 1988, works with the Library of Congress to study and implement plans for film and television preservation. The site's research page includes links to the board's 1993 film preservation study, a 1994 film preservation plan, and a 1997 television and video study. All the documents warn of the dire state of film and television preservation in the United States.
lcweb.loc.gov/film/filmpres.html

**The National Institute of Standards and Technology (NIST)** posts IEC International

CRB 0036

Standard names and symbols for prefixes for binary multiples for use in data processing and data transmission.
www.physics.nist.gov/cuu/Units/binary.html

**The Text Retrieval Conference (TREC)** encourages research in information retrieval from large text collections.
trec.nist.gov

## Internet Mapping

**An Atlas of Cyberspaces** has maps and dynamic tools for visualizing Web browsing.
www.cybergeography.com/atlas/surf.html

**The Internet Mapping Project** is a long-term project by a scientist at Bell Labs to collect routing data on the Internet.
www.cs.bell-labs.com/who/ches/map

**The Matrix Information Directory Service** has good maps and visualizations of the networked world.
www.mids.org

**Peacock Maps** has maps of Internet connectivity.
www.peacockmaps.com

## Internet Statistics

**WebReference** has an Internet statistics page (publisher: Internet.com).
webreference.com/internet/statistics.html

## Copyright

**The Association for Computing Machinery (ACM) copyright information page** includes text of pertinent laws and pending legislation.
www.acm.org/usacm/copyright

**Tom W. Bell**
teaches intellectual property and Internet law at Chapman University School of Law.
www.tomwbell.com
His site includes a graph showing the trend of the maximum US copyright term at
www.tomwbell.com/writings/(C)_Term.html

**Cornell University** posts the text of **copyright law** at
www4.law.cornell.edu/uscode/unframed/17/107.html
www4.law.cornell.edu/uscode/unframed/17/108.html

**The Digital Future Coalition** is a nonprofit working on the issues of copyright in the digital

CRB 0037

age.
www.dfc.org

**The National Academy Press** is the publishing arm of the national academies.
"The Digital Dilemma: Intellectual Property in the Information Age"
http://www.nap.edu/html/digital_dilemma/
"LC21: A Digital Strategy for the Library of Congress"
www.nap.edu/books/0309071445/html

**Pamela Samuelson**
is a professor in the School of Information Management and Systems at UC Berkeley.
info.berkeley.edu/~pam

**Title 17 of US copyright code**
www.loc.gov/copyright/title17/

**US Government Copyright Office**
www.loc.gov/copyright

**Privacy and Free Speech**

**The Association for Computing Machinery (ACM) free-speech information page** includes the text of pertinent laws and pending legislation.
www.acm.org/usacm/speech

**The Association for Computing Machinery (ACM) privacy information page** includes the text of congressional testimony and links to other resources.
www.acm.org/usacm/privacy

**The Benton Foundation Communications Policy and Practice Program** has the goal of infusing the emerging communications environment with public-interest values.
www.benton.org/cpphome.html

**The Center for Democracy and Technology** works to promote democratic values and constitutional liberties in the digital age.
www.cdt.org

**The Computers Freedom and Privacy Conference** has a site containing information on each annual conference held since 1991.
www.cfp.org

**The Electronic Frontier Foundation** works to protect fundamental civil liberties, including privacy and freedom of expression in the arena of computers and the Internet.
www.eff.org

CRB 0038

**The Electronic Privacy Information Center,** a project of the <u>Fund for Constitutional Government</u>, is a public-interest research center whose goal is to focus public attention on emerging civil liberties issues and to protect privacy, the First Amendment, and constitutional values.
<u>www.epic.org</u>

**The Free Expression Policy Project** is a think tank on artistic and intellectual freedom at NYU's Brennan Center for Justice. Through policy research and advocacy, they explore freedom of expression issues including censorship, copyright law, media localism, and corporate media reform.
<u>www.fepproject.org</u>

**The Internet Free Expression Alliance** is an information and advocacy organization focused on free speech as it relates to the Internet.
<u>www.ifea.net</u>

**The Internet Privacy Coalition** aims to protect privacy on the Internet by promoting the widespread availability of strong encryption and the relaxation of export controls on cryptography.
<u>www.privacy.org/ipc</u>

**The Privacy Page**
includes news, alerts, and links to privacy-related resources. Related organizations include the <u>Electronic Privacy Information Center</u>, the <u>Internet Privacy Coalition</u>, and <u>Privacy International</u>.
<u>www.privacy.org</u>

**Privacy International**
is a London-based human rights group formed as a watchdog on surveillance by governments and corporations.
<u>www.privacy.org/pi</u>

Please <u>suggest</u> other pages that may be appropriate here.

**Storage and Preservation**

The Archive has two practical considerations in dealing with digital collections:

<u>How to store</u> massive amounts of data
<u>How to preserve</u> the data for posterity

**Storage**

Storing the Archive's collections involves parsing, indexing, and physically encoding the data. With the Internet collections growing at exponential rates, this task poses an ongoing challenge.

**CRB 0039**

Our hardware consists of PCs with clusters of IDE hard drives. Data is stored on DLT tape and hard drives in various appropriate formats, depending on the collection. Web data is received and stored in archive format of 100-megabyte ARC files made up of many individual files. Alexa Internet (currently the source of all crawls in our collections) is proposing ARC as a standard for archiving Internet objects. See Alexa for the format specification.

### Preservation

Preservation is the ongoing task of permanently protecting stored resources from damage or destruction. The main issues are guarding against the consequences of accidents and data degradation and maintaining the accessibility of data as formats become obsolete.

**Accidents:**
Any medium or site used to store data is potentially vulnerable to accidents and natural disasters. Maintaining copies of the Archiveï¿½s collections at multiple sites can help alleviate this risk. Part of the collection is already handled this way, and we are proceeding as quickly as possible to do the same with the rest.

**Migration:**
Over time, storage media can degrade to a point where the data becomes permanently irretrievable. Although DLT tape is rated to last 30 years, the industry rule of thumb is to migrate data every 10 years. We no longer use tapes for storage, however. Please take a look at our page on our Petabox system for more information on our storage systems.

**Data formats:**
As advances are made in software applications, many data formats become obsolete. We will be collecting software and emulators that will aid future researchers, historians, and scholars in their research.

### Find out

How to get free access to the Archive's Internet collections
About our announcement and discussion lists on Internet libraries and movie archives

Terms of Use (10 Mar 2001)

CRB 0040



**Enter Web Address:** http://        All        Take Me Back     Adv. Search

## FAQs

For the curious surfer, we've gathered the following commonly asked questions. For the supremely curious, we recommend contacting us directly at wayback@archive.org.

### Questions

**The Internet Archive Wayback Machine**

1. What is the Internet Archive Wayback Machine?

2. Can I link to old pages on the Wayback Machine?

3. I don't want my site's pages in the archive. How do I remove them?

4. Are other sites available in the Wayback Machine?

5. What does it mean when a site's archive data has been "updated"?

6. Who was involved in the creating the Internet Archive Wayback Machine?

7. How was the Internet Archive Wayback Machine made?

8. How large is the Archive?

9. Can I search the Archive?

10. What type of machinery is used in this Internet Archive?

11. How do you archive dynamic pages?

12. Why are some sites harder to archive than others?

13. Some sites are not available because of Robots.txt or other exclusions. What does that mean?

14. How can I get my site included in the Archive?

CRB 0041

15.  How can I help?

## Answers

1. **What is the Internet Archive Wayback Machine?**
   The Internet Archive Wayback Machine is a service that allows people to visit archived versions of stored websites.  Visitors to the Internet Archive Wayback Machine can type in an URL, select a date, and then begin surfing on an archived version of the web. Imagine surfing circa 1999 and looking at all the Y2K hype, or revisiting an older copy of your favorite website.  The Internet Archive Wayback Machine can make all of this possible. See the Press Release.

2. **Can I link to old pages on the Internet Archive Wayback Machine?**
   Yes! Alexa Internet has built the Internet Archive Wayback Machine so that it can be used and referenced by anybody and everybody. If you find an archived page that you would like to reference on your web page or in an article, you can copy the URL and share it with others. You can even use fuzzy URL matching and date specifications... but that's a bit more advanced.

3. **I don't want my site's pages in the archive. How do I remove them?**
   By installing a robots.txt file on your web server, you can exclude your site from being archived, as well as block access to them on the archive. For information, see our FAQ about removing documents.

4. **Are other sites available in the Internet Archive Wayback Machine?**
   The Internet Archive is attempting to archive the entire publicly available web.  Some sites may not be included because the automated crawlers were unaware of their existence at the time of the crawl. It's also possible that some sites were not archived because they were password protected or otherwise inaccessible to our automated systems.

5. **What does it mean when a site's archive date has been "updated"?**
   When our automated systems crawl the web every few months or so, we find that only about 50% of all pages on the web have changed from our previous visit.  This means that much of the content in our archive is duplicate material.  If you don't see "*" next to an archived document, then the content on the archived page is identical to the previously archived copy.

6. **Who was involved in creating the Internet Archive Wayback Machine?**
   The original idea for the Internet Archive Wayback Machine began in 1996, when the Internet Archive first began archiving the web.  Now, five years later, with over 100 terabytes and a dozen web crawls completed, the Internet Archive has made the Internet Archive Wayback Machine available to the public.  The Internet Archive has relied on donations of web crawls, technology and expertise from Alexa Internet and others.  The Internet Archive Wayback Machine is owned and operated by the Internet Archive.

7. **How was the Wayback Machine made?**
   Over 100 terabytes of data are stored on several dozen modified servers. Alexa Internet, in cooperation with the Internet Archive, has designed a three dimensional index that allows browsing of web documents over multiple time periods, and turned this unique feature into the Wayback Machine.

8. **How large is the Archive?**
   The Internet Archive Wayback Machine contains over 100 terabytes of data and is currently growing at a rate of 12 terabytes per month.  The archive contains multiple copies of the entire publicly available web.  This eclipses the amount of data contained in the

CRB 0042

world's largest libraries, including the Library of Congress. If you tried to place the entire contents of the archive onto floppy disks (I don't recommend this!) and laid them end to end, it would stretch from New York, past Los Angeles, and halfway to Hawaii.

9. **Can I search the Archive?**
Using the Internet Archive Wayback Machine, it is possible to search for the names of sites contained in the Archive and to specify date ranges for your search. However, we do not yet have an indexed text search of the documents in the collection. The collection is a bit too large and complicated for that. We continue to work on it and should have a full text search soon.

10. **What type of machinery is used in the Internet Archive?**
The Internet Archive is stored on dozens of slightly modified Hewlett Packard servers. The computers run on the FreeBSD operating system. Each computer has 512Mb of memory and can hold just over 300 gigabytes of data on IDE disks.

11. **How do you archive dynamic pages?**
There are many different kinds of dynamic pages, some of which are easily stored in an archive and some of which fall apart completely. When a dynamic page renders standard html, the archive works beautifully. When a dynamic page contains forms, JavaScript, or other elements that require interaction with the originating host, the archive will not accurately reflect the original site's functionality.

12. **Why are some sites harder to archive than others?**
If you look at our collection of archived sites, you will find some broken pages, missing graphics, and some sites that aren't archived at all. We have tried to create a complete archive, but have had difficulties with some sites. Here are some things that make it difficult to archive a web site:

     ○ Robots.txt -- If our robot crawler is forbidden from visiting a site, we can't archive it.
     ○ Javascript -- Javascript elements are often hard for us to archive, but especially if it generates links without having the full name in the page. Plus, if javascript needs to contact with the originiating server in order to work, it will fail when archived.
     ○ Server side image maps -- Like any functionality on the web, if it needs to contact the originating server in order to work, it will fail when archived.
     ○ Unknown sites -- If Alexa doesn't know about your site, it won't be archived. Use the Alexa service, and we will know about your page. Or you can visit our Archive Your Site page.
     ○ Orphan pages -- If there are no links to your pages, our robot won't find it (our robots don't enter queries in search boxes.)

As a general rule of thumb, simple html is the easiest to archive.

13. **Some sites are not available because of Robots.txt or other exclusions.**
**What does that mean?**
The Standard for Robot Exclusion (SRE) is a means by which web site owners can instruct automated systems not to crawl their sites. Web site owners can specify files or directories that are allowed or disallowed from a crawl, and they can even create specific rules for different automated crawlers. All of this information is contained in a file called robots.txt. While robots.txt has been adopted as the universal standard for robot exclusion, compliance with robots.txt is strictly voluntary. In fact most web sites do not have a robots.txt file, and many web crawlers are not programmed to obey the instructions anyway. However, Alexa, the company that crawls the web for the Internet Archive, does respect robots.txt instructions, and even does so retroactively. If a web site owner ever decides he / she prefers not to have a web crawler visiting his / her files and sets up robots.txt on the site, the Alexa crawlers will stop visiting those files and mark all files previously gathered as unavailable. This means that sometimes,

CRB 0043

while using the Internet Archive Wayback Machine, you may find a site that is unavailable due to robots.txt or other exclusions. Other exclusions? Yes, sometimes a web site owner will contact us directly and ask us to stop crawling or archiving a site. We comply with these requests.

14. **How can I get my site included in the Archive?**
Alexa Internet has been crawling the web since 1996, which has resulted in a massive archive. If you have a web site, and you would like to ensure that it is saved for posterity in the Archive, chances are that it's already there. We make every effort to crawl the entire publicly available web. However, if you wish to take extra measures to ensure that we archive your site, you can visit the "Archive Your Site" page.

15. **How can I help?**
The Internet Archive actively seeks donations of digital materials for preservation. Alexa Internet provides access to a web-wide crawl that contains copies of the publicly accessible web. If you have digital materials that may be of interest to future generations, let us know. The Internet Archive is also seeking additional funding to continue this important mission. Please contact us if you wish to make a contribution.

---

Home | Help

Internet Archive | Terms of Use | Privacy Policy

CRB 0044

Internet Archive Wayback Machine                                                                                                    Page 1 of 1



Enter Web Address: http://          All          [ Take Me Back ]    Adv. Search  Compare Archive Pages

Searched for http://www.bostonpublishing.com/                                                                    **79** Results

Note some duplicates are not shown. See all.
* denotes when site was updated.
Material typically becomes available here 6 months after collection. See FAQ.

## Search Results for Jan 01, 1996 - Sep 06, 2007

| 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 pages | 0 pages | 2 pages | 3 pages | 11 pages | 6 pages | 8 pages | 10 pages | 11 pages | 6 pages | 12 pages | 5 pages |

| 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|---|---|---|---|---|---|---|---|---|---|
| May 20, 1998 * | Jan 25, 1999 | Feb 29, 2000 | Feb 02, 2001 | May 25, 2002 | Feb 09, 2003 | Mar 30, 2004 * | Feb 02, 2005 | Jan 06, 2006 | Feb 05, 2007 * |
| Dec 12, 1998 * | Feb 24, 1999 * | Apr 10, 2000 | Feb 15, 2001 | May 31, 2002 | Feb 18, 2003 | Apr 06, 2004 * | Feb 10, 2005 | Jan 28, 2006 | Feb 23, 2007 |
|  | Oct 13, 1999 * | Apr 20, 2000 | Mar 01, 2001 | Aug 02, 2002 | Mar 25, 2003 | May 23, 2004 | Mar 13, 2005 | Jan 29, 2006 | Apr 03, 2007 |
|  |  | May 11, 2000 | Apr 01, 2001 * | Sep 24, 2002 | Apr 04, 2003 | Jun 09, 2004 | Jul 10, 2005 | Feb 01, 2006 | Apr 05, 2007 |
|  |  | Jun 20, 2000 | Apr 05, 2001 | Sep 26, 2002 | Apr 19, 2003 | Jun 10, 2004 | Oct 25, 2005 | Feb 04, 2006 | Jun 30, 2007 |
|  |  | Aug 18, 2000 | May 17, 2001 * | Nov 26, 2002 * | Jun 06, 2003 | Jun 14, 2004 | Nov 24, 2005 | Apr 21, 2006 |  |
|  |  | Oct 08, 2000 |  | Nov 28, 2002 | Jun 18, 2003 | Aug 31, 2004 |  | Apr 24, 2006 |  |
|  |  | Oct 17, 2000 |  | Nov 29, 2002 | Aug 04, 2003 | Sep 03, 2004 |  | Apr 26, 2006 |  |
|  |  | Oct 19, 2000 |  |  | Aug 07, 2003 | Sep 20, 2004 |  | Jun 14, 2006 |  |
|  |  | Oct 21, 2000 |  |  | Oct 07, 2003 | Nov 26, 2004 |  | Oct 15, 2006 |  |
|  |  | Dec 04, 2000 * |  |  |  | Nov 28, 2004 |  | Oct 22, 2006 |  |
|  |  |  |  |  |  |  |  | Nov 24, 2006 * |  |

Home | Help

Internet Archive | Terms of Use | Privacy Policy

http://web.archive.org/web/*/http://www.bostonpublishing.com/                                                    3/4/2008

CRB 0045

Internet Archive Wayback Machine                                                                                          Page 1 of 2



Enter Web Address:          All [ ]  [ Take Me Back ]   Adv. Search  Compare Archive Pages

Searched for http://www.open-mag.com/                                                                                    **114** Results

Note some duplicates are not shown. See all.
\* denotes when site was updated.
Material typically becomes available here 6 months after collection. See FAQ.

## Search Results for Jan 01, 1996 - Sep 06, 2007

| 1996 | 1997 | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 |
|------|------|------|------|------|------|------|------|------|------|------|------|
| 0 pages | 0 pages | 0 pages | 0 pages | 0 pages | 1 pages | 16 pages | 24 pages | 16 pages | 11 pages | 22 pages | 14 pages |
| | | | | | Nov 29, 2001 * | Jan 23, 2002 * | Jan 24, 2003 | Jan 31, 2004 | Jan 05, 2005 | Feb 16, 2006 * | Jan 05, 2007 |
| | | | | | | Mar 30, 2002 * | Feb 08, 2003 | Mar 29, 2004 | Jan 23, 2005 | Feb 21, 2006 | Jan 09, 2007 |
| | | | | | | May 23, 2002 * | Feb 13, 2003 | Apr 04, 2004 | Feb 04, 2005 | Mar 28, 2006 * | Jan 15, 2007 |
| | | | | | | Jun 03, 2002 | Feb 18, 2003 | Jun 08, 2004 * | Feb 06, 2005 | Apr 07, 2006 * | Jan 20, 2007 * |
| | | | | | | Jun 05, 2002 | Mar 29, 2003 | Jun 12, 2004 | Feb 08, 2005 | Apr 25, 2006 | Jan 27, 2007 * |
| | | | | | | Jul 26, 2002 * | Mar 31, 2003 | Jun 13, 2004 | Mar 03, 2005 | Apr 27, 2006 | Feb 06, 2007 |
| | | | | | | Aug 03, 2002 * | Apr 10, 2003 | Jun 15, 2004 | Apr 02, 2005 | Jun 12, 2006 | Feb 09, 2007 |
| | | | | | | Sep 23, 2002 | Apr 20, 2003 | Jun 22, 2004 | Aug 29, 2005 * | Jun 13, 2006 | Feb 27, 2007 |
| | | | | | | Sep 25, 2002 | Apr 22, 2003 | Jul 21, 2004 | Sep 24, 2005 | Jun 15, 2006 | Mar 14, 2007 |
| | | | | | | Sep 28, 2002 | May 24, 2003 * | Jul 29, 2004 | Dec 10, 2005 | Jul 05, 2006 | May 09, 2007 |
| | | | | | | Sep 29, 2002 | May 25, 2003 | Sep 04, 2004 | Dec 17, 2005 | Jul 10, 2006 | May 20, 2007 |
| | | | | | | Nov 13, 2002 * | May 28, 2003 | Sep 05, 2004 | | Jul 17, 2006 | Jun 16, 2007 * |
| | | | | | | Nov 21, 2002 | Jun 10, 2003 | Sep 19, 2004 | | Aug 13, 2006 | Aug 09, 2007 * |
| | | | | | | Nov 22, 2002 | Jul 16, 2003 | Sep 26, 2004 | | Aug 18, 2006 | Aug 22, 2007 * |
| | | | | | | Nov 23, 2002 | Jul 23, 2003 | Dec 06, 2004 * | | Aug 31, 2006 | |
| | | | | | | Nov 25, 2002 | Aug 05, 2003 | Dec 17, 2004 | | Sep 01, 2006 | |
| | | | | | | | Sep 25, 2003 | | | Oct 20, 2006 * | |
| | | | | | | | Oct 12, 2003 | | | Nov 28, 2006 * | |
| | | | | | | | Oct 19, 2003 | | | Dec 05, 2006 | |
| | | | | | | | Nov 19, 2003 | | | Dec 14, 2006 * | |
| | | | | | | | Dec 04, 2003 | | | Dec 22, 2006 * | |
| | | | | | | | Dec 12, 2003 | | | Dec 31, 2006 | |
| | | | | | | | Dec 17, 2003 | | | | |
| | | | | | | | Dec 25, 2003 | | | | |

CRB 0046

Internet Archive Wayback Machine

Home | Help

Internet Archive | Terms of Use | Privacy Policy

CRB 0047



**INTERNET ARCHIVE**
**WaybackMachine**

Enter Web Address: | http:// |          | All |     | Take Me Back |   Adv. Search

## Robots.txt Query Exclusion.

We're sorry, access to http://strategiccommunications.com/* has been blocked by the site owner via robots.txt.
Read more about robots.txt
Try another request or click here to search for all pages on strategiccommunications.com/
See the FAQs for more info and help, or contact us.

Home | Help

Internet Archive | Terms of Use | Privacy Policy

CRB 0048

# EXHIBIT 8
## TO
# AFFIDAVIT OF BRIGHAM J. BOWEN



Home | Find a REALTOR® | Calendar | Site Map | Contact Us | | Search

**View in: Spanish – Portuguese**

☆ Member Resources

Member Login / Profile

Consumer Resources

Press Resources

Annual Subscriptions

Copyright Information

Editorial Submission Policy

The Massachusetts Association of REALTORS / Member Resources / Publications and News / Bay State REALTOR®

**Bay State RELATOR® – The Official Publication by the Massachusetts Association of REALTORS®**

- Bay State REALTOR Jan-Feb 2008
  Strength in Structure

- Bay State REALTOR Nov-Dec 2007
  Keeping Your Head in the Game

- Bay State REALTOR Sept-Oct 2007
  Surveying the Digital Landscape

- Bay State REALTOR July-August 2007
  Who Gets Paid?

- Bay State REALTOR May-June 2007
  Mass Exodus

- Bay State REALTOR March-April 2007
  7 Great Ways to Prove Your Worth

- Bay State REALTOR January-February 2007
  Guiding MAR Into the Future

- Bay State REALTOR November-December 2006
  2006 REALTOR of the Year

- Bay State REALTOR September-October 2006
  Catch the Web Wave

■ Bay State REALTOR July-August 2006
  **REALTORS to the Rescue: How You Can Save the Deal**

< Prev                    1 2 3 4                         Next >

Home | Contact Us | Member Resources | Consumer Resources | MAR Product Mall
Research Data | Course Calendar | Find a REALTOR® | Advertising Opportunities | Privacy Policy

© 2008 Massachusetts Association of REALTORS®. All Rights Reserved.



| Home | Find a REALTOR® | Calendar | Site Map | Contact Us | | Search |

**View in: Spanish - Portuguese**



☆ Member Resources

Member Login / Profile

Consumer Resources

Press Resources

Annual Subscriptions

Copyright Information

Editorial Submission Policy

The Massachusetts Association of REALTORS / Member Resources / Publications and News / Bay State REALTOR®

**Bay State RELATOR® – The Official Publication by the Massachusetts Association of REALTORS®**

- Bay State REALTOR May-June 2006
  **Zoning in on Growth**
- Bay State REALTOR March-April 2006
  **Cultivating the Mass. Market**
- Bay State REALTOR January-February 2006
  **Constructing a Master Plan**
- Bay State REALTOR November-December 2005
  **2005 REALTOR of the Year**
- Bay State REALTOR September-October 2005
  **Delegating Non-Core Tasks "Virtually" for Rewards**
- Bay State REALTOR July-August 2005
  **Armed for Success: Tools to Make & Keep Customers**
- Bay State REALTOR May-June 2005
  **Are You Ready? The Digital Era is Here**
- Bay State REALTOR March-April 2005
  **Watch Your Step - Strategies to Minimize Risk**
- Bay State REALTOR January-February 2005
  **A New Kind Leader**

- Bay State REALTOR November-December 2004
  **REALTOR of the Year**

< Prev                    1 **2** 3 4                    Next >


Home | Contact Us | Member Resources | Consumer Resources | MAR Product Mall
Research Data | Course Calendar | Find a REALTOR® | Advertising Opportunities | Privacy Policy

© 2008 Massachusetts Association of REALTORS®. All Rights Reserved.



Get the REALTOR® Credit Card

Bank of America

MAR Members Only
Get Yours Today!
Higher Standards

| Home | Find a REALTOR® | Calendar | Site Map | Contact Us | | Search |

**View in: Spanish - Portuguese**

Member Resources

Member Login / Profile

Consumer Resources

Press Resources

The Massachusetts Association of REALTORS / Member Resources / Publications and News / Bay State REALTOR®

**Bay State RELATOR® - The Official Publication by the Massachusetts Association of REALTORS®**

Annual Subscriptions

Copyright Information

Editorial Submission Policy

- Bay State REALTOR September-October 2004
  A Road Map to Your Future: Setting Business Goals
- Bay State REALTOR July-August 2004
  An Extreme Makeover
- Bay State REALTOR May-June 2004
  Leveraging the Internet
- Bay State REALTOR March-April 2004
  The New Kids on the Block
- Bay State REALTOR January-February 2004
  MAR... the Bridge to Your Future
- Bay State REALTOR November-December 2003
  REALTOR of the Year
- Bay State REALTOR September-October 2003
  Boost Housing Production
- Bay State REALTOR July-August 2003
  Master the Market
- Bay State REALTOR May-June 2003
  Marketing Strategies that Work

- **Bay State REALTOR March-April 2003**
  **Foreign Home Buyers**

< Prev                    1  2  **3**  4                    Next >

Home | Contact Us | Member Resources | Consumer Resources | MAR Product Mall
Research Data | Course Calendar | Find a REALTOR® | Advertising Opportunities | Privacy Policy

© 2008 Massachusetts Association of REALTORS®. All Rights Reserved.

3/11/2008 5:45 PM



Home   Find a REALTOR®   Calendar   Site Map   Contact Us   Search

View in: **Spanish - Portuguese**

⭐  **Member Resources**

Member Login / Profile

Consumer Resources

Press Resources

Annual Subscriptions

Copyright Information

Editorial Submission Policy

The Massachusetts Association of REALTORS / Member Resources / Publications and News / Bay State REALTOR®

**Bay State RELATOR® - The Official Publication by the Massachusetts Association of REALTORS®**

- Bay State REALTOR January-February 2003
  2003 Leadership

< Prev                    1  2  3  **4**                    Next >

Home | Contact Us | Member Resources | Consumer Resources | MAR Product Mall
Research Data | Course Calendar | Find a REALTOR® | Advertising Opportunities | Privacy Policy

© 2008 Massachusetts Association of REALTORS®. All Rights Reserved.

# EXHIBIT 9
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN

**Web**  Images  Maps  News  Shopping  Gmail  more ▾                                        Sign in

Google            custom communications            [ Search ]   Advanced Search
                                                               Preferences
_____

**Web**                                Results **1 - 10** of about **3,220,000** for <u>custom</u> <u>communications</u>. (**0.07** seconds)

<u>**Custom Communications**</u> - Human Resource Solutions          <span>Sponsored Links</span>
**Custom Communications** is a leading provider of **communication** services and benefits
administration to companies of all sizes, across a diverse range of ...    <u>Strategic **Communications**</u>
**custom**-comm.com/ - 15k - <u>Cached</u> - <u>Similar pages</u>                    **Custom** Publishing Solutions For
                                                                         The Fortune 500. Learn More.
<u>Voice and Data Solutions for your Business</u>                        www.StratCommInc.com
**Custom Communications** provides voice and data products and services for your    District of Columbia
business. Telephone Systems-Fiber Optic Cabling, Voice mail Products, ...
www.**customcommunications**inc.com/ - 13k - <u>Cached</u> - <u>Similar pages</u>

<u>**Custom Communications** we deliver your message in print and online</u>
Writing and designing marketing materials, brochures, newsletters, children's books,
histories, poetry and web site design.
www.desktoppub.com/ - 3k - <u>Cached</u> - <u>Similar pages</u>

<u>gastrokid</u>
healthy food and good eating for kids and parents alike.
**custom**com.typepad.com/ - 177k - <u>Cached</u> - <u>Similar pages</u>

<u>**Custom** Alarm of Rochester, MN | Security Systems, Sound Solutions ...</u>
**Custom Communications**, Inc. (CCi), also know as **Custom** Alarm, ... 2007 **Custom
Communications**, Inc. - Web Design & Hosting by CWS - Rochester MN.
www.**custom**-alarm.com/ - 6k - <u>Cached</u> - <u>Similar pages</u>

<u>Staywell **Custom Communications**</u>
**Custom** newsletters health care newsletter design **custom** publishing **communications**
hospital newsletter healthcare marketing for pharmaceutical pharmacy ...
www.staywellsolutions.com/ - 10k - <u>Cached</u> - <u>Similar pages</u>

<u>FCC Home</u>
For over 36 years Fischer **Custom Communications**, Inc. has designed, ... To see how
Fischer **Custom Communications**, Inc. products and engineering services can ...
www.fischercc.com/ - 6k - <u>Cached</u> - <u>Similar pages</u>

John R. Ingrisano
During that time, my company, **Custom Communications** Insurance Publishing, has
helped dozens of clients – from Ameriprise Financial and New York Life to ...
www.jringrisano.com/ - 28k - Cached - Similar pages

Wax **Custom Communications**
Provides marketing, healthcare public relations, and corporate marketing publishing
solutions.
www.waxcom.com/ - 18k - Cached - Similar pages

Ariad **Custom Communications**
Ariad **Custom Communications** is a leading customer **communications** agency
specializing in client newsletters, marketing collateral and online marketing.
www.ariad.ca/ - 12k - Cached - Similar pages

1 2 3 4 5 6 7 8 9 10    **Next**

custom communications          Search

Search within results | Language Tools | Search Tips | Dissatisfied? Help us improve | Try Google Experimental

©2008 Google - Google Home - Advertising Programs - Business Solutions - About Google

# EXHIBIT 10
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN



English (US)                                                        

## Grow your business with Google

No matter what size business you run, you can display your ads on Google and our advertising network. Reach users searching on Google or browsing websites in our content network, which can deliver your message to more people than any other ad network in the world.[1] Pay if people click your ads.

1 - comScore World Metrix, September 2007



Your ads appear beside related search results...    People click your ads...    ...And connect to your business

**Sign up now »**

Sign in to Google AdWords with your
Google **Account**

Email:
Password:

Sign in

I cannot access my account

Learn how dog daycare facility Happy Hound gets 90% of its business from Google AdWords. Watch the video »

---

**Learn about AdWords**

How it works

Reach more customers

**You create your ads**
You create ads and choose keywords, which are words or phrases related to your business.
Get keyword ideas

**Your ads appear on Google**

---

Costs and payment

For local businesses

Success stories

When people search on Google using one of your keywords, your ad may appear next to the search results. Now you're advertising to an audience that's already interested in you.

**You attract customers**
People can simply click your ad to make a purchase or learn more about you. You don't even need a webpage to get started - Google will help you create one for free. It's that easy!

Sign up now | Next topic»



*Keywords* are what people search for on Google.



Your *ad* appears beside relevant search results.

**Related Programs**

Google Advertising Professionals                    Local Business Center
Google AdSense                                      Google Print Ads
Google Analytics                                    Google TV Ads beta
Google Audio Ads                                    Other Business Solutions
Google Checkout

©2008 Google - Contact Us - Help - Privacy Policy

# EXHIBIT 11
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN



WHAT WE DO    HOW WE DO IT    WHAT SETS US APART    CASE STUDIES    CLIENTS    CONTACT US

Strategic Communications, Inc. is a leading custom publishing and communications firm with over 30 years of experience helping Fortune 500 companies and other large, complex organizations communicate more effectively with their customers, prospects, employees, and shareholders. Our company has won nearly every major editorial and design award, including two Pulitzer Prize nominations.

more >

© 2005 Strategic Communications, Inc. All rights reserved.

CRB 0049

2/28/2008 6:29 PM



    WHAT WE DO | HOW WE DO IT | WHAT SETS US APART | CASE STUDIES | CLIENTS | CONTACT US



**A CLOSER LOOK**

Click below to view a typical StratComm program and learn how we repurpose content for multiple mediums.

MORE

### Cutting Edge Metrics for Measurable Feedback

The most cost effective way to increase demand and improve customer retention is to build a strong affinity group. To accomplish this, a company must communicate with its customers on a regular basis, and these communications must be engaging and generate measurable feedback.

Too many companies have outdated publication programs that have been on "auto pilot" for years. The publications are not read and generate little feedback, yet cost millions of dollars each year.

Strategic Communications builds hard working, highly engaging, and highly interactive integrated communications programs.

Not only do we tap into a vast pool of editorial and design resources to produce the highest quality content possible, we also possess a full suite of advanced tools and methods for tracking and measuring communications effectiveness. We leverage your content and make it work harder for you. We track and assess areas of weakness,

tweaking and streamlining your communications program where necessary to make it the most cost-effective and successful it can be.

### Highly Specialized Writers

All of our writers are seasoned professional journalists and highly specialized. They know the language of their respective markets and can translate "technical speak" into layman's terms, "demystifying" high-level concepts in a tailored way so that the target audience can understand the business applications and the bottom line impact.

### Groundbreaking Integrated Communications

Strategic Communications pioneered the concept of creating integrated print and electronic publications that work hand-in-hand as part of an integrated communications program to enhance the effectiveness of our clients' communications efforts.

Recently, we surveyed the readership of several of our clients' publications. Some of our clients were distributing to their customers either an online publication ONLY or a print publication ONLY. We learned that, on average, only 11% of the customers read their online publications, while 56% read all or part of their print publications.

**CRB 0050**

However, when a print and online publication are published in tandem, the readership numbers for both publications increases dramatically, with 80% of customers reading the print publication regularly, 44% reading the online publication, and 40% reading both the print and online publication regularly. The print publication directs the reader to the online publication for the interactive material, and the online publication directs the reader to the print publication and to archives of past issues on the website. When working as part of an integrated communications program, each publication lifts the readership rate of the other, making the content work harder and improving demand.

We also learned that print publications are much more effective for branding purposes, and longer, more complex articles are better read on the printed page, where they can be illustrated and made more engaging and reader-friendly.

Only short articles are read on a computer screen, but the strength of online publications is their interactivity, which enables them to more effectively garner reader feedback and other measurable data. Interactive publications tell our clients what's working and what's not.

In summary, many of our clients have reduced the frequency of their print publications in order to save money on printing, paper, and postage, but they've added cost-effective online publications for interactivity purposes and to obtain measurable feedback.

For more information on creating an integrated communication program and to download our solutions-oriented white paper, click here.

CRB 0051



**stratcomm**  WHAT WE DO | HOW WE DO IT | WHAT SETS US APART | CASE STUDIES | CLIENTS | CONTACT US

GM/Medal of Honor





GM Centennial book (top)
Medal of Honor book (bottom)

MORE

**Create Carefully Researched Content to be Used Both Individually and Jointly by Three Major Clients:**

**Clients:**

- General Motors Corporation
- U.S. Olympic Committee
- Congressional Medal of Honor Society

**About Our Clients:** General Motors (GM) has been a primary sponsor of the Olympic Games for many years. GM has also sponsored events for leading non-profit associations such as the Congressional Medal of Honor Society, which is comprised of members of the U.S. Armed Forces who have been awarded the nation's highest military decoration, the Medal of Honor.

**The Assignment:** Create a series of publications providing a brief history of the General Motors Corporation and outline the company's contributions to transportation in the U.S. over the past 100 years. Similarly, write a brief history of the Olympic Games and show GM's contribution to the modern Olympic Games.

**The Project Overview:**

- Over the past 100 years, General Motors has become woven into the fabric of American society, influencing almost every aspect of our lives, from the cars we drive to the economy and the lifestyle we enjoy.
- General Motors also supports many of our country's leading causes, from our U.S. Olympic athletes to members of the U.S. Armed Forces.
- Accordingly, General Motors commissioned a series of history publications addressing these subjects. Strategic Communications was selected to write a brief history of General Motors and its contributions to transportation in the U.S. over the past century and to parallel GM's growth and its increasing support of the modern Olympic Games.
- Strategic Communications was also asked to write what was later adopted as the "official history" of the Congressional Medal of Honor.

**The Strategic Communications Solution:**

- Strategic Communications delved into the GM archives and interviewed dozens of GM employees, past and present, to create a brief yet comprehensive history of one of America's oldest and largest corporations. Our journalists brought facts to life as they explored how "GM grew up with America" weathering the good times and the bad, producing a great variety of automobiles as America's transportation system grew, and then quickly switching its assembly lines for the production needed to produce the tanks and planes our country required to defend itself during the World Wars.
- Our writers also chronicled the growth of the modern Olympic Games, which have been supported in part by General Motors, from the many achievements of Jim Thorpe in the 1912 Games to the controversies and politics surrounding Jesse Owens in the Berlin Games of 1936 to the triumphs of Mark Spitz in 1972 and Tommy Moe in 1994.
- Strategic Communications also carefully researched and wrote the most comprehensive history of the Medal of Honor published to date. Our writers interviewed nearly all of the 199 living recipients of the Medal of Honor and created a rich history of the Medal and its recipients¾from its inception during the Civil War to the present. The Congressional Medal of Honor Society later adopted our work as the "official history" of the Medal of Honor.

CRB 0052



Copyright Clearance Center





CLIENT LIST

CRB 0053



QLogic

CLIENT LIST

Download .pdf ▼

CRB 0054

STRATEGIC
COMMUNICATIONS

SANS in Small- to Medium-Size Businesses

# Analysis: Simplifying SAN Scalability
## through stackable switches

Prepared for:



QLOGIC

CRB 0055

# Analysis: Simplifying SAN Scalability through stackable switches

Author: Jack Fegreus, Ph.D.
Technology Director
Strategic Communications
May 31, 2004
Prepared for QLogic Corp.

*Jack Fegreus is Technology Director at Strategic Communications, which consults with a number of independent publications. He currently serves as Editorial Director of Open magazine, Labs Director of HP World and contributes to InfoStor. He has served as Editor in Chief of Data Storage, BackOffice CTO, Client/Server Today, and Digital Review. Previously Jack served as a consultant to Demax Software and was IT Director at Riley Stoker Corp. Jack holds a Ph.D. in Mathematics and worked on the application of computers to symbolic logic.*

CRB 0056

# Table of Contents

| | |
|---|---|
| Executive Summary | 04 |
| Assessment Scenario | 06 |
| The Critical Role of Scalability | 07 |
| Enterprise-Scale Testing | 11 |
| Conclusions | 16 |

03

CRB 0057

# Executive Summary

"The costs associated with a SAN fabric that is built on stackable switches are considerably less than those of any comparable fabric."

Technology innovations along with a new demand-driven consumer market have radically changed the way large enterprises architect IT operations. These drivers are now emerging as powerful forces for change in the small-to-medium size business (SMB) arena. Key drivers for change are:

- Rising use of the Web as a 24x7x365 transactional environment
- Use of customer relationship management (CRM) software to track and direct sales efforts
- Emergence of high-end rack-mounted servers dedicated to single-task functions
- Growing awareness at the corporate-officer level of the value of company data and risks posed by backup and security vulnerabilities

To meet the imperatives of this new business environment, IT departments in SMB enterprises are frequently structuring their IT services around three to four servers dedicated to single strategic tasks:

- A Windows domain controller to provide file, print, and single login services for desktop and laptop PCs
- A Web server
- An email server
- A database server

Out of this new IT environment, the dominant cost driver has become data storage. While the capacity of disk drives has increased exponentially, the traditional method of employing dedicated SCSI-based storage devices on each host along with the need to provide enhanced data security have weighed against any savings and have actually driven costs steadily upward.

The generation gap between today's SAN technology and the first-generation SANs of the large enterprise data center is huge. SMBs can now take

04

advantage of unprecedented innovation and affordability. The introduction of low-cost disk drives, with capacities in the range of 150-to-200 GB, makes it very easy to build a 1-TB RAID array. While only a few of today's SMB servers require 1TB of storage, many SMBs are finding that their overall storage needs are rapidly approaching the multiple-terabyte level.

While large-capacity drives provide an opportunity for cost savings, they don't always mean lower total cost of ownership (TCO). The costs associated with the configuring and maintaining a traditional SAN topology can make it nearly impossible for a minimally-staffed IT organization to realize any operational savings.

What changes the equation in favor of SAN deployment at SMB sites is the introduction of technologies that simplify the deployment and management of a SAN throughout its entire lifecycle. To this end, QLogic® Corporation commissioned Strategic Communications to assess the new SAN technologies introduced with QLogic's SANbox® 5200 stackable Fibre Channel switches. In this white paper, we examine the construct of stackable switches in terms of performance and fabric simplification.

In essence, QLogic has extended the idea of stackable Ethernet switches into the world of SAN fabrics by adding industry-standard 10-Gbit per second ports to link SANbox 5200 switches. As Ethernet speeds went from 10- to 100- and then to 1,000-Mbits per second, the first use of the new high-speed ports was for the most part centered on linking hubs and switches in order to increase the number of LAN access points.

Along this vein, QLogic has placed four 10-Gbit-per-second ports to complement the sixteen 2-Gbit-per-second ports on each SANbox 5200 switch. For the SAN administrator, this provides a simple mechanism for creating configuration-free inter-switch links (ISLs). Not only do these high-speed ISL ports simplify the creation of a larger fabric, they also provide greater throughput than the conventional method of combining multiple 2-Gbit-per-second ports into a virtual trunk connection.

05

# Assessment Scenario

"Not only do stackable switches scale well, the ease with which this scaling is accomplished greatly simplifies the design tasks for creating a well-functioning SAN fabric."

For this assessment, Strategic Communications examined two independent sets of data. The first set was generated to serve as a baseline for all single-port throughput performance comparisons. We generated this data using our oblDisk and oblLoad benchmarks, which test large file streaming and small-block database-patterned transaction processing. These tests were run within our SMB test fabric, which was built around two QLogic SANbox 5200 switches, QLA®2340 Fibre Channel HBAs, and SANbox Manager™, a host-based software package for end-to-end managing and monitoring of a SAN fabric.



Within our test fabric we modeled an SMB environment consisting of three Intel® Xeon-based servers that came from three different manufacturers: a Dell PowerEdge™ 2650, an HP ProLiant ML 350 G3, and an Appro 2400Xi. The Dell and HP servers were configured to run Windows Server™ 2003, while the Appro ran SUSE LINUX Professional version 9.

Shared disk storage was handled by an nStor NexStor® 4500F Series storage system. The system was populated with four IBM and eight Seagate Fibre Channel drives, which were formatted as two independent RAID 5 arrays, in order to provide approximately 1TB of total storage that would be divided among the three servers.

For robust performance and transparent fault-tolerance, the nStor 4500F system was set up with two RAID controllers in an active-active configuration. With a central storage system configured in this manner, a seasoned system administrator can optimize I/O across servers by assigning different primary controllers to different arrays on different systems, while at the same time eliminating the possibility that a disk controller would be a single point of failure.

To complement the inherent fault tolerance provided by the active-active dual-controller configuration of our storage system, we chose to implement a basic dual-switch topology for our SAN fabric. Given the number of devices being networked into our SMB SAN environment, a

single 16-port SANbox 5200 would have been more than sufficient to support the current fabric structure and leave plenty of room for future expansion. A single-switch topology, however, would leave the switch as a single point of failure and violate our business constraint to provide the most robust 24x7x365 systems availability possible.

The second set of data was generated while performing audited switch performance tests using highly specialized equipment in the lab at Spirent Communications. Using Spirent's SmartBits system to generate frame data, Fibre Channel stress tests were performed at various network load factors targeting as many as 64 ports on up to six switches simultaneously. The data set from these tests provide an extremely accurate measure of fabric scalability and performance.

Using our single-port I/O throughput and transaction-processing load tests to put the multi-port Spirent tests into context, one overwhelming conclusion rose out of the reams of data: Not only do stackable switches scale well, the ease by which this scaling can be accomplished greatly simplifies the design tasks for creating a well-functioning SAN fabric.

# The Critical Role of Scalability

"We were not surprised when our benchmarks demonstrated that I/O throughput in a SAN could exceed I/O throughput achieved with a local Ultra320 SCSI disk array and saturate a 2Gb port."

The purpose of a SAN is to distribute logical devices using the SCSI protocol to multiple systems. To this end, the Fibre Channel creates a dynamic intelligent architecture to provide both high-bandwidth and high reliability. Among the technology features that distinguish Fibre Channel are:

- Automatic self-discovery of all Fibre Channel topologies
- Support for dedicated bandwidth point-to-point, shared bandwidth, and scalable bandwidth on switched circuits
- Confirmed delivery of data
- Microsecond latency in establishing circuits
- Variable length frames (from 60 bytes to 2,148 bytes) to provide high throughput and low latency when transferring data

For an SMB site looking for high-throughput performance, the first likely storage solution to be examined is Ultra320 SCSI. In our tests of Ultra320-based subsystems in 32-bit Xeon-based servers, we obtained throughput levels on the order of 150-to-175 MB per second on internal 4-drive RAID arrays. The strict cabling requirements to maintain the proper signaling strength, however, place hard constraints on the ability to grow these arrays.

These constraints are not a concern in a pure fiber environment. The use of fiber-connect drives and storage subsystems with fiber loop back-planes makes it very easy to string together large numbers of disks and enclosures. That's precisely what's needed to maximize the performance of RAID arrays.

What's more, each port on a 2Gb SAN switch is capable of delivering a full 2-Gbits of data per second. That translates into about 200MB to 220MB of data per second. As a result, we were not surprised when our benchmarks demonstrated that I/O throughput in a SAN could exceed I/O throughput achieved with a local Ultra320 SCSI disk array and saturate a 2Gb port. Taking account of this fact is an essential step on the way to properly designing a SAN fabric that will scale.

While the QLogic 5200 switches are completely OS neutral, achieving this level of consistent throughput from a single 32-bit server, was bolstered through the use of a QLogic QLA2340 HBA on a server running Linux which is very SAN-friendly. The Linux kernel attempts to bundle I/O requests into 128KB blocks. When the QLogic Fibre Channel HBA driver is used in conjunction with a Linux distribution based on the 2.4 kernel, the driver capitalizes on the behavior of Linux by further bundling the 128K Linux I/O requests in order to deliver very large 512KB data requests to the storage subsystem.

A somewhat different picture arises when the traffic profile switches from large sequential data transfers on Linux to a simulation of a transaction-processing environment on a Windows Server 2003 platform. In this scenario, the server issues I/O requests to a large database. These I/O requests are typically 8KB in size and a significant portion are clustered in index tables.

08



*Using the Fabric View feature of the SANbox Manager software, we monitored the fabric while running our oblDisk benchmark on an Intel Xeon-based server. Capturing frames per second on the nStor port and bytes per second on the server port, we confirmed that both ports were saturated and that the largest and most efficient frame size was being utilized.*

Running our transaction-processing benchmarks, smaller frame sizes were automatically used to optimize traffic. Nonetheless, the key measure of processing is in the number of completed I/Os with a response time of less than 100 ms. With that in mind, the server was able to successfully process upwards of 2,000 I/O requests per second while maintaining an average response time of less than 100ms. Clearly this transaction load stressed the server and disk array, but what about the fabric?



Monitoring the fabric while running our oblLoad benchmark on a Windows Server 2003 platform, a very different profile emerges. This benchmark simulates a high-volume transaction-processing environment with small (8KB) I/Os, which in turn utilized smaller frames. In this case, our server was able to sustain up to 2,000 I/Os per second (about 16MB of data) before response time fell below 100ms.

10

In the classical terms of data throughput-MB per-second, the oblLoad transaction-processing benchmark had not come close to stressing the fabric. Expressed in terms of data throughput, the fabric was operating on somewhat less than a 10% load. While data throughput is the natural measure for a system administrator to focus upon, that metric ignores the fact that the natural metric is the frame rate in a SAN.

CRB 0064

In this case, the average frame carried about half the data packaged into frames during our oblDisk benchmark. As a result, frame traffic was about 50% greater than what we would have predicted based on the behavior of oblDisk. As I/O requests at the OS level become smaller and more difficult to bundle, the SAN fabric is forced to handle more and more small frames of data.

These tests demonstrate the ability of Fibre Channel devices to work within a fabric to adapt to the current conditions and optimize the flow of data. This dynamic environment makes it all the more important to provide sufficient head room for traffic that will be traveling across switch boundaries.

Nonetheless, there is yet another reason why scalability of inter-switch links is so significant: redundancy.

Having no traffic on ISLs is just as bad—perhaps even worse—for a SAN fabric as having too much traffic. No traffic moving among the switches is a clear indication that there is not a single fabric but instead a federation of multiple single-switch fabrics where the switch is a single point of failure. In such a topology, a single bad connector or loose cable could result in significant downtime and labor costs as an administrator is forced to troubleshoot the problem.

# Enterprise-Scale Testing

"The bottom line for a Fibre Channel switch is how well it handles traffic when flooded with small frames of data."

With the exception of QLogic's new class of stackable switches, the task of configuring ISLs in a SAN is analogous to the classic problem of robbing Peter to pay Paul. The classic SAN fabric topology is a mesh where every switch is linked to every other switch in order to minimize the number of hops a frame must make when traveling between two devices. For the systems administrator, this means deciding how many ports will be reserved for each link to another switch.

This modus operandi (MO) has led to the term "subscription ratio." This ratio is derived by comparing the total number of device ports to the

total number of ports used for ISLs. On a 16-port switch where four ports are reserved for ISLs, twelve ports would be left for device access, and so the subscription ratio would be 3:1, which has become an accepted rule of-thumb indicator for good overall performance. Nonetheless, when it comes to SANs, rules of thumb are often not as simple as they seem.

Simply connecting a group of ports between two switches does nothing to make those circuits act as a single high-bandwidth logical connection. There is nothing to stop most of the traffic from moving down one of the port-to-port connections and creating a bottleneck. To prevent that from happening, additional trunking firmware must be enabled on the switch to provide load balancing over the group of adjacent ports designated to form the single logical trunk. Unfortunately, load balancing in this fashion adds overhead to switch processing. This added overhead is not necessary with 10GB ports, which are architected around four channels that are automatically balanced.

What's more, focusing on throughput in terms of MBs-per-second ignores the real work done by a switch: the handling of frames.

The 2Gb-per-second throughput specification for each port is a real bound on sustainable peak performance. Nonetheless, the ability of SAN devices to dynamicly adapt and bundle data into a few large frames makes it relatively easy to reach this level of performance and never stress the fabric while streaming data. During an I/O request on a SAN, data must be segmented into frames, encoded, and then sent across the fabric. When the frames reach their destination, they are unpacked and decoded. As a result, there is a world of difference between transferring a megabyte of data in 500 large frames and transferring a megabyte of data in 17,000 small frames.

As our oblDisk and oblLoad benchmarks demonstrate, devices in a fabric will attempt to utilize the largest frames possible. Nonetheless, just how effective this scheme to maximize frame size will be depends on a number of external factors, including how the applications in use access data, how the computer operating systems in use make I/O requests, the intelligence of the drivers associated with the Fibre Channel HBAs in these systems, as well as the structure of the stored data. It should therefore come as no surprise that the bottom line for a Fibre Channel switch comes down to how well it handles traffic when flooded with small frames of data.

This explains the importance of the behavior or the QLogic HBA in a system running Linux and the positive ramifications for overall SAN performance. First, the I/O requests arrive at the switch in very large blocks, which allow the switch to utilize large frames. This puts minimal stress on the switch and potentially on an ISL if a switch hop is required. Second, the data arriving at the storage server appears as if it were coming from a high-end UNIX server.

As a further result of this I/O bundling scheme, the RAID array can be configured with large 256KB chunks. This minimizes the possibility that a chunk will be split across drives because of alignment issues. At the same time, it maximizes the probability that a write operation will consume a full stripe on the array. So not only is the switch operating at full efficiency, so too is the storage system.

To generate a constant homogeneous stream of fixed byte frames requires specialized equipment that can generate the required frames in sufficient numbers to saturate multiple switch networks. The industry-recognized leader in this kind of equipment is Spirent Communications. In audited tests at the Spirent Communications Lab using that company's SmartBits system, numerous mesh and backbone tests were conducted using multiple SANbox 5200 switches along with competitive products including the Brocade SilkWorm 3800. The SmartBits system generated frames for fabric stress tests, which were performed at various network load factors and targeted as many as 65 ports on up to six switches simultaneously.

The most important test for traditional Fibre Channel switches, however, was performed with the SmartBits system targeting a single switch. With the exception of the QLogic stackable switches, all other switches are essentially characterized by their stand-alone performance. That's because all of the ports are identical. The scalability of a fabric is dependent upon the design of the fabric topology and the key to that design is the proper creation of inter-switch links.

These ISLs, are nothing more than groups of data ports used to link switches rather than devices. In theory, the performance of an ISL can be no greater than the aggregate performance of the data ports used to create the ISL. In reality, it could be worse: Load balancing traffic over a group of ports introduces processing overhead at the switch.

The performance of a single switch, however, needs to be carefully

13

examined in the context of what a switch is designed to do: move frames. Moving data is a byproduct of moving frames. As a result, it is impossible to determine the scalability of switches just by using throughput in gigabits per second as the metric. This point was driven home by using the SmartBits system to generate frame traffic to stress various fabrics at 25%, 50%, 75%, and 100% load factors in frames per second using homogeneous streams of fixed-sized frames, where 100% load = 2Gbits/(data per frame in bytes).

Using the largest frame size (2,148 bytes of data), aggregate frame traffic scaled perfectly for all load factors. Test results were virtually identical on both switches. These impressive large-frame results, however, were not duplicated when the switch was flooded with small frames of data (60 bytes). From 25% through 50% load on the fabric, both switches scaled perfectly and matched each other in aggregate throughput. At 75% load, the results began to diverge. The Brocade switch reached a maximum per-port throughput at approximately 106M frames per second. At 100% load, the QLogic switch was still within 97% of handling the target load generated by the Spirent SmartBits system. The Brocade switch, however, was still restricted to 106M frames per second.

Naturally, any data-port scalability issues cascade into any multi-switch fabrics built using anything other than stackable switches. First there is the precarious balancing act of taking enough ports out of service to function as ISLs. This task is further complicated by the requirement to keep all of the ports dedicated to function as a particular ISL in a contiguous block in order to provide load balancing over the group. The net result is the need to use more switches when creating a complex fabric to service the same number of devices. In particular, scaling a test fabric to 64 data ports required only four 16-port QLogic SANbox 5200 switches; however, scaling a test fabric to 65 data ports required six 16-port Brocade SilkWorm 3800 switches.

Repeating the Spirent SmartBits tests on the 4-switch SANbox 5200 mesh, results closely followed those for a single-switch: At 100% load, the 3% drop off in traffic had increased to a still relatively modest 11% from the theoretical load. The 6-switch SilkWorm 3800 mesh, however, demonstrated significantly greater degradation than the performance bottleneck uncovered in the single-switch tests. In our fabric, maximum per-port frame throughput occurred at 56M frames per second-50% load. Even when the distribution of ports between data and ISL functionality is done perfectly, the scalability of a fabric remains a function

14

of the frame sizes that characterize traffic on the fabric and not the amount of data traveling on the fabric.



*The scalability of a fabric is a function of the frame sizes that characterize traffic on the fabric and not the amount of data traveling on the fabric. For switches that require aggregating data ports to create inter-switch links, the key metric for projecting the scalability of a large fabric is linked to the ability of each switch to handle large numbers of frames. Any bottlenecks measured at the single switch level will cascade into the enterprise fabric.*

15

Using the QLogic SANbox 5200 stackable switches, these issues are no longer a necessary problem to be resolved. First, there is no need to allocate any of the sixteen data ports to function as ISLs. In addition to

CRB 0069

the sixteen 2Gb-per-second data ports, there are four industry-standard 10Gb-per-second ports explicitly placed on the switch to perform this function. These ports actually support a throughput rate of 12Gbs per second as they are architected around four 3.1875Gb/s channels. Every 4-byte Fibre Channel word is 'striped' across each of the four channels in single bytes. This automatically provides load balancing with no added overhead for the switch.

Given the throughput specification of these ports, a simple two-switch fabric will have its full collection of 32 ports available for connecting devices. By employing two ISL ports—each of which is the equivalent of 6 ordinary data ports—for a backbone, the switches will have highly effective 2.7-to-1 subscription ratios.

# Conclusions

> "QLogic has radically rationalized the SAN as an attractive SMB storage approach."

16

Under audited testing that was conducted using a Spirent SmartBits system, the QLogic SANbox 5200 switch demonstrated near-perfect scalability. At 25%, 50%, 75% and 100% loads, the SANbox 5200 scaled to providing an average per-port throughput of over 210MB per second using 2,148-byte frames. Even when flooded with the smallest possible data frames, the switch was still able to scale to within 97% of the target throughput.

More importantly, the switch also comes configured with four 10Gb-per-second ports for use in creating inter-switch links. With each ISL port being the equivalent of six load-balanced 2Gb-per-second data ports, the SANbox 5200 simplifies any mesh configuration by eliminating the need to configure trunks and balance the number of ports dedicated to data and ISLs-dubbed the subscription ratio.

By eliminating the issues of port allocation for trunking and providing a highly scalable hardware infrastructure, full software-monitoring tools, and a simplified wizard-based system for setting up a basic SAN fabric in 30 minutes, QLogic has radically rationalized the SAN as an attractive SMB storage approach.





| stratcomm | WHAT WE DO | HOW WE DO IT | WHAT SETS US APART | CASE STUDIES | CLIENTS | CONTACT US |

MAR



The Massachusetts Association
of REALTORS® bimonthly
Bay State REALTOR® Magazine

MORE

**Relaunch a Member Magazine with High-Quality Production Values and Increased Advertising Pages**

**Client: Massachusetts Association of REALTORS®**

**About Our Client:** MAR is "The Voice for Real Estate™" in Massachusetts. For more than 80 years, MAR has been working diligently on behalf of property owners to advocate fair housing and home ownership for all. The association also administers educational training, professional standards services, and ethics cases to ensure its members not only understand but adhere to the state and federal laws and the strict national REALTOR® Code of Ethics.

**The Challenge:**

- Relaunch *Bay State REALTOR*® magazine, a publication with low production values, to communicate more effectively with members, engage readers, and put a fresh face on the association in order to keep members better informed and to encourage them to utilize the association's services to a greater degree.
- Assist the association in its efforts to increase membership and membership benefits.
- Increase advertising revenue and boost ad sales from only six pages of ads per issue.
- Redesign an outdated media kit to aggressively target new advertisers.

**The Project Demands:**

- Implementation of the project had to meet with unanimous approval from all of the association's board members and the executive committee.
- Strategic Communications had one month to roll out the media kit and prepare for the magazine's relaunch.
- With very few existing advertising contacts, Strategic Communications needed to be proactive in generating support for the magazine.

**The Strategic Communications Solution:**

- By designing a targeted, comprehensive advertising program to support the struggling organization and creating new incentives for advertisers, ad revenues more than doubled in less than six months. The current publication supports just under 20 pages of ads and new business partner relationships have been created.
- Since relaunching the magazine, membership has grown by 25%, advertising revenues have quadrupled, and the circulation continues to increase.

**CRB 0071**





IBM

**E-Newsletters that Translate High-Technology Into Business Terms**

**Client: IBM**

**About Our Client:** The IBM name is synonymous with information technology leadership in all things hardware and software.

**The Challenge:**

- Build a community of C-level executives.
- Provide an entertaining learning experience in the business value for a number of cutting-edge IT technologies, including virtualization, IT Service Management (ITSM), IT Governance, and IT optimization.
- Meet a pressing need to expand a limited client database, though new readers must be highly targeted to be of value.

**The Project Demands:**

- IBM had a limited budget for the project and required quick turnaround times.
- Strategic Communications needed to refocus existing materials from "how to" to "why to."

**The Strategic Communications Solution:**

- Strategic Communications creates the weekly content for a number of online IBM webzines, including *Tivoli Beat* and *Virtualization View*.
- To further the audience reach of these webzines, Strategic Communications leveraged its own *Open Magazine* site, which had been utilized to develop and support IBM's *Linux Line* and *Open Power Village*.
- Originally launched as a business and technology magazine for open source computing, the breadth of Open was narrowed to technology evaluation via openBench Labs, while the scope was broadened to cover all open standards-based IT technologies with a particular focus on system, storage, and network virtualization and ITSM.
- Launch a new newsletter, NextGen IT/Today, using Open to provide technology evaluations that complement the business value message of the IBM client Webzines.
- Working with the Strategic Communications team of writers and technologists, IBM was able to double the circulation of *the Linux Line* and then take the *Tivoli Beat and Virtualization View* webzines from concept to distribution via the *NextGen IT/Today* newsletter in a matter of weeks.



IBM's OpenPower Village website

MORE

**CRB 0072**



| | | | | | |
|---|---|---|---|---|---|
| stratcomm | WHAT WE DO | HOW WE DO IT | WHAT SETS US APART | CASE STUDIES | CLIENTS | CONTACT US |

OpenBench Labs





OpenBench Labs publication
for Quantum

MORE

**OpenBench Labs**, a division of **StrategicCommunications**, provides high-tech manufacturers with white papers and hardware/software reviews of technical features. These publications are frequently based on our benchmark suite, which has evolved through 15 years of development into an easy yet technically accurate way to measure system performance.

**OpenBench Labs** connects the dots between your technology excellence and business value. We leverage a sophisticated knowledge base of business strategies, industry trends, and market research in compiling reports. Then with our own suite of benchmarks, we can place your technology and products into business context.

Our reports help make customer planning as easy as possible by delivering above-average context and takeaways for the most demanding target audiences. More importantly, **OpenBench Labs** helps you become a valued information provider to your customers with independent technology assessments that engage and educate.

**CRB 0073**



| | WHAT WE DO | HOW WE DO IT | WHAT SETS US APART | CASE STUDIES | CLIENTS | CONTACT US |

Below is a partial list of current clients for whom we create content on a weekly or monthly basis.

**ASK OUR CLIENTS**

Your team is so easy to work with, and they are so professional. Nothing slips between the cracks. Everything runs on schedule and the quality of your work is superb.
— Thank you.

- Brian Bishop
Corporate Communications
Prudential Financial
Newark, NJ

symantec.

Goldman Sachs

Geller & Company

MASSACHUSETTS ASSOCIATION of REALTORS

IBM

Prudential

Fidelity INVESTMENTS

PEAK
PEAK Technologies
Improving the Flow of Business

| | |
|---|---|
| AllEnergy | Harcourt Brace |
| American Federation of the Arts | Houston Lighting & Power |
| American Power Conversion | Hewlett Packard |
| AFL/CIO | IBM |
| AOPA | International Telephone & Telegraph |
| AT&T | Lahey Clinic |
| BankBoston | Mass. Association of REALTORS |
| Blue Cross/Blue Shield | Mellon Bank |
| Bristol-Myers Squibb | NYNEX |
| Ciga Hotels (Europe) | Parke-Davis |
| Citibank | PCS Health Systems |
| Computer Associates | PEAK Technologies |
| Congressional Medal of Honor Society | Prudential Financial |
| Copyright Clearance Center | Quantum Corporation |
| Data Reality Companies | Racal Decca Ltd. |
| Deloitte & Touche | Reliant Energy |
| Fidelity Investments | Rizzoli |
| Field Publications | Select Energy |

CRB 0074

| | |
|---|---|
| First National Bank of Chicago | Symantec |
| FundQuest | Time-Life Books |
| Geller & Company | U.S. Attorney General's Office |
| General Motors | U.S. Olympic Committee |
| Giddings & Lewis | Wells Fargo |
| Gillette | Western Union |
| Goldman Sachs & Co. | Women's Consumer Network |

**CRB 0075**

Strategic Communications Inc                                    http://www.stratcomminc.com/whatwedo.html



stratcomm    WHAT WE DO | HOW WE DO IT | WHAT SETS US APART | CASE STUDIES | CLIENTS | CONTACT US

ASK OUR CLIENTS

The StratComm team does such wonderful work. The quality of our publications has never been better, and your in-house technology and the ability for us to receive customer feedback is a major enhancement. It's a pleasure to work with everyone in your company.

- Nancy Wertheim
Deloitte & Touche

Strategic Communications specializes in designing and implementing highly successful integrated communications programs.

We create and manage our clients' print and online publications, specializing in custom magazines and newsletters. We write their marketing collateral, produce and host their website content, and manage their databases.

In short, we create highly effective relationship marketing programs that create demand for our clients' products and services.

High profile companies trust our 30 years of experience and our good judgment. With hundreds of experienced, specialized writers and designers at our fingertips, we're able to produce high-quality content on virtually any subject, in any language, using any medium.

We replace advertising clutter with "information" that helps your customers do their jobs better—information that produces measurable results, brands your products, and creates demand. For more information on creating an integrated communications program and to download our solutions-oriented white paper, click here.

We are solutions oriented. We help technology companies manage their communications in the midst of rapidly changing IT environments; energy companies deal with the changing landscape of deregulated markets; financial services firms during mergers and acquisitions; and health services companies inform their customers in the midst of new advances and breakthroughs.

We have worked in virtually every industry and market, including financial services, technology, hospitality, manufacturing, healthcare, and retail and consumer goods.

We enable clients to control their message and speak with one voice. We serve as a collaborative extension of our client's in-house team, providing added depth, experience, and flexibility. We improve quality while reducing costs.

Our company has won nearly every major editorial and design award, including two Pulitzer Prize nominations.

Very simply, we are about good communications.

**CRB 0076**

# EXHIBIT 12
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN



# openBench Labs

### A Division of
### Strategic Communications

Enterprise SAN Performance

# Analysis: Raising the SAN Value Proposition
# By Automating Tiered Data Migration



# Analysis: Raising the SAN Value Proposition By Automating Tiered Data Migration

Author: Jack Fegreus, Ph.D.
Chief Technology Officer
Strategic Communications
http://www.StratCommInc.com
July 6, 2006

*Jack Fegreus is Chief Technology Officer at Strategic Communications, which consults with a number of independent publications. He currently serves as Editorial Director of Open magazine, Labs Director of HP World and contributes to InfoStor. He has served as Editor in Chief of Data Storage, BackOffice CTO, Client/Server Today, and Digital Review. Previously Jack served as a consultant to Demax Software and was IT Director at Riley Stoker Corp. Jack holds a Ph.D. in Mathematics and worked on the application of computers to symbolic logic.*

# Table of Contents

Executive Summary                        04

Fundamental Technologies                 05

Storage Center Basics                    09

Value Proposition                        14



# Executive Summary

"To create a SAN environment that can provide the level of automated storage management traditionally associated with an ILM package, Compellent radically restructured the way storage is virtualized."

Neither Moore's Law—processing price/performance doubles every 18 months—nor Shugart's Law—magnetic storage price/bit halves every 18 months—shows any signs of being repealed in the foreseeable future. Nonetheless, resource planning remains a burning issue for IT as tight budget constraints, increased demands on administrator time, and unplanned increases in system workloads continue to plague IT planners. As a result, IT consolidation and simplification are securely ensconced within the mantra of many CIOs.

At the same time, CEOs, continue to pressure CIOs to provide an IT infrastructure that demonstrably improves business responsiveness and operational speed in order to meet rapidly changing business cycles. The global IT practice of McKinsey & Company, Inc. projects for 2006 that investments will be made in business intelligence software that can access data in Enterprise Resource Planning (ERP) systems for market analysis, as well as, software that can either improve the productivity of industry-specific processes or addresses industry-specific competitive issues.

More importantly, this IT expansion comes when overall IT budgets for capital and operational expenses are experiencing modest 3% growth. To fuel double-digit capital growth, CIOs are left with leveraging Moore's and Shugart's Laws to garner significant operational cost savings. A key resource targeted for significant cost-saving is storage, which is pegged by the Storage Networking Industry Association (SNIA) as having grown at a 79.6% compound annual rate for global companies.

To successfully wring out those savings, however, application workloads must be separated from infrastructure resources to minimize any risk of negatively impacting mission-critical applications, while optimizing and changing the underlying infrastructure. That separation process is termed "virtualization" and involves presenting an operating system (OS) with a logical representation of the device in place of the actual hardware. The logical or virtualized device masks any changes to the underlying hardware



from the OS or any application running on the OS.

For storage, separating a logical resource representation from its physical implementation starts with the adoption of a storage area network (SAN). That makes a SAN a necessary condition to achieve the ultimate cost-cutting goal for storage: a self-managing resource that scales without disruption. While a SAN is necessary to achieve significant cost cutting, it is not sufficient to guarantee that those goals will be achieved. Garnering the level of storage cost savings needed to fund increased capital spending requires significant changes in the way storage is managed.

Gartner projects that three to five times more per GB is spent managing storage than acquiring it, which makes a significant reduction in the Total Cost of Ownership (TCO) dependent on driving down management costs. This is particularly important when dealing with structured and semi-structured data on which mission-critical applications, such as ERP and email, are built. These key production systems have performance limitations that require both optimally organized data and optimally configured storage. Automating an optimal storage environment for these applications has the potential to generate substantial management savings.

Until now, to approach that level of automated storage management required a sophisticated and costly Information Lifecycle Management (ILM) application running on top of a SAN implementation. To create a SAN environment that can provide the level of automated storage management traditionally associated with an ILM package, Compellent radically restructured the way storage is virtualized. While traditional SAN software virtualizes storage based on partitions of disk volumes, Compellent's Storage Center virtualizes storage based on disk blocks.

# Fundamental Technologies

"The Compellent Storage Center significantly reduces SAN TCO by obliterating an astonishing number of storage management issues and tasks."

## Building an Architecture on Virtual Disk Blocks

Unlike most intelligent SAN storage arrays, the Compellent Storage Center™ is sold as a complete modular storage area network (SAN)

Fundamental Technologies

 OPENBENCH LABS TEST BRIEFING:

Compellent Storage Center™ SAN

1) **Compellent virtualizes storage at the disk-block level versus traditional SAN virtualization at the array-partition level.**

2) **Dynamic Block Architecture™ tags logical blocks with metadata that includes last access time and RAID characteristics to emulate.**

3) **Logical blocks are served from tiered storage pools based on drive characteristics, such as interface—SATA or Fibre Channel— and rotational speed—15K or 10K rpm.**

4) **Compellent Storage Center manages logical blocks only when they are utilized and not when they are allocated.**

5) **Dynamic Capacity™ provides thin provisioning by automatically expanding disk pools to support allocated logical blocks.**

6) **Data Progression™ provides for automated tiered storage by migrating data blocks across pools based on access policies.**

7) **Using our obIDisk benchmark, I/O throughput was comparable to tests run on traditional SANs.**

solution and not as a single component. The reason for this is rooted in the product's remarkable value proposition. The Compellent Storage Center significantly reduces SAN TCO by obliterating an astonishing number of storage management issues and tasks. To achieve this goal, Compellent seized upon the notion of virtualizing the most fundamental element of storage: the data block.

All SAN virtualization software presents host systems with virtualized logical disks. Using traditional SAN software, that process starts with a SAN administrator combining physical disks into RAID volumes, partitioning those volumes, and then virtualizing the partitions into logical disks. Compellent software's rich functionality, however, is driven by a very different, sophisticated, and unique construct: Dynamic Block Architecture™. For an administrator using the Compellent Storage Center, virtualization does not begin at the level of a partition belonging to a disk array, but at the level of a logical disk block.

All of the disk blocks associated with all of the drives within a SAN are abstracted into a logical space of storage blocks, which can be larger than the physical space. Compellent accomplishes this extraordinary feat of legerdemain with the aid of a rich collection of metadata. Each logical disk block is associated with a collection of tags that represent notions that are normally associated with file-level and volume-level data constructs. File-oriented metadata includes such notions as data type and time stamps for events, including the last access, and the last modification of the data. In addition to that file-oriented metadata, metadata that is typically associate with disk volumes includes constructs such as the type of disk drive, the associated disk tier, the underlying RAID level for data security, and the corresponding logical volume.

A very powerful and subtle aspect of Compellent's implementation of logical blocks and volume-oriented metadata is the rather remarkable



Fundamental Technologies



virtualization of the notion of RAID level. Within a Compellent Storage Center environment, RAID level is just a mathematical abstraction that relates to data security and availability. No longer does RAID level relate to a physical disk-formatting task.

With a Compellent SAN, the system manager no longer needs to make any decisions on how to physically format RAID disk volumes. Immediately, that takes an important task in storage management off of the table. What's more, the virtualization of RAID levels directly resolves another important storage management issue: the need to balance I/O requests. The Compellent Storage Center automatically spreads and balances I/O requests across all disks in a physical tier independently of the RAID meta-data classification. As a result, I/O performance scales optimally as disk drives are added.

> When we ran a file I/O benchmark on a logical RAID volume located within a disk enclosure, I/O requests were distributed by the SAN software evenly across all of the disks in the enclosure.

## Maximizing Performance and Functionality

Optimization of real-time performance is important to support virtualization and server I/O on any SAN controller. The fine-grained Dynamic Block Architecture and extended functionality of the Compellent Storage Center, which includes the ability to transparently migrate data across tiers of disk drives, only amplifies the importance of performance. On the other hand, the complexity associated with the implementation of such levels of device and data abstraction has the potential to introduce a significant amount of overhead.

For critical real-time operations such as the reading and writing of disk data, such added overhead carries a high probability that it will turn response time to sludge. To resolve this issue, Compellent chose not to use a traditional real-time operating system (RTOS) on its SAN storage controllers. In place of a traditional RTOS, Compellent chose to use eCos (Embedded Configurable Operating System), an open source application specific operating system (ASOS).

Like a normal operating system, an RTOS runs independently under an application. In contrast, an ASOS is explicitly linked with the application—in this case the Compellent Storage Center—code to form a single executable image. This creates a precisely tuned environment for running the Compellent Storage Center software. What's more, it

### From RTOS to ASOS

There are many real-time operating systems (RTOS) available, which are often based on the Linux kernel. While the Linux kernel can be customized for an application, the OS still requires a minimum set of system resources in order to run and never becomes application specific.

Using a traditional RTOS, applications run on top of the OS and are written using embedded APIs for that OS. On the other hand, with an application specific operating system (ASOS), such as eCos, POSIX APIs are embedded within the application. The application code and the ASOS are then linked to create a single executable module.

As a result, the application drives very fine-grained customization of the OS. This generates a minimal resource footprint for both the OS and application and facilitates optimal run-time performance.

Fundamental Technologies

embodies the SAN with the on-going ease-of-use that is usually reserved for devices that are dubbed "an appliance." In line with the notion of an IT appliance, the Compellent Storage Center solution provides IT with an infrastructure that is at once highly-modular and highly-customizable while exhibiting tight integration, real-time performance, and a high level of resource utilization .

Currently, the principal hardware components that can be utilized in building a comprehensive Compellent SAN solution are:

- Intel-based servers acting as Storage Center Controllers;
- Qlogic QLA®2342 Fibre Channel HBAs featuring automatic multipath failover support;
- Qlogic QLA®4050C ISCSI HBAs primarily intended to extend SAN connectivity to remote locations;
- McDATA/Brocade Fibre Channel Switches; and
- disk drive enclosures populated with either Fibre Channel or SATA drives.

Moreover, through new software releases, this architecture can be readily expanded and scaled through the addition of new hardware within the Compellent Storage Center. Additions that are planned for near-term introduction include a new fast tier for Fibre Channel drives that connect via HBAs at 4Gb per second and a new middle tier for SATA-II drives that connect at 3Gb per second.

Using well-defined collections of hardware, a Compellent SAN is able to scale in performance, total storage capacity, and system availability with minimal impact on management overhead. Storage enclosures can be added in any increment to increase storage capacity and I/O will be automatically balanced over larger storage pools. For high availability, QLogic Fibre Channel HBAs provide multipath failover support between Storage Center controllers and disk enclosures. In addition, Storage Center controllers have on-board battery backup to protect data in the event of a power loss. For sites that need even more in high-availability support, Storage Center controllers can be clustered to provide for failover at the Compellent controller level.

# Storage Center Basics

"The Compellent SAN's single most powerful feature for reducing system management costs is automated Data Progression, which transforms the SAN into a virtual ILM appliance."

### Core Software Features



The Compellent Storage Center uses an embedded Web server to provide a single interface that can support all of the SAN's underlying technology. The classic System Explorer view, uses an expandable tree to present the components that make up the Compellent Storage Center. Also, there is a Topology Explorer view that provides the SAN administrator with drag-and-drop graphical editing of the site's entire configuration. At the top of the System Explorer tree, information about the licensed SAN software components can be found. These components include what Compellent dubs the Storage Center Core and Storage Center applications, which are licensed separately.

Storage Center Core provides the foundation features for a Compellent SAN: Dynamic Block Architecture sets up block-level data management; advanced virtualization enables managing physical disks as a single pool; data caching supports multi-threaded read-ahead operations and mirrored writes; servers can boot from the SAN and eliminate all internal drives; and logical volumes can be copied, mirrored and migrated without impacting users.

While all of the necessary components to set up a functional SAN are contained within the Storage Center Core, the advanced features needed to change the storage management paradigm are licensed as optional

In addition to running the Storage Center embedded Web interface on IE with Windows XP Pro, we had no problems running the interface on a laptop with SUSE Linux 10 using the Epiphany Web browser. Epiphany is part of the GNOME desktop and uses the Mozilla layout engine to display web pages.

## Going Ahead with Management

Compellent builds its management interface using the GoAhead open source Web server, which has a very small footprint and is designed to be embedded in a wide range of small devices. GoAhead supports JavaScript, in-memory CGI processing, and Active Server Pages (ASP)— Windows CE devices are among Web server's targets. The Compellent Storage Center uses embedded JavaScript to create dynamic data in ASP pages which GoAhead delivers to client systems performing storage management tasks.



applications. Of these Storage Center options, three applications are critical in order to dramatically reduce operational overhead costs that relate to system and storage management: Dynamic Capacity, Data Progression, and Data Instant Replay.

| Compellent Storage Center Applications | |
|---|---|
| APPLICATION | FEATURE |
| Dynamic Capacity™ | Dynamic expansion of storage capacity for thin provisioning |
| Data Progression™ | Automated tiered storage puts data on the most cost effective media vis à vis throughput and capacity |
| Data Instant Replay™ | Immediate recovery from any data hazards via local data replication |
| Remote Instant Replay™ | Immediate recovery from any data hazards via remote data replication |
| Reporting Kit | Detailed storage trend reporting |

## Automatic Storage Expansion



Storage Center advanced virtualization assigns logical disk blocks to logical drives only when data bits are written to the drive. The Dynamic Capacity application builds upon block-level virtualization and expands the real capacity of a disk folder automatically as drives are added. This allows SAN administrators to define logical volumes that have larger capacities than the real physical capacity available in a folder. This is especially useful whenever a host operating system does not readily support the expansion of a disk volume's capacity.

> Our oblDiskFolder had a physical capacity of 4TB. Storage Center, however, deals only with utilized data blocks to minimize system overhead, which in our case was 352GB.

By providing for the allocation of more storage than is physically installed—dubbed thin provisioning—and consuming physical disk resources only when data bits are written, Dynamic Capacity takes a number of the issues complicating capacity planning off of the table. One of the most important of these issues involves a trade off between current capital expenses and future administrative expenses.

A number of applications and operating systems require significant



management intervention when their underlying storage volumes must be modified. As a result, a decision must be made before implementation as to whether it is more cost effective to immediately acquire all of the disk capacity that will likely be needed in the future in order to avoid all of the additional management tasks that will be needed to modify the storage architecture in the future. Complicating this calculated tradeoff is the fact that disks are a rapidly deflating commodity–Shugart's Law equates an 18-month delay with a net cost savings of 50%—while storage management is an inflating labor cost.

Setting up physical disks in a folder is astonishingly trivial: administrators put disks in a managed pool. There are no RAID arrays to create or manage. Storage Center groups drives in tiers based on drive type—SATA or Fibre Channel—and rotational speed—15K or 10K rpm. In our tests, the oblDiskFolder had two tiers: Tier 1 with 10K rpm Fibre Channel drives and Tier 3 with SATA drives.



Dynamic Capacity obviates the need to make that trade off: Leveraging this feature, IT can cut upfront expenditures, avoid future management costs, and incur no penalty. The key to these benefits is the ability of Compellent's Storage Center to work with utilized rather than allocated space. Since any block that is not utilized is ignored, an extended number of logical disk blocks can be allocated to a logical volume without incurring any loss in performance. In our testing, we allocated a logical volume to a server running Windows 2003 Server that was larger than all of our physical disk space and measured no impact on SAN performance.

For our test site we set up two servers: one ran Windows® Server 2003 and the other Red Hat Linux®. Logical disks were created from a single folder of 29 physical disks. We assigned one logical disk, oblVol1, a capacity of 5TB, which was 1TB greater than the total physical capacity of the disk pool, and exported that disk to our Windows server.

## Automatic Data Relocation

The Compellent SAN's single most powerful feature for generating



savings by reducing storage management overhead is Data Progression, which transforms the SAN into a virtual ILM appliance. Data Progression provides the support needed for automated tiered storage. With Data Progression, the SAN administrator defines policies about the frequency with which data is accessed. Then the Compellent controller tracks data access patterns on a real-time basis and transparently migrates logical data blocks between storage tiers according to those policies. Data Progression elevates the Compellent SAN from a storage appliance to an ILM appliance.

> With Data Progression running, we were able to utilize multiple RAID levels and multiple disk tiers for both "Writable" and "Replay" data, which are Compellent's terms for normal and snapshot data. Without Data Progression, we would have been limited to one RAID level and one disk tier for the underlying disk structure as in a traditional SAN.

All of the storage growth projections that put the compound annual growth rate (CAGR) as high as 125% make Data Progression very interesting for IT. Even the more modest projection of the SNIA, a 79.6% CAGR, pegs a typical site's storage volume as growing by an order of magnitude by 2010. That will put an extraordinary storage management burden on any site trying to balance growing demands for data with the need to optimize their IT infrastructure.

A key strategy to maintain a cost-effective storage infrastructure calls for administrators to optimize the placement of data on devices based on the frequency with which that data is accessed and the performance characteristics—hence cost—of the storage device. In this scenario, only the most frequently accessed data files are retained on the highest performing devices. The goal is to purchase fewer high-performance storage devices in order to reduce overall storage expenditures.

### Data Optimization: Location, Location, Location

For mission-critical applications that use either structured or semi-structured data, that scenario can become an exceedingly complex task. Thanks to data retention regulations, such as the Sarbanes-Oxley Act, mission-critical production databases must now retain significantly greater amounts of historical data, which creates a significant overhead for both storage and database administrators. The lack of storage granularity within database software compounds the impact of the growing use of production databases as historic data repositories.

For a database, the smallest discrete addressable storage component is a table, which ties tables to logical drives. Without ILM functionality, record access activity is a relatively meaningless statistic in terms of where data can be directly located. For storage optimization, DBAs are limited to placing tables on logical drives.

The only way to optimize the location of historical records is to restructure the tables within the database. Typically, that involves creating new instances of tables for storing historic data that are different from the production-instance tables. With that restructuring, tables can be placed on different logical disks with different underlying physical characteristics.

None of that manual intervention is necessary on a Compellent SAN with Data Progression. Since disk blocks are as virtual as the logical drives that contain them, the Compellent controller can freely place infrequently accessed data blocks—and the records that those blocks represent—on the most cost-effect storage devices, without changing the way logical drives are presented to the host OS. More importantly, block migration is completely transparent to both the OS and any applications. ILM software requires application-specific modules that embed stubs in the application's data files to redirect that application to any new data location.



Shortly after creating our oblVol1 logical drive, the automated Data Progression application had spread its logical blocks over both RAID-10 and RAID-5 logical blocks in our Tier 1 storage. Moving blocks from RAID-5 to RAID-10 saved over 300MB. Over time, logical blocks would also be moved to Tier 3 (SATA) storage.

Compellent's analog to traditional snapshots is dubbed Data Instant Replay. The read-only copies of data are called replays and consume minimal storage space. Replays can be scheduled for automatic creation at specific intervals via intuitive templates or created on demand. Replays provide for extremely fast recovery from business interruptions including viruses, file deletions, and file corruption. Storage Center's architecture allows for the creation of an unlimited number of replays. Without Data Progression licensed, all replay data resides within only one RAID level and disk tier.

# Value Proposition

"The Compellent Storage Center SAN generates storage environment savings that are entirely transparent and involve neither the explicit nor implicit manipulation of any file structures for any applications."

With the extensive functionality and pervasive virtualization, which makes disk blocks logical rather than physical entities, the issue of I/O performance should hold top-of-mind attention for any IT decision maker who is assessing a Compellent SAN. To get a handle on performance, we ran our streaming I/O benchmark, oblDisk v3.0, on two logical RAID-5 disks.



The first logical disk, oblTest1, was created from a pool of Fibre Channel drives spinning at 10,000 rpm. The second logical disk, oblTest2, was created from a pool of SATA drives. Next, we exported both logical drives to an Intel-based server that was running Red Hat Linux.

Our oblDisk I/O benchmark repeatedly provided throughput results consistent with previous tests of 10K Fibre Chanel and SATA logical drives that were created using logical partitions of physical arrays with traditional SAN software. On reads, I/O consistently peaked around 72MB per second using the volume created in Tier 1 with 10K

We created two logical RAID-5 drives at opposite ends of the performance spectrum and exported them to a server running Red Hat Linux. These volumes were formatted on the Red Hat 8.0 server with the ext3 file system. The Tier 1 drive, oblTest1, utilized 10K Fibre Channel drives, while the Tier 3 drive, oblTest2, utilized SATA drives. We ran our oblDisk v3.0 benchmark on both logical drives and monitored progress with the Compellent Storage Center's performance reporting tools. The results were entirely consistent with logical drives created on RAID-5 partitions created with traditional SAN software.

Fibre Channel drives and 28MB per second using the Tier 3 volume on SATA drives. Write throughput was 42MB per second and 14MB per second respectively.

In our throughput test, we found no significant overhead penalty on system performance using logical drives created from virtualized disk blocks rather than from a virtualized physical array partition, which allowed us to freely benefit from the ILM capabilities of the Compellent SAN. In particular, we were able to set policies for logical disk blocks that associated their location in storage tiers based on the frequency of access and the frequency at which Compellent would automatically realign disk blocks within the storage tiers.

| Compellent's Cost-Savings Fundamentals | | | | | | |
|---|---|---|---|---|---|---|
| DRIVE | DRIVE TIER | CAPACITY | COST/GB | RAID | READ I/O RATE | WRITE I/O RATE |
| Seagate Cheetah | Fibre (10K) | 147GB | $2.99 | 5 | 72MB/second | 42MB/second |
| Seagate Barracuda | SATA | 250GB | $0.36 | 5 | 28MB/second | 14MB/second |

The savings in hard storage costs alone with automated tiered progression can be prodigious. While Fibre Channel drives offer a three to one advantage in throughput performance, SATA provides better than an eight to one advantage in capacity costs. This can be particularly attractive in areas such as high-performance technical computing, where IDC projects that storage requirements will grow from a median level of 27TB today to 500TB in the next five years.

| 1TB Cost-Savings Scenarios | | | | |
|---|---|---|---|---|
| SCENARIO | ACTIVE DATA | TIER1 STORAGE COST | TIER3 STORAGE COST | COST SAVINGS |
| Email Server | 15% | $448 | $270 | $2,220 |
| ERP Database | 70% | $2,093 | $108 | $789 |

The relative ease of these savings is particularly compelling for mission-critical applications that are built on either structured or semi-structured data files. The Compellent Storage Center SAN generates storage environment savings that are entirely transparent and involve neither the explicit nor implicit manipulation of any file structures for any applications. In many cases, the cost of a DBA manually restructuring the appropriate database tables would exceed the savings in hardware costs and could potentially lead to problems with the application induced by those changes.

# EXHIBIT 13
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN

| SUBSCRIBE ✉ e-newsletter 📖 magazines | | SEARCH | Advanced |



Home | Articles | Top News | Wire News | Webcasts | White Papers | Featured Sites | Subscribe | Advertise | Newsletters | Links

### InfoStor

🔖 BOOKMARK 📑 📧 | 📶 Add RSS Feed    **INFOSTOR**

✉ SAVE THIS
✉ EMAIL THIS
🖨 PRINT THIS

## iSCSI vs. FC, Windows vs. Linux

*Our first shot at creating an iSCSI-based IP SAN for SMBs yields impressive results, but not without caveats.*

### By Jack Fegreus

With internal demands to improve corporate performance and external regulations to document corporate performance both driving the growth of storage requirements, the mandate for IT is simple: Manage storage growth. While the mandate may be simple, execution of that mandate involves multiple tasks that can be quite complex.



The problems begin with sloppy terminology surrounding our notion of a SAN. A SAN is not about sharing storage; it's about partitioning and allocating virtual storage devices out of a central pool for efficient resource utilization. With one notable historic exception, the VMS Cluster, computer systems do not share storage devices well. Whether we are talking about Windows, Linux, or Unix, today's

**Current Issues**

February 2008    Q4 2007
Subscribe

operating systems expect uncontested ownership of storage devices. Outright ownership of storage devices is essential for the implementation of such operating system constructs as journaled file systems.

As a result, the topology of a SAN fabric goes a long way to defining the resiliency of the SAN to faults and disruption. Naturally, the cost of equipment for adding multiple controllers to arrays and multiple HBAs to hosts will be pivotal in choosing that topology. That said, the rise of lower-cost storage networking alternatives to traditional Fibre Channel SANs should come as no surprise.

The most interesting of these alternatives is iSCSI. Under this scheme, SCSI commands and data are encapsulated in TCP/IP packets and transmitted over Gigabit Ethernet networks.

The simplicity of iSCSI plays well into marketing hoopla that touts the absolute minimum investment necessary to set up a working SAN fabric. Network cards, switches, and cables for Gigabit Ethernet are a fraction of the cost of Fibre Channel components.

To investigate iSCSI possibilities for an SMB site, *InfoStor* Labs evaluated the VTrak 15200, a 15-drive iSCSI storage array from Promise Technology. In many ways, the VTrak 15200 fits perfectly into the role of poster child for the SMB-two- to six-node fabric-SAN revolution.

Priced at $5,999, the 3U VTrak 15200 does not include disk drives in the standard package. Users are free to configure the system with up to 15 off-the-shelf, low-cost Serial ATA (SATA) or Parallel ATA (using an adapter) disk drives. Our test system was populated with 14 Hitachi Deskstar 7K400-400 SATA disk drives. These drives have a rotation speed of 7,200rpm, a capacity of 400GB, and a current street price of $369.

To fulfill its role as a cost-effective iSCSI target, the VTrak 15200 disk array features a dual-port TCP Offload Engine (TOE) from QLogic to provide efficient iSCSI throughput and fail-over protection. The QLogic TOE is an ASIC that implements the TCP and iSCSI protocol stacks in silicon to provide very fast TCP/IP packet processing. With the maximum theoretical bandwidth for an iSCSI Ethernet port at approximately 100MBps, a dual-ported TOE is essential.

The VTrak 15200 enclosure features N+1 hot-swap, redundant, field-replaceable power and cooling units. The I/O controller, power supplies, and fans are cable-less for plug-and-play access without tools. In addition, the VTrak 15200 comes with a 72-hour battery backup as a standard feature. Configuration of the VTrak 15200 is done through either a menu-driven command line interface (CLI) using Telnet over a serial connection or a Web GUI and the Promise Array Manager (WebPAM) software, which is a J2EE application. Installation of WebPAM, whether on Windows, Linux, or Unix, includes installation of a number of open source components, such as the Apache Web server and the Tomcat Java Application Server. Once WebPAM is installed on a central server that communicates with the VTrak's network management Ethernet port, administrators can log into the WebPAM application from



anywhere on the net using a browser that supports dynamic HTML.



Click here to enlarge image

      To test typical file I/O performance we averaged the throughput reading of all of the files in a 3GB directory. This provides a good real-world assessment for Windows NTFS file system performance. Using aggressive asynchronous I/O will provide more than twice the throughput level, but is unrealistic for typical applications. Most significantly, we needed to use seven spindles with Windows Server 2003 to maximize throughput from the SATA-based logical array and still fell short of the throughput measured with SLES 9 and the Reiser file system on a four-drive array using 64KB stripes.

Beyond creating and expanding disk arrays, there is precious little to manage or configure on a long-term basis with WebPAM. Even data-cache policies are automatically adjusted based on data patterns, thereby optimizing performance for different application profiles. Although the VTrak is OS-agnostic when it comes to clients, its maximum stripe size of 64KB for logical disks makes it much more optimized for a Windows client than one running Linux for which 128KB would be the default choice. Nonetheless, the results of our file-throughput test proved that configuration issue to be of little concern.

Promise also provides several background processes that head off potential maintenance emergencies. Media Patrol performs media scans and remaps bad sectors before a user process incurs a media fault during an I/O request. Predictive Data Migration (PDM) detects possible drive failure situations and proactively migrates data prior to failure to reduce the



▶ FIND OUT MORE

Taking command of your data can be simple with CA

ca.

Transforming IT Management

risk of data loss.

To assess the performance of the VTrak 15200, we created an iSCSI SAN network with four nodes: three servers and the VTrak array. At the heart of this SAN fabric was a 5-port Netgear Gigabit Ethernet switch. The server generating I/O loads was an Appro 1142H, which is a 1U quad-processor Opteron system with dual Gigabit Ethernet ports and 133MHz PCI/X support. To provide a baseline comparison to a Fibre Channel SAN, we also installed an Emulex LightPulse LP1050 HBA in the Appro's open PCI/X slot.

For these tests we installed both Windows Server 2003 and SuSE Linux Enterprise Server v9 (SLES 9) on the quad-processor Appro. In both cases we used the Appro's built-in Broadcom Gigabit Ethernet NIC along with a software iSCSI initiator. Under Windows Server 2003, we used Microsoft's iSCSI software initiator, which makes connecting to an iSCSI target like the VTrak 15200 a simple point-and-click exercise. Under SLES 9, we used the open source iSCSI initiator from Cisco.

To set up this initiator it is necessary to edit the /etc/iscsi.config file. There are many settings, each exhaustively detailed in this file. What is lacking, however, is a note detailing the two variables that are essential to connect to an iSCSI target: DiscoveryAddress and TargetName.



Click here to enlarge image

INFOSTOR featured White Paper:

## SAS and SATA: Multiple Benefits of Unified Storage

Download this White Paper HERE

Sponsored by:

Seagate

With both the iSCSI and Fibre Channel arrays, Windows Server 2003 had a distinct edge over SLES 9 running our I/O load benchmark. The oblLoad

benchmark was configured to run 8KB reads in a database-oriented pattern. We used a four-drive logical volume on each server; however, the 15,000rpm Seagate drives in the nStor array gave it a distinct advantage. Nonetheless, the ability of the VTrak 15200 (from either Windows 2003 Server or SLES 9) to sustain a load of approximately 3,000 I/Os while maintaining an average response time of less than 100ms is more than sufficient to support most transaction-processing-oriented applications.

Once these two variables are set and the iSCSI daemon started, YaST will request if the user desires to configure any newly discovered iSCSI drives. Using the YaST Partitioner, however, leads to a nasty problem.

YaST does not know that these are iSCSI drives and therefore puts all of the mounting information in /etc/fstab. The next time the system is booted, it checks /etc/fstab for drives to mount and runs a file system check (fsck). Unfortunately, the iSCSI daemon is initialized later in the boot sequence. As a result, the drives will not be available and the boot will fail. To rectify this problem, it is necessary to remove the iSCSI drive information from /etc/fstab and put it in /etc/fstab.iscsi, which is accessed when the iSCSI daemon is started.

For our WebPAM server, we used an HP ML350 G3 server running SuSE Linux 9.2. We found the performance of the Windows version of the Tomcat J2EE server to be a bit quirky on Windows Server 2003. When we ran WebPAM on a Linux server, we had no problems accessing the application from either a Windows or Linux client.

## Testing: one, two, three

We started by configuring three logical drives. Each logical drive was made up of four physical drives configured in a RAID-0 stripe set. This matched our Fibre Channel SAN test configuration. It should be noted, however, that the Seagate Cheetah Fibre Channel drives in our nStor 4520 Storage System had half the rotational latency-spinning at 15,000rpm-of the SATA drives.

We expected to see a dramatic performance difference in a head-to-head comparison with only four drives in each array. While SATA drives offer users lower-cost storage (typically, one-third to one-half the price of SCSI drives), RAID performance on Windows usually requires 50% more spindles using ATA drives to get equivalent throughput.

For this assessment, rather than test for maximum throughput using asynchronous reads, we chose to use normal file I/O encumbered with all of the operating system overhead to get a better user perspective. Typically this conservative approach results in throughput that is about 45% of what we would measure using aggressive asynchronous reads.

We first tested throughput under Windows Server 2003. With four drives in a RAID-0 stripe set, we measured average file I/O throughput from our Fibre Channel nStor 4520 at 79.3MBps. Reading from three distinct logical arrays simultaneously, throughput scaled to 151MBps.

The four-drive SATA array over iSCSI delivered a meager 27.4MBps. Reading simultaneously from three logical arrays, throughput from the iSCSI server scaled to 71.4MBps. Adding physical drives to the VTrak's logical array significantly improved throughput. The addition of one drive raised throughput by 35%. We found optimal performance to be with a seven-drive array, where average throughput rose to 48.7MBps from our logical volume.

Running the same throughput tests on SLES 9 yielded dramatically different results. From our Fibre Channel storage server, a single logical array averaged throughput that was 20% higher, at 86.2MBps. Using three arrays, throughput rose to 163.2MBps. Even more impressive, however, was the improved throughput using the logical disks exported from the VTrak 15200.

With file I/O throughput at 55.1MBps on SLES 9 using a single four-drive array, we surpassed what we had achieved with Windows using a seven-drive array. With three arrays, file I/O throughput rose to 87.2MBps. More importantly, running under SLES 9, the SATA-based arrays that were exported by the VTrak 15200 scaled just as well as Fibre Channel arrays exported by the nStor 4520. Our initial four-drive RAID-0 array provided exceptional baseline performance and adding drives provided only marginally higher throughput.

Given the rotational latency advantage of our Fibre Channel drives, and the onboard hardware context cache on the Emulex LP10000 HBA for high transaction performance, we expected that we would find a dramatic difference in I/O load support for transaction-oriented database operations.

These expectations were clearly measured and were most dramatic under Windows Server 2003. Nonetheless, the ability to support more than 3,100 I/O operations-each 8KB-while maintaining an average response time of less than 100 milliseconds means that the VTrak array is capable of supporting most transaction-oriented applications.

Although configurability of the storage array and throughput performance would easily meet the most stringent requirements for SMB applications, manageability of our fabric was nonexistent. None of the Gigabit Ethernet hardware or software that we used was designed to handle the issues of a SAN. First and foremost of these issues is virtualization. As a result, all of our servers could see and access all of the drives.

On our Fibre Channel fabric, StorView (nStor's configuration software) identifies each of the HBAs to which a logical drive is mapped via that HBA's unique wwn number-analogous to an NIC's MAC address. In the HBA mapping process, logical drives can be revealed or masked via the HBA to ensure a 1-to-1 mapping of logical disks to systems.

While differences in file systems would prevent the accidental cross-mounting of logical drives between Windows and Linux systems in our test scenario, there was absolutely nothing else-other than the brain matter between the ears of the systems administrator-to prevent servers running the same operating system from scribbling all over each other's drives.

Clearly, iSCSI SANs work. Making these SANs work for you, however, requires more investment-certainly more investment than the acquisition of a few Ethernet cables.

**Jack Fegreus** is technology director at Strategic Communications (www.stratcomm.com).
He can be reached at jfegreus@stratcomm.info.

---

**InfoStor** *Labs scenario*

## UNDER EXAMINATION

iSCSI disk array and SAN

## WHAT WE TESTED

**Promise VTrak 15200 Storage System**

- Supports Serial ATA (SATA) and Parallel ATA (with adapter) drives
- RAID Levels 0,1, 3, 5, 10, 50
- Dynamically extend and change RAID level of existing arrays
- Dual Gigabit Ethernet iSCSI ports and one management port
- 256MB predictive data cache
- 72-hour battery backup
- Web-based Promise Array Manager (WebPAM) software

**14 Hitachi Deskstar 7K400-400 SATA hard disk drives (400GB, 7,200rpm)**

## HOW WE TESTED

- Appro 1142H 1U Server
  - Quad AMD Opteron CPUs
  - Dual Gigabit Ethernet ports
  - 133MHz PCI-X expansion slot
- Windows Server 2003
- SuSE Linux Enterprise Server v9
- Emulex LP 1050 Fibre Channel HBA
  - PCI-X support
  - Onboard hardware context cache for high transaction performance
- nStor 4520 Storage System
  - Two WahooXP RAID controllers
  - 12 Seagate 15K Cheetah Fibre Channel drives

Benchmarks:

- oblFilePerf
- oblLoad

## KEY FINDINGS

- Maximum stripe size for RAID limited to 64KB
- Dynamic support for expanding and restructuring arrays
- No support for LUN virtualization
- Linux file throughput double that of Window Server 2003 using a single four-drive RAID-0 array.

*InfoStor* April, 2005
**Author**(s) :   Jack Fegreus

BOOKMARK   ■■ ✪ ☆ ✍ ... | 📄 Add RSS Feed

**More April, 2005 Articles >**                          **Search Archives >**

*InfoStor* Article Categories:

| | |
|---|---|
| Top News | Business Briefs |
| Tech Republic | Online Features |
| ESG Lab Review | SAS Resources |
| Data Recovery Resources | OpenBench Lab Review |
| InfoStor Europe Current Issue Table of Contents | |
| InfoStor Current Issue Table of Contents | |

**Search Industry Jobs >**

**Magazine & E-Newsletter Subscriptions >**

**From The Wires**

| | |
|---|---|
| **Pillar extends storage network ...** <br> Business Wire (March 4, 2008) | **BLADE expands leadership position** <br> Market Wire (March 4, 2008) |
| **BlueArc Titan 3000 creates ...** <br> Market Wire (March 4, 2008) | **Brocade, BlueArc to simplify ...** <br> Market Wire (March 4, 2008) |
| **Exanet announces ExaStore ...** <br> PR Newswire (March 4, 2008) | **iStor integraStor 325 series ...** <br> Market Wire (March 4, 2008) |
| **Xyratex gives OEMs green alternatives** <br> PR Newswire (March 4, 2008) | **Brocade to acquire Strategic ...** <br> M2 Communications (March 4, 2008) |

more ▶

Return to Previous Page

### Webcasts



Keeping Data Private: Meeting PCI Compliance Requirements <u>and</u> Keeping Your Company Out of the Headlines
Original broadcast on June 28, 2007

*Finisar* Lifting the Fabric Blindness in Remote Data Replication
Original broadcast on July 24, 2007

::fast Beyond Litigation: Optimize Your Business by Leveraging Data Storage Through Embedded Search
Original broadcast on June 21, 2007

more 

### InfoStor Special Webcast Series

*InfoStor* has teamed up with leading industry analysts and storage vendors to present a series of Webcasts designed for end users and storage integrators and VARs. View these presentations, as well as our most recent custom Webcasts, for in-depth insight into a wide variety of storage technologies and trends.

Sponsored by: Overland Storage
Presented by: ESG
Building a Tiered Data Protection Environment
Original broadcast on February 28, 2008

Sponsored by: Overland Storage
Presented by: ESG
The Data De-Duplication Effect
Original broadcast on December 11, 2007

Sponsored by: Overland Storage
Presented by: Taneja Group
Data Protection: Buying in a new landscape
Original broadcast on November 8, 2007

more 

### Sponsored White Papers Library

#### Recently Added White Papers

**ILM Business Rules at Work** (02/19/2008, Bycast Inc.)

**Digital Archiving Circa 2008: Addressing Long-Term Data Storage and Preservation Requirements** (01/24/2008, Bycast Inc.)

**Enabling Data Sharing in Regional Archives** (01/20/2008, Bycast Inc.)

**Optimizing File Sharing and Data Back Up over Wide Area Networks** (01/18/2008, GlobalSCAPE)

#### Featured White Papers



**ILM Business Rules at Work** (02/19/2008)



**Optimizing File Sharing and Data Back Up over Wide Area Networks** (01/18/2008)



**GlobalSCAPE WAFS helps fill the pipeline at Jordan and Skala Engineers** (01/17/2008, GlobalSCAPE)

more ▶

**A Practical Guide to Business Continuity** (08/27/2007)

**Virtual Storage + Virtual Servers** (07/12/2007)

more ▶

**What's Your Appetite?**
For more product info, visit www.aicipc.com

Home | About Us | Contact Us | Corporate Website | Privacy Policy | Courage and Valor Foundation | Site Map
RSS | View all PennWell sites | View all PennWell events
**Also Visit:** Lightwave | Vision Systems Design | SMT | Connector Specifier

Copyright © 2008: PennWell Corporation, Tulsa, OK; All Rights Reserved. | Terms & Conditions | Webmaster

# EXHIBIT 14
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN



## ABOUT US

***NextGen/IT Today*** is a Web portal that brings you the latest in actionable products that help transform IT and supercharge the IT value proposition.

In this day and age, IT does everything from supporting the management of business process costs to helping respond to changes in supply and demand through the identification of critical business process adjustments in as close to real-time as possible.

**IT is at the heart of every business process initiative dealing with the external forces of globalization, commoditization, shrinking product lifecycles, and increased regulatory compliance. As a result, business processes are more automated and IT dependant than ever before.**

Thanks to Moore's Law, the computational firepower of commodity systems continues to expand exponentially. There is another edge to that sword, however, as the complexity of solutions also grows exponentially. While IT can do more theoretically with commodity hardware, more and more, IT finds itself constrained from doing so by the cost burdens imposed by traditional IT management techniques.

"We see computers everywhere except in the productivity statistics." In eight words, Robert Solow, Nobel laureate economist, summed up an issue faced by many enterprises. CEOs, pressured to innovate and grow their businesses, were asking, "What is our return on IT investments?" Too often, the response was a deafening silence. These CEOs had stumbled upon *The Productivity Paradox of Information Technology* - a critical issue raised by Erik Brynjolfsson, the director of the Center for eBusiness at the MIT Sloan School of Management.

***NextGen/IT Today*** concentrates on both the technology and management issues that IT must address in order to transform itself and break those constraints. Within the many publications under ***NextGen/IT Today***, features and lab-based reviews take on the most challenging issues facing IT today, such as IT Service Management (ITSM), Virtualization, Grid computing Business Optimization, and IT Governance.



**MEDIA KIT**

**CONTACT**
Jack Fegreus
E-mail: jfegreus@stratcomminc.com
Phone: 508-281-7986

**LINKS**
http://www.stratcomminc.com
http://www-306.ibm.com/software/tivoli/



COPYRIGHT 2008 | ABOUT OPEN

# EXHIBIT 15
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN

The Strategic Guide to Open Source

# OPEN 2006 MEDIA KIT

*Open:* **The one that's** READ



## A GUIDE TO OPEN

**About *Open***
Overview
Format and Delivery

**Editorial Focus**
Strategy & Technology
OpenBench Labs
Editorial Contacts

**Circulation**
Rapid Growth
Unique Demographics
Statistics

**e-Mail Sponsorship**
Rates & Specs

**Web Sponsorship**
Rates & Specs

**Site Sponsorship**
Rates & Specs

**Sales Contacts**

rev Jan. 1, 2006

www.open-mag.com

# About *Open*

## OVERVIEW

**Open** is the magazine that corporate executives turn to for news and views about the tectonic shift in IT to Open Source and the Linux operating system.

**Open** delivers:
- Independent lab reviews for IT planners
- Interviews with industry and government leaders
- Technology briefings by leading experts

**Open's** breadth of exposure is second to none. Sites that link to features on **Open** represent an impressive array of prestigious publications with audiences who are sophisticated readers of business and technology news. Our articles are also carried by the world's most prestigious research labs and academic institutions.

## FORMAT AND DELIVERY

How **Open** reaches readers:
- Only subscribers can access a navigable Web site.
- Subscribers receive navigation links for each new issue in an e-mail cover letter.

The format of **Open**, being an electronic Web publication, has a unique visual language that layers information upon information. Stories are at once authoritative and aesthetically pleasing. All stories carry rich contextual links to vendor sites, white papers, and market research.



**OPEN'S UNIQUE READER EXPERIENCE**


www.open-mag.com

# Editorial Focus

*The Strategic Guide to Open Source*

## STRATEGY & TECHNOLOGY

**Open** follows the issues that senior IT executives need to study in planning the platforms and applications that make up critical IT infrastructure. Each week, our coverage includes the latest hot-button topics from high-availability clustering, to storage area networks, to information security tools, to Web-centric e-commerce. Professional IT executives and senior developers turn to **Open** for everything from ROI analysis to benchmarking performance results. Whether testing infrastructure components, comparing vendor business models, or interviewing leading voices in the Open Source developer community, our editors and contributors provide crucial insights, data, and market intelligence for those seeking Open Source fluency.

As a global magazine of IT strategy, **Open** brings its subscribers content such as:

- 💡 *An inside look at the strategy of an Austrian oil company to run SAP on Linux mainframes*

- 💡 *Richly visual briefings on enterprise applications including the key groupware technologies behind OpenExchange*

- 💡 *The decision matrix of a coffee-shop owner who must choose between a closed-source Point of Sales system and an Open Source alternative*

## OPENBENCH LABS

OpenBench Labs analyzes key products that enhance Linux and Open Source computing. Our testing addresses the performance of Linux in mixed environments and our benchmarks are being used by hardware manufacturers to validate performance.

## EDITORIAL CONTACTS

Editorial Director
Jack Fegreus, Ph.D
jack.fegreus@open-mag.com

Jack Fegreus, co-author of *BackOffice Bible*, holds a doctorate in mathematics from Clark University, having worked on the application of computers to symbolic logic. He was the editor-in-chief and visionary behind three technology monthlies covering major shifts in enterprise computing: *Digital Review*, *Client/Server Today*, and the award-winning *BackOffice CTO*. Dr. Fegreus applies the kind of experience that connects the dots between technology theory, applied practice, and actionable lessons learned. He was IT Director for five years at a division of Ashland Oil before joining Ziff-Davis and *Digital Review*.

 www.open-mag.com

# Circulation
*The Strategic Guide to Open Source*

## UNIQUE DEMOGRAPHICS

**Open** matured in a print-centric environment and is shaped like no other electronic publication. Using print-circulation techniques, **Open** built a 100% controlled, qualified, direct-request circulation of 86,986 domestic and 10,659 international subscribers.

No other publication delivers such **a concentrated domestic and international subscriber file of Linux product buyers.** This makes **Open** a key driver in any marketing communications program seeking to reach and influence these buyers.

## REACHING KEY DECISION MAKERS

As Open Source software and the Linux operating system emerged in corporate IT, sites required a staff having high-level technical skills and an demanded an equally high ROI return. These factors drove early adoption of Linux at opposite ends of the IT spectrum.

Small companies with sophisticated start-up teams adopted Linux as the way to afford IT capabilities needed to run their businesses. On the other hand, large companies with expert staffs adopted Linux to cut overhead, maximize revenue, and undercut competitors.

As a result, subscribers to **Open** include **a rich mix of CIOs, IS managers, and IT consultants in prestigious organizations.** Fully 39% are involved in IT management an 25% of these subscribers hold the title of CIO, CTO or VP. Over 12% are IT consultants often having buying responsibility for multiple enterprises. It should not be a surprise that these readers frequently work in complex computing environments that include big Unix installations, such as **HP UNIX (22%)**, **Solaris (24%)**, **AIX (20%)**; **IBM mainframe sites (8%)**; and **Windows NT/2000 (91%)**.

## OPEN READERSHIP

### *Open*: The one that's READ



"*Open's* cutting-edge editorial attracts a world-wide audience that is rich with cutting-edge IT decision makers. Their readership provides us with a generous number of qualified leads from a high-quality audience that has been unmatched by other publications in which we have advertised."

*Linda Hypes, Dir. of Marketing, Shaffer Solutions*

As of January 1, 2006, subscribers to **Open** numbered **100, 660.**

### Geographic Distribution

| | | |
|---|---|---|
| **North America - 90,001** | | |
| U.S. | - | 86,986 |
| Canada | - | 3,015 |
| **International - 10,659** | | |
| E.U. | - | 3,947 |
| Latin America | - | 1,556 |
| S.E. Asia | - | 3,537 |
| Other | - | 1,619 |

# Web Tower

*The Strategic Guide to Open Source*

## WEB TOWER AD SPECIFICATIONS

### WEB TOWER ADVERTISING: $2 PER CLICK

Thousands of IT professionals come to Open-mag.com everyday seeking information, knowledge and the insight they need to succeed. They typically read two features per visit and spend 2 minutes on each.

### WEB TOWER CARD RATE - RUN OF FEATURES

#### Powerful Exclusivity on the Web

Only one ad is placed in a fixed tower on the right of a feature page. The ad remains fixed on screen, as readers scroll through the feature. Ads rotate into the tower frame as subscribers load new feature pages. With *Open* features having an average read-time of 2 minutes, advertisers have an opportunity to display a very rich message to potential buyers.

***Ad Specifications:*** 125X600 pixel tower in either static or dynamic rich media (Flash).



#### Publisher's Protective Clause

The publisher reserves the right to insert the words "Sponsored by" or "advertisement" when, in the publisher's opinion, an advertisement resembles editorial material. All contents or advertisements are subject to publisher's approval. Publisher cannot be held liable for circumstances beyond his control affecting production or delivery in any manner. Publisher reserves the right to hold the advertiser and/or its advertising agency jointly and separately liable for such moneys as are due and payable to the publisher.

# e-Mail Sponsorship

*The Strategic Guide to Open Source*

## e-MAIL Sponsorship

With each issue, subscribers receive an e-mail cover letter, which summarizes each new feature and provides access to the new issue's Table of Contents. Only subscribers of **Open** can access features in the new edition from that contents page in a private area of the **Open** site.

The cover letters, therefore, serve as a crucial portal into the **Open** Web. Often subscribers clip and paste these cover letters into Web forums. For these reasons, **Open** takes great care in crafting the content of these e-mail messages to trigger reader response.



## MASTERING MIND SHARE

### Powerful Exclusivity on e-Mail

Each e-mail cover note sent to subscribers will have only one 75-word text message plus a hyperlink placed on top. The message and hyperlink will be in plain text, without logos, graphics, or font differences. As a growing number of sites restrict the delivery of e-mail through the use of automated SPAM filters, **Open** reserves the right to edit and approve all text messages to maximize delivery.

*Ad Specifications:* 75-word text message and hyperlink at top of message.

*Frequency:* Weekly.

*Subscriber Site Operating Systems:*

| | |
|---|---|
| Linux | – 74% |
| Any BSD | – 43% |
| Any Unix | – 63% |
| Sun Solaris | – 24% |
| HP-UX | – 22% |
| IBM AIX | – 20% |
| IBM zOS (Mainframe) | – 8% |
| Windows NT/2000 | – 91% |
| Novell NetWare | – 24% |

# Site Sponsorship

**The Strategic Guide to Open Source**

## EXCLUSIVE *OPEN* SITE SPONSORSHIP
### CARD RATE - $2 PER CLICK

**Every e-Mail** - *Run of Circulation*
**Every Page** - *Run of Site*
**One Issue** - *100,000 e-Mail Letters plus all Site Visitors*
**One Price**



# MAXIMUM MIND SHARE

The combination of the *Open* cover letter and the magazine's Web site gives sponsors twice the access to a highly targeted world-wide audience of over 100,000 direct-request buyers of Linux and Open Source products and services.

### Powerful Exclusivity on e-Mail and The Web

Each *Open* subscriber will receive an e-mail cover letter that will include a 75-word text message from the site sponsor plus a hyperlink. The message and hyperlink will be in plain text, without graphics, or font differences. To minimize the impact of automated SPAM filters, *Open* reserves the right to edit all messages to maximize delivery.

For that issue, every page in the site, will include in its fixed header a banner from the site sponsor. No other banners will appear in a page header. The ad remains fixed at the top of the screen, as readers scroll down the page.

### Ad Specifications:
- 75-word text message and hyperlink at top of message.
- 450X50 pixel banner in either static or dynamic rich media (Flash) on every page.

www.open-mag.com

# *Open* Sales

The Strategic Guide to Open Source

**Robert George**
RGeorge@StratComm.info
Voice • 617-969-0700 Ext 201
Fax • 617-969-0770

**Jack Fegreus**
JFegreus@StratComm.info
Voice • 508-281-7986
Fax • 508-485-2560

# TO REACH THE RIGHT AUDIENCE

*Open* delivers a highly targeted audience of qualified buyers of Linux-related products. For more detailed information on subscribers, contact us.



 www.open-mag.com

# EXHIBIT 16
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN

STRATEGIC
COMMUNICATIONS

NAS SAN Fusion



Analysis The role of NFS performance
in a NAS-SAN fusion environment

Prepared for:



Shaffer Solutions Corp

# Analysis

# The role of NFS performance
# in an NAS-SAN fusion environment

Author: Jack Fegreus, Ph.D.
Technology Director
Strategic Communications
April 11, 2005
Prepared for Shaffer Solutions Corp.

*Jack Fegreus is Technology Director at Strategic Communications, which consults with a number of independent publications. He currently serves as Editorial Director of Open magazine, Labs Director of HP World and contributes to InfoStor. He has served as Editor in Chief of Data Storage, BackOffice CTO, Client/Server Today, and Digital Review. Previously Jack served as a consultant to Demax Software and was IT Director at Riley Stoker Corp. Jack holds a Ph.D. in Mathematics and worked on the application of computers to symbolic logic.*

# Table of Contents

| | |
|---|---|
| Executive Summary | 04 |
| NAS Rennaissance | 06 |
| Assessment Scenario | 07 |
| NAS Protocol Tango | 08 |
| Performance Measurements | 14 |
| Conclusions | 18 |

# Executive Summary

"The explosive growth of Linux as a server OS combined with the ability of NAS devices to provide heterogeneous data sharing has put the IT spotlight back on NAS for server-to-server file sharing."

## The Data-Driven Business Landscape

Network-attached storage is seeing a rebirth as an enterprise-class system, thanks to new advances in technology and growing requirements for file sharing. NAS has until recently been constrained by performance issues from advancing as a key enabling enterprise technology. This focused the storage industry on Fibre Channel SAN technologies.

As the focus on Fibre Channel technologies fueled innovation and drove down prices, direct-attached storage virtually disappeared from enterprise data centers. At the same time, a new demand-driven consumer market was radically changing the way enterprises architect IT operations. These drivers are now emerging as powerful forces for change in the small- to medium-business (SMB) arena:

- Rising use of the Web as a 24x7x365 transactional environment
- Increasing reliance on servers dedicated to single-task functions
- Growing regulatory pressures on corporate-officers to audit and track data and reduce risks posed by backup and security vulnerabilities

To meet the imperatives of this new business environment, large IT departments frequently structure their IT services on tiers of servers dedicated to single strategic tasks. Similarly, IT infrastructure at SMB sites is often built on three of four fundamental servers for functions such as file and print sharing, Web services, e-mail, and database management.

In this new IT environment of dedicated servers, as disk capacity increases exponentially, the use of storage devices that are dedicated to a single computer impedes savings and can drive costs upward. Large-capacity drives make it very easy to build multi-terabyte arrays; however, few servers individually require a terabyte of storage. On the other hand, even SMB sites are now finding their overall storage needs require multiple terabytes of on-line data.

From a financial perspective, the answer to the rising cost of storage is quite clear: Reduce storage costs by configuring large central arrays and then sharing those devices. Unfortunately for IT operations, the storage area network (SAN) paradigm is a radical departure from the traditional storage model.

### Sharing Devices Not Data

In the traditional model, storage devices are directly attached to a single host. That's why existing storage utilities assume uncontested ownership of any device that they discover. In a SAN, however, hosts do not own physical storage devices. Storage servers present host computers with logical abstractions of a block-mode storage devices from shared arrays.

Computer operating systems, however, were never designed to share storage devices. To do so requires the addition of significantly more software, including a common clustered file system with a distributed file locking manager. This adds greater overhead and complexity. As a result, nearly all sharing of logical disks in a SAN is done exclusively on a 1-to-1 basis between the storage server and hosts. Insuring such exclusivity is achieved through a construct known as virtualization.

The need to virtualize shared devices makes a SAN complex to implement, inhibits the ability to share data, and limits the utility of SANs to server environments. Nonetheless, the widespread use of SANs has dramatically changed the notion of a network attached storage (NAS) server. In the new paradigm of NAS-SAN fusion, a NAS server does not have physical storage attached to it. Rather, the server acts more as a LAN portal or gateway as it shares files that reside on logical devices imported over the SAN. 

NAS clients request access to files using standard network file sharing systems. The two network file sharing schemes that dominate this space are NFS (the network file system, which evolved in the UNIX™ space) and CIFS (the common Internet file system, which evolved in the Windows space). By supporting multiple file sharing protocols, a NAS server is able to serve multiple heterogeneous clients and provide heterogeneous data sharing.

The explosive growth of Linux as a server OS combined with the ability of NAS devices to provide heterogeneous data sharing has put the IT spotlight back on NAS for server-to-server file sharing. The emergence of

the NAS gateway has made the implementation of file sharing protocols the most critical factor when evaluating a NAS device.

# NAS Rennaissance

"By masking the complexities of the underlying storage infrastructure and keeping the environment simple, NAS devices provide a means to minimize storage management costs and essentially decouple those costs from increases in capacity."

### Application Servers Drive NAS-SAN Fusion

The most significant change for NAS in IT settings has been the increased need for data sharing and rapid redeployment of file systems from one server to another. The seeds for this change came about through the adoption of high-end rack-mounted 1U servers dedicated to single function tasks. This infrastructure was seen as an optimal way to increase compute power, minimize the footprint of servers, and take advantage of SAN-based storage consolidation in the data center.



Now this paradigm has been taken one-step further with the growing adoption of blade servers. Blade servers compress the compute footprint even smaller and provide greater operational savings by sharing and reducing a number of electro-mechanical components. More importantly, blade servers, which readily plug into a blade center chassis, can be easily redeployed from one application task to another. Such redeployment is for many, the most significant part of their value proposition.

Nonetheless, redeploying servers, whether classical or blade servers, is not without certain complications. Even with robust SAN storage management software in place, redeploying an entire storage infrastructure among multiple servers will more than likely be a time consuming task. On the other hand, an application server can attach to a large-scale NAS system via a single IP address in order to access data on the device, witout regard to any of the software, including the operating system that is running on the application server.

By masking the complexities of the underlying storage infrastructure

and keeping the environment simple, NAS devices provide a means to minimize storage management costs and essentially decouple those cost from increases in capacity. This makes NAS systems a natural fit for blade server and other high-density computing implementations.

This has created a symbiosis between SAN and NAS infrastructure whereby the growth in storage demand has fueled the demand for a SAN infrastructure and that in turn creates more opportunities at the application level for sharing file-oriented data via NAS systems. As a result, NAS now represents the fastest growing segment of the enterprise storage market.

# Assessment Strategy

"For this assessment we evaluated DiskShare v 6.0 with respect to Microsoft's Services for UNIX (SFU) v3.5 in a NAS-SAN gateway environment "

## NAS-SAN Deployment

Shaffer Solutions commissioned Strategic Communications to assess the value proposition of the latest release of its NFS product for Windows, DiskShare™. For this assessment we evaluated DiskShare v6.0 with respect to Microsoft's Services for UNIX (SFU) v3.5 in a NAS-SAN gateway environment on two levels:
- Ease of configuration and management
- Performance as measured from the perspective of server running Linux with NFS file mounts exported by the Windows server.

Both DiskShare and Microsoft's SFU enables administrators of a Windows server to share any disk, partition, or folder as an NFS volume. To do this, both software packages utilize NFS remote procedure calls (RPC) and Sun's external data representation (XDR) protocol to ensure portable data transmission.

It is also important to note that DiskShare originates out of the same code base as Microsoft Services for UNIX. Microsoft acquired the code for SFU from Integraph. The team that originally developed the code at Integraph then spun themselves out as Shaffer Solutions Corp. with rights to the same code foundation. The differences in the evolution of the two

products are nothing if not dramatic.

Today, NAS appliances built by HP, EMC, Dell, and other OEMs that run Windows Storage Server 2003, which comes bundled with SFU, now account for more than 50% of the NAS appliance market. HP's gateway offering, dubbed the HP NAS 9000, is built on a quad-processor (2.8GHz Intel Xeon CPUs) Proliant DL580 server with dual Gigabit Ethernet NICs that can be teamed in either load-balanced or fail-over configurations.

Given these dynamics, Strategic Communications configured a high-end quad-processor (2.2 GHz Opteron 848 CPUs) server running Windows Server 2003 to act as our gateway NAS server. For LAN I/O, we configured the two embedded BroadComm Gigabit NICs in our NAS gateway server as a virtual load-balanced team having a single TCP/IP address.

For SAN I/O, we installed a dual ported QLogic 2342 Fibre Channel HBA. For SAN storage we used an nStor 4520 Storage Server provisioned with 3 RAID 0 arrays, each created with 4 Seagate 15K FC Barracuda drives.

For our client, we used a baseline mid-range dual-processor (2.8 GHz Intel Xeon CPUs) server with a single Gigabit NIC. On this server we ran SUSE Linux Professional 9.2, Since we were using a Linux and not UNIX server as an NFS Client, we also evaluated the performance of Samba to connect to a native Windows CIFS share as an alternative to using NFS. In addition, we installed the backup software package NetVault v7.3 from BakBone Software and configured an HP StorageWorks Ultrium 960 LTO-3 tape drive on this server to test performance when backing up the Windows-based NAS gateway over NFS mount points.

# NAS Protocol Tango

"Using NIS with SFU was nothing if not traumatic."

### The Politics of Protocol

Integrating Linux servers into a corporate network with Windows servers and desktop clients has long been an exercise in making Linux dance to the tune of Windows using native CIFS (Common Internet File System) shares. The file sharing protocol at the heart of CIFS is an updated version of the Server Message Block (SMB) protocol. IBM, Microsoft,

Intel, and 3Com originally developed the SMB protocol in the mid-1980s for MS-DOS and PC-DOS. This has meant running Samba on Linux and struggling to make a Linux server look and behave like a Windows domain controller by integrating Samba with LDAP.

For small Microsoft-dominated IT environments with casual integration needs, Samba is perfectly adequate for allowing Windows clients to move data back and forth via the ubiquitous Network Neighborhood icon. If that's the case, then Samba slides Linux in without missing a beat. It's when you introduce a few more operating systems; say Solaris or HP-UX, or when you start to build an enterprise IT architecture on top of a SAN, that the Windows Samba solo proves inadequate.

Adding to the pace of change has been the steady growth of J2EE applications and on-going server consolidation projects. At the same time, the quality of Linux has been exponentially improving thanks to contributions from government agencies such as the NSA and premier IT companies including HP and IBM. As a result, Linux is rapidly evolving from a platform for edge services-Web and email-to a mission critical platform. Novell's recent introduction of Open Enterprise Server (OES), which brings eDirectory, Nsure Identity Manager, NetStorage, and other services, is another prime example of this change.

All of this adds up to a growing need for fast and efficient server-to-server communications over Gigabit Ethernet independent of whether a dedicated NAS system is involved. In addition, a growing willingness to put Windows Server platforms in step with an open industry standard protocol is renewing interest in running NFS on Windows Server as an alternative to using Samba on Linux. That notion, however, often goes beyond IT infrastructure and gets bogged down in politics: He who owns the protocols owns the servers that choreograph IT.

### Creating an NFS Domain Infrastructure

Just consider the minefield of file security. UNIX and Linux file systems apply ownership and security from a completely different perspective from Windows. Under Windows, which is built on the NT File System (NTFS), individuals and the groups to which they belong may own files. Under UNIX and Linux, only individual users own files. For NTFS, Windows Server 2000/2003 begins applying security from a global perspective-Everyone-and then begins to look for membership in subset groups-Domain Administrators, Domain Users. UNIX and Linux, on the other hand, start with the UID, and then turn to the GID.

Before installing either DiskShare or Microsoft's SFU we needed to decide on the mechanism we would use for user authentication. The IP address of an NFS client along with the UID and GID of the user are the controlling factors when gaining access to an NFS server. Once these credentials have been established, the NFS server is able to control read, write, and execute privileges during file access. We wanted to be able to easily manage the user account information-UID and GID-for a large network from a central core of replicated systems. In essence, we needed to implement an analog to the domain security of Windows.

For this task we chose to implement Sun's Network Information Service (NIS), popularly dubbed the Yellow Pages. Under this scheme, an NIS master server-with possible replicated slave servers-maintains a distributed database system that lets NIS client computers share password files, group files, host tables, and other files, which are referred to as NIS maps, over the network. The maps correspond to files stored in the /etc directory such as /etc/passwd, /etc/hosts, and /etc/services and are normally built from these files resident on the master server.

On a third independent server running SUSE Linux Enterprise Server v9, we ran NIS and configured an NIS domain dubbed "oblnet." Into oblnet we entered valid user names and passwords along with the address of our Windows NFS server.

Sharing a volume from a Windows server via NFS is a bit more difficult than sharing a volume via CIFS because of the fundamental differences in user accounts and security between UNIX and Windows. The differences require the administrator to create a mapping between the Windows users and groups and the UNIX users and groups. This is the critical element in the configuation of NFS under Windows.

Given their common code legacy, it is not surprising that DiskShare and SFU present the systems administrator with very similar constructs for configuration and management. Both packages provide very Windows-friendly interfaces for setting up such basics as whether or not file names will be case sensitive and how special characters will be mapped. Within tha context, DiskShare is more UNIX-like in that it allows for more precise allocation of resources including directory cache size and the maximum number of active threads for the NFS process. Surprisingly, we also found the help system in DiskShare to be more robust.

More important than interface cosmetics, both appear to discover all of

the necessary resources to map users and share a volume under NFS. Appearances, however, can be very deceiving.

### Mapping Paradoxy

Both DiskShare and SFU offer the same options for setting up user and group maps for authentication. The choices are either to use static /etc/passwd and /etc/group files imported from a Linux/UNIX server or to dynamically import this data from an NIS server. If the Windows NFS server is set up as a workgroup system, this mapping is done locally. On the other hand, if the Windows NFS server is a member of a Windows domain, then the mapping must be setup on each domain controller.

> We had no problems setting up user authentication maps between Linux and Windows users with DiskShare. We used an NIS server to check passwords and provide Windows with a list of current users to build implicit and explicit maps.



Importing files works equally well with both DiskShare and SFU. The Achilles heel of this technique is in on-going systems maintenance. In a small relatively static environment of Linux/UNIX users, the impact on systems administration will likely be minimal. In an active environment,

for instance where end users freely change their passwords, such static files will probably need to be updated quite frequently.

Using an NIS server with DiskShare makes the mapping of users and groups a trivial task. DiskShare will automatically create maps between UNIX/Linux users and Windows users that share the same username. This, however, is not the case with SFU, which makes the creation of implicit-simple in the argot of SFU- maps optional.

Numerous problems surfaced with SFU creating authentication maps. When attempting to use NIS with the Windows server configured as a workgroup computer, SFU accessed the NIS server, created the maps, but would not authorize users until we created a single-computer domain for the Windows NFS server.



There is an important reason for not making implicit maps automatic: The explicit mapping feature SFU does not allow multiple UNIX users to be mapped onto the same Windows user. A UNIX user can be mapped to multiple Windows users, but not the other way around. Compound this problem with minimal documentation, no error checking, and no feed-back, and it becomes very easy to configure a mapping structure that will simply fail to authenticate any and all users. Only by using the tools supplied by Shaffer Solutions with DiskShare were we able to confirm that the share did indeed exist. Using the utilities shipped with DiskShare, An



administrator can probe the Windows NFS server for exported mount points and running RPC services.

The 1-to-1 mapping issue was not the only problem we spent considerable time debugging. Using NIS with SFU was nothing if not traumatic.

We initially configured our Windows NFS server as a member of a workgroup and not a Windows domain. When we configured SFU to access our NIS server for user and group data, we were presented with the same set of users and implicit maps that were created by DiskShare. Everything necessary to validate users appeared to be working.

From our Linux client, we first attempted to discover an NFS share to mount. This worked flawlessly as we were able to discover the Windows NFS server and find the exported NFS volume that we had created earlier. Nonetheless, when we attempted to mount that volume, the process failed and we were presented with a corrupted inode/directory structure error. Checking the SFU log file on our Windows server was an even more bizarre experience: The log file recorded a successful mount.

Endless checking for our configuration error proved fruitless. Even the DiskShare tools indicated that all of the SFU components were active. The only hint was a curious entry made in the UNIX domain name on the SFU mapping page. Rather than report our NFS domain name as oblnet, as set up on our NIS server, the domain name entry was "PCNFS."

Clearly something was preventing proper authentication of a Linux user as the apparently mapped Windows user. In desperation, we threw the dice: We upgraded the Windows server to a domain controller for a new single-computer domain dubbed "OBLTEST." Instantly, we were able to mount an NFS volume on our Linux client. Invoking the SFU mapping utility, the domain name replaced the node name, but more importantly, "oblnet" replaced 'PCNFS" as the NFS domain name.

Unfortunately, our mapping problems with SFU were not yet over. In addition to allowing normal users access to NFS mounts we also needed

> To help solve the problems of SFU configuration, we used many of the tools bundled with DiskShare to monitor rpc services and disk mounts.



to provide access for the root account in order to perform backups. Both DiskShare and SFU have check buttons on their NFS File Sharing menus to allow root access. This worked for DiskShare, but it did not work for SFU.

To really give the root account access, we had to explicitly map the Linux root account-UID 0-to the Windows Administrator account. Not surprisingly, NIS does not blast the root account across the net. SFU will only map what it sees. That meant we were back to using an imported /etc/passwd and /etc/group file to generate our map.

# Performance Measurements

"The implication of our directory and file test results is clear: For a Linux-based backup-server scenario, using NFS mounts incurs very minimal overhead."

### Reading, Writing, and Backing up

All of the disk volumes that the Windows server would export via DiskShare, SFU, and CIFS were created on a Fibre Channel nStor 4520 Storage System. In creating the logical devices, the key was to maximize streaming throughput and not random access as databases are not good candidates for NFS.

We ran directory- and file-based read and write tests on all of the shared volumes. In these tests, we ran normal copy and backup operations rather than our optimized benchmarks to better simulate the performance an end user would encounter. We measured Ethernet-based data throughput to and from our client system and Fibre Channel-based data throughput to and from the nStor Server System. This provided an overall perspective of performance at all points of the process.

At the client, a number of interesting performance patterns began to emerge. Our principle test was the reading of all of the files in a 10-GB directory. This directory would also serve as the source of data for our tape backup test with NetVault.



We measured data throughput performance reading files and directories at the client server. Reading files, NFS demonstrated a 2-to-1 advantage and SFU shares held a 5% edge over DiskShare.



In addition to measuring data throughput on reads at the client, we measured back-end disk throughput for the Windows server coming from the FC disk array. While Ethernet-based client I/O exhibited an edge for SFU, overall back-end throughput for DiskShare and SFU was virtually identical.

With shares exported using either DiskShare or SFU, NFS at the client proved to be roughly twice as fast as using Samba with a CIFS volume.

NFS throughput averaged about 48MB per second versus 25MB per second with Samba. This was mirrored precisely at the back end where we were able to measure data throughput more accurately.

Equally interesting, we observed far greater variation in instantaneous throughput using NFS. The highest instantaneous throughput was measured with NFS accessing a volume exported via DiskShare. In this case throughput often reached peaks of 80MB per second. Average overall



File and directory writes proved to be a serious problem for NFS with SFU shares. For most of the data transfer process, directory writes proceeded at a glacial 3-to-5MB per second.

throughput at the backend, however, was identical. Measured at the front end as Ethernet traffic at the client, however, SFU had a consistent 5% advantage in throughput. We postulate that SFU might be gaining that very slight advantage through its handling of the NT cache.

The tables turned dramatically, however, when it came to writing that

Performance Measurements

same directory structure to the NFS volume. In these tests, using Samba to write the files to a CIFS share proved to have a slight throughput advantage when compared to the throughput measured using NFS and a volume exported via DiskShare.

Once again NFS throughput showed far greater swings. We measured peak throughput reaching 95MB per second at the logical disk on the Fibre Channel storage server. This is the range that our benchmark would consistently measure; however, our benchmark bypasses a lot of overhead that a normal user I/O process would encounter.

> Using NetVault, we were able to backup the Windows server over NFS mount points. Performance using DiskShare and SFU was comparable; however, the need to run as root uncovered user-mapping issues with SFU.



Nonetheless, throughput when writing a single large file using NFS to a DiskShare volume was nearly identical to that measured using Samba

and a CIFS share. It appears that there is more of an overhead burden when writing directory structures using NFS than when writing a file.

In contrast, writing files using NFS and an SFU share was significantly slower than Samba. It was when writing full directories; however that the NFS and SFU combo turned glacial. While writing all of the files in our directory tree, throughput was often in the 3-to-5MB per second range. That level of throughput relegates the use on SFU exported shares to 'read mostly' if not 'read only' scenarios.

The implication of our directory and file test results is clear: For a Linux-based backup-server scenario, using NFS mounts incurs very minimal overhead. As a result, it is possible to perform network backups of a Windows server without involving special clients or extra licenses.

To confirm this observation, we configured a series of backup jobs with NetVault, which supports the ability to back up files over NFS mounts as a standard feature. When we ran the backup jobs on shares exported by both DiskShare and SFU, we monitored throughput at both the application and at the back end on nStor Fibre Channel port.

Throughput directly mirrored what we had measured in disk-to-disk tests. Once again we saw large swings in I/O throughput with peaks hitting 88MB per second using DiskShare. Over multiple tests, average throughput consistently fell in a tight range centered on 46 MB per second. That kind of performance is typical of a direct attached RAID array.

# Conclusions

"From the total capital costs associated with our SMB scenario, we see that hardware costs for server-based storage reach an inflection point at 1TB. At this point, simple acquisition costs mitigate in favor of implementing a SAN."

Clearly for Gigabit Ethernet server-to-server file I/O traffic between UNIX/Linux servers and Windows Server 2003, the performance choice is to put NFS on Windows rather than utilize CIFS. When it comes to putting NFS on Windows there are then two choices: Microsoft Services

for UNIX and DiskShare.

For ease of installation and configuration, however, there is only one choice. While we encountered no problems setting up file sharing with DiskShare, a number of critical issues surfaced with SFU. The problems were amplified by the consistent behavior to simply fail without providing any feedback. In particular we encountered such incidents when mapping multiple Linux users to the same Windows user and when using NIS without a Windows domain. Equally troubling was the inability to provide root access while using NIS.

Write performance with NFS shares via SFU was abysmal. Writing files was considerably slower when using an SFU share. Writing directory trees often crawled at 3MB per second.

On the other hand, write performance using a DiskShare exported volume was at a par with CIFS exported volumes. More importantly, read throughput was twice that of the CIFS share accessed with Samba. As a result, we were able to backup the Windows server over NFS/DiskShare mounts without special client software at a throughput rate that rivaled the throughput of local files.

# EXHIBIT 17
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN

Executive Briefs          Client Case Studies



**CLIENT:**

The **IBM** name is synonymous with information technology leadership in all things hardware and software. One key strategy traversing all of IBM's product lines and areas of competency is to fully leverage the power of Web-based publications.

**CHALLENGE:**

- Capitalize on a $1 billion-dollar investment in the Linux operating system.
- Build a community of C-level executives looking to leverage IT investments through server consolidation and virtualization.
- Build awareness of Power Architecture for end users and potential electronics partners looking for a "System On a Chip"
- Leverage a wealth of technical product specs, press releases, webcasts, market research surveys.

**SOLUTION:**

With content created by *open***Bench Labs**, we developed four online newsletters for IBM. The first needed to engage CIOs as to the merits and paybacks of using Linux, virtualization, and IT Service Management.

**PAYBACK:**

Working with with *open***Bench Labs'** team of technologists who understand IBM's products, and can can work autonomously with little supervision, IBM was able to grow the circulations of Tivoli Beat and the Linux Line, and take the Virtualization View newsletter from concept to distribution in only four weeks.

# EXHIBIT 18
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN

# Jack Fegreus

Owner, openBench Labs

Greater Boston Area

| | |
|---|---|
| **Current** | • **CEO at openBench Labs (Sole Proprietorship)**<br>• **CTO at Strategic Communications** |
| **Past** | • Editorial Director at Andover Net/Open Magazine<br>• Editor in Chief at Pennwell/Data Storage<br>• Editorial Director at BackOffice Magazine<br><div align="right">3 more...</div> |
| **Education** | • Clark University |
| **Connections** | **19** connections |
| **Industry** | Information Technology and Services |
| **Websites** | • <u>My Company</u> |

# Jack Fegreus's Experience

### CEO
**openBench Labs (Sole Proprietorship)**
(Sole Proprietorship; Information Technology and Services industry)
January 2007 — Present (1 year 3 months)

### CTO
**Strategic Communications**
(Information Technology and Services industry)
April 2001 — Present (7 years)

### Editorial Director
**Andover Net/Open Magazine**
(Publishing industry)
January 2000 — April 2001 (1 year 4 months)

**Editor in Chief**
**Pennwell/Data Storage**
(Publishing industry)
June 1999 — January 2000 (8 months)

**Editorial Director**
**BackOffice Magazine**
(Information Technology and Services industry)
1994 — 1999 (5 years)

**Editorial Director**
**Pennwell/BackOffice Magazine**
(Publishing industry)
May 1995 — April 1999 (4 years)

**Editorial Director**
**Cahners/Client/Server Today**
(Publishing industry)
January 1994 — May 1995 (1 year 5 months)

**Editorial Director**
**Ziff Davis/Digital Review**
(Publishing industry)
May 1984 — January 1994 (9 years 9 months)

# Jack Fegreus's Education

**Clark University**
PhD, Mathematics

## Additional Information

**Jack Fegreus's Websites:**

My Company

# EXHIBIT 19
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN



# The Commonwealth of Massachusetts
## William Francis Galvin

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, MA 02108-1512
Telephone: (617) 727-9640

### *BPC GROUP, INC.* Summary Screen

Help with this form

| Request a Certificate |

**The exact name of the Domestic Profit Corporation:** BPC GROUP, INC.

**The name was changed from:** BOSTON PUBLISHING CO., INC. **on** 12/18/1991

**Entity Type:** Domestic Profit Corporation

**Identification Number:** 042858456

**Old Federal Employer Identification Number (Old FEIN):** 000218803

**Date of Organization in Massachusetts:** 03/05/1985

**Date of Involuntary Dissolution:** 08/31/1998

**Current Fiscal Month / Day:** 12 / 31          **Previous Fiscal Month / Day:** 00 / 00

**The location of its principal office in Massachusetts:**
No. and Street:   314 DARTMOUTH ST.
City or Town:   BOSTON        State: MA     Zip: 02116    Country: USA

**If the business entity is organized wholly to do business outside Massachusetts, the location of that office:**
No. and Street:
City or Town:        State:     Zip:     Country:

**Name and address of the Registered Agent:**
Name:
No. and Street:
City or Town:        State:     Zip:     Country:

**The officers and all of the directors of the corporation:**

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code | Expiration<br>of Term |
|---|---|---|---|
| PRESIDENT | ROBERT J. GEORGE | 314 DARTMOUTH ST.,<br>BOSTON, MA USA<br>314 DARTMOUTH ST.,<br>BOSTON, MA USA | |
| TREASURER | ROBERT J. GEORGE | 314 DARTMOUTH ST.,<br>BOSTON, MA USA<br>314 DARTMOUTH ST.,<br>BOSTON, MA USA | |

Case 1:07-cv-02242-JR    Document 23-25    Filed 03/12/2008    Page 3 of 3

| SECRETARY | RONALD GARMEY | 314 DARTMOUTH ST., BOSTON, MA USA 314 DARTMOUTH ST., BOSTON, MA USA | |

**business entity stock is publicly traded:** __

**The total number of shares and par value, if any, of each class of stock which the business entity is authorized to issue:**

| Class of Stock | Par Value Per Share Enter **0** if no Par | Total Authorized by Articles of Organization or Amendments *Num of Shares*     *Total Par Value* | Total Issued and Outstanding *Num of Shares* |
|---|---|---|---|
| No Stock Information available online. Prior to August 27, 2001, records can be obtained on microfilm. | | | |

__ Consent          **X** Manufacturer          __ Confidential Data          __ Does Not Require Annual Report

**X** Partnership          __ Resident Agent          **X** For Profit          __ Merger Allowed

**Note: There is additional information located in the cardfile that is not available on the system.**

**Select a type of filing from below to view this business entity filings:**

ALL FILINGS
Administrative Dissolution
Annual Report
Application For Revival
Articles of Amendment

View Filings          New Search

| Comments |
|---|

© 2001 - 2008 Commonwealth of Massachusetts
All Rights Reserved

Help

# EXHIBIT 20
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN



# The Commonwealth of Massachusetts
## William Francis Galvin

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, MA 02108-1512
Telephone: (617) 727-9640

**BOSTON PUBLISHING COMPANY, INC.** Summary Screen

Help with this form

Request a Certificate

The exact name of the Domestic Profit Corporation: BOSTON PUBLISHING COMPANY, INC.

The name was changed from: BOSTON PUBLISHING CO., INC. on 2/25/1992
The name was changed from: MUSEUM PUBLICATIONS OF AMERICA on 12/18/1991

Entity Type: Domestic Profit Corporation

Identification Number: 043069829

Old Federal Employer Identification Number (Old FEIN): 000319392

Date of Organization in Massachusetts: 12/04/1989

Date of Involuntary Dissolution: 08/31/1998

Current Fiscal Month / Day: 12 / 31          Previous Fiscal Month / Day: 00 / 00

The location of its principal office in Massachusetts:
No. and Street: 306 DARTMOUTH ST.
City or Town: BOSTON          State: MA          Zip: 02116          Country: USA

If the business entity is organized wholly to do business outside Massachusetts, the location of that office:
No. and Street:
City or Town:          State:          Zip:          Country:

Name and address of the Registered Agent:
Name:
No. and Street:
City or Town:          State:          Zip:          Country:

The officers and all of the directors of the corporation:

| Title | Individual Name<br>First, Middle, Last, Suffix | Address (no PO Box)<br>Address, City or Town, State, Zip Code | Expiration<br>of Term |
|---|---|---|---|
| PRESIDENT | ROBERT J. GEORGE | 138 FARM RD.,<br>SHERBORN, MA USA<br>138 FARM RD.,<br>SHERBORN, MA USA | |

| TREASURER | ROBERT J. GEORGE | 138 FARM RD., SHERBORN, MA USA 138 FARM RD., SHERBORN, MA USA | |
| SECRETARY | RONALD GARMEY | HUTCHINS & WHEELER 101 FEDERAL ST., BOSTON, MA USA HUTCHINS & WHEELER 101 FEDERAL ST., BOSTON, MA USA | |

**business entity stock is publicly traded:** __

**The total number of shares and par value, if any, of each class of stock which the business entity is authorized to issue:**

| Class of Stock | Par Value Per Share Enter **0** if no Par | Total Authorized by Articles of Organization or Amendments *Num of Shares    Total Par Value* | Total Issued and Outstanding *Num of Shares* |
| --- | --- | --- | --- |
| No Stock Information available online. Prior to August 27, 2001, records can be obtained on microfilm. | | | |

| **X** Consent | **X** Manufacturer | __ Confidential Data | __ Does Not Require Annual Report |
| **X** Partnership | __ Resident Agent | **X** For Profit | __ Merger Allowed |

**Select a type of filing from below to view this business entity filings:**

ALL FILINGS
Administrative Dissolution
Annual Report
Application For Revival
Articles of Amendment

View Filings    New Search

Comments

© 2001 - 2008 Commonwealth of Massachusetts
All Rights Reserved

?
Help

# EXHIBIT 21
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN



# The Commonwealth of Massachusetts
# William Francis Galvin

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, MA 02108-1512
Telephone: (617) 727-9640

**BPC PUBLICATIONS, INC.** Summary Screen

Help with this form

> Request a Certificate

The exact name of the Domestic Profit Corporation: BPC PUBLICATIONS, INC.

Entity Type: Domestic Profit Corporation

Identification Number: 000474567

Old Federal Employer Identification Number (Old FEIN): 000000000

Date of Organization in Massachusetts: 08/26/1994

Date of Involuntary Dissolution: 08/31/1998

Current Fiscal Month / Day: 12 / 31          Previous Fiscal Month / Day: 00 / 00

The location of its principal office in Massachusetts:
No. and Street:   138 FARM RD.
City or Town:   SHERBORN          State: MA          Zip: 01770          Country: USA

If the business entity is organized wholly to do business outside Massachusetts, the location of that office:
No. and Street:
City or Town:          State:          Zip:          Country:

Name and address of the Registered Agent:
Name:
No. and Street:
City or Town:          State:          Zip:          Country:

The officers and all of the directors of the corporation:

| Title | Individual Name First, Middle, Last, Suffix | Address (no PO Box) Address, City or Town, State, Zip Code | Expiration of Term |
|---|---|---|---|
| PRESIDENT | ROBERT J. GEORGE | 138 FARM RD., SHERBORN, MA 01770 USA 138 FARM RD., SHERBORN, MA 01770 USA | |
| TREASURER | ROBERT J. GEORGE | 138 FARM RD., SHERBORN, MA 01770 USA 138 FARM RD., SHERBORN, MA 01770 USA | |

| SECRETARY | ROBERT J. GEORGE | 138 FARM RD., SHERBORN, MA 01770 USA 138 FARM RD., SHERBORN, MA 01770 USA | |

**business entity stock is publicly traded:** __

**The total number of shares and par value, if any, of each class of stock which the business entity is authorized to issue:**

| Class of Stock | Par Value Per Share Enter **0** if no Par | Total Authorized by Articles of Organization or Amendments *Num of Shares        Total Par Value* | Total Issued and Outstanding *Num of Shares* |
|---|---|---|---|
| No Stock Information available online. Prior to August 27, 2001, records can be obtained on microfilm. | | | |

| __ Consent | **X** Manufacturer | __ Confidential Data | __ Does Not Require Annual Report |
|---|---|---|---|
| **X** Partnership | __ Resident Agent | **X** For Profit | __ Merger Allowed |

**Select a type of filing from below to view this business entity filings:**

ALL FILINGS
Administrative Dissolution
Annual Report
Application For Revival
Articles of Amendment

View Filings     New Search

| Comments |
|---|
| |

© 2001 - 2008 Commonwealth of Massachusetts
All Rights Reserved

? Help

# EXHIBIT 22
# TO
# AFFIDAVIT OF BRIGHAM J. BOWEN

# CCI Can Help You Control Your Message and Deliver It to a Targeted Audience Using Virtually Any Medium



"CCI is unique, providing the highest quality edit and design,
supported by extensive in-house technology."
Ken Godfrey, Manager, IBM Linux Marketing

**Welcome to Custom Communications (CCI).** Our website will show you how we create newsletters, magazines, books, online publications, websites, direct mail and other database-driven programs for a host of clients in a wide range of markets. Companies in financial services, healthcare, utility, high-tech and other industries use our programs to target and communicate with their customers, prospects, employees, shareholders and others.

CCI is a full-service communications provider. We handle everything from program development, edit, art and design through print, circulation, distribution and database management.

⊙ Maximize

With CCI, you can outsource your communications to a company that knows publishing and direct marketing and can execute programs based on your objectives. We can produce higher quality communications for less money

than it would take to produce these programs in-house.

Keep exploring this site and you'll find that CCI has all the tools to develop a program that fits your company's needs. Or contact us for more information.



Custom Communications
info@CustomCommunications.com
1-800-872-8122

For more information, or to receive a copy of our booklet, click here.

Please visit other CCI websites at:
OpenMagazine.net | BostonPublishing.com |
VietnamExperience.com

3/4/2008 8:10 PM

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| COLE, RAYWID & BRAVERMAN, LLP | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 07-CV-2242-JR |
| v. | ) | |
| | ) | |
| ROBERT J. GEORGE, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |

**[PROPOSED] ORDER**

Before the Court are two motions: the motion of Defendant Custom Communications International, Inc. to dismiss the Amended Complaint, filed pursuant to Fed. R. Civ. P. 12(b)(6); and the motion of Defendants StratComm, Inc., Strategic Communications, Inc., Custom Communications, LLC, and Boston Publishing Company, Inc., to dismiss the Amended Complaint, filed pursuant to Fed. R. Civ. P. 12(b)(2). Plaintiff has also filed a cross-motion for jurisdictional discovery in the alternative to denial of the motions to dismiss. Upon consideration of the motions, the opposition thereto, and the record of this case, it is this __ day of March, 2008, hereby

**ORDERED** that the motions to dismiss are **DENIED**. Plaintiff's cross-motion, accordingly, is **DENIED AS MOOT**.

_____
James Robertson
United States District Judge